## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| POPTECH, L.P., individually, and on behalf of a class of others similarly situated, | : | |
| | : | |
| Plaintiff, | : | Civil Action no. 3:10-cv-967 (MRK) |
| | : | |
| v. | : | <u>Jury Trial Demanded</u> |
| | : | |
| STEWARDSHIP CREDIT ARBITRAGE FUND, LLC; STEWARDSHIP INVESTMENT ADVISORS, LLC; ACORN CAPITAL GROUP, LLC; MARLON QUAN; GUSTAV E. ESCHER, III: PAUL SEIDENWAR; and ROBERT BUCCI, | : : : : : | |
| | : | |
| Defendants. | : | December 13, 2010 |
| | : | |

## <u>AMENDED CLASS ACTION COMPLAINT</u>

SHEPHERD, FINKELMAN, MILLER
  & SHAH, LLP
James E. Miller (ct21560)
Patrick A. Klingman (ct17813)
Karen Leser-Grenon (ct23587)
65 Main Street
Chester, CT  06412
Telephone: (860) 526-1100
Facsimile: (860) 526-1120
Email: jmiller@sfmslaw.com
        pklingman@sfmslaw.com
        kleser@sfmslaw.com

SHEPHERD, FINKELMAN, MILLER
  & SHAH, LLP
Lesley E. Weaver
199 Fremont Street, 20th Floor
San Francisco, CA  94105
Telephone: (415) 992-7282
Facsimile: (415) 489-7701
E-mail: lweaver@sfmslaw.com

SHEPHERD, FINKELMAN, MILLER
  & SHAH, LLP
Scott R. Shepherd
Lawrence D. Berger
35 E. State Street
Media, PA  19063
Telephone: (610) 891-9880
Facsimile: (610) 891-9883
Email: sshepherd@sfmslaw.com
        lberger@sfmslaw.com

Attorneys for Plaintiffs

## TABLE OF CONTENTS

Page

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.     OVERVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

III.    JURISDICTION AND VENUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

IV.     PARTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  9

V.      BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

        A.      THE PRIVATE PLACEMENT MEMORANDUM AND
                OTHER ASSURANCES REGARDING INVESTING
                IN THE STEWARDSHIP FUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

        B.      THE PETTERS' PONZI SCHEME – BY FAR, THE FUND'S
                LARGEST "ASSET" – COMPRISING ALMOST 70% OF
                THE FUND'S "INVESTMENTS" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

        C.      DEFENDANTS' OFF-SHORE FUND LIABILITIES . . . . . . . . . . . . . . . .  33

        D.      THE STEWARDSHIP FUND'S OTHER INVESTMENTS
                WERE ALSO BASED ON FRAUDULENT REPRESENTATIONS,
                THEREBY CONFIRMING DEFENDANTS' WILLINGNESS
                TO TURN A BLIND EYE TO "RED FLAGS" WHILE THEY
                EARNED FEES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  36

VI.     THE CLASS PERIOD STATEMENTS OF ADVISORS AND QUAN . . . . . . . .  39

        A.      THE STATEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

        B.      DEFENDANTS OMIT THAT NO DUE DILIGENCE HAS BEEN
                CONDUCTED PRIOR TO ENTERING INTO THE NOVEMBER
                2004 INITIAL CREDIT AGREEMENT . . . . . . . . . . . . . . . . . . . . . . . . . .  48

        C.      DEFENDANTS OMIT THAT THEY HAVE FAILED TO MONITOR
                AND ENFORCE COMPLIANCE WITH THE LOAN AGREEMENTS
                AND LOAN PERFORMANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  51

VII.    ADDITIONAL SCIENTER ALLEGATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . .  60

**VIII.    CLASS ACTION ALLEGATIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  68

**IX.       ALTER EGO ALLEGATIONS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  70


**COUNT I     VIOLATION OF SECTION 10(b) OF THE EXCHANGE
                 ACT AND RULE 10b-5 THEREUNDER
                 (Against Stewardship Fund, Advisors, Acorn and Quan)** . . . . . . . . . . . . . .  73

**COUNT II    VIOLATION OF SECTION 20(a) OF THE EXCHANGE
                 ACT
                 (Against Advisors, Acorn, Quan, Seidenwar and Bucci)** . . . . . . . . . . . . . .  78

**COUNT III   VIOLATION OF THE CONNECTICUT UNIFORM
                 SECURITIES ACT
                 (Against Stewardship Fund, Advisors, Acorn and Quan)** . . . . . . . . . . . . . .  79

**COUNT IV    AIDING AND ABETTING THE VIOLATION OF THE
                 CONNECTICUT UNIFORM SECURITIES ACT
                 (Against Advisors, Acorn, Quan, Seidenwar, Bucci and Escher)** . . . . . . . .  81


**JURY DEMAND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  86

## I.   **INTRODUCTION**

Lead Plaintiff, Poptech, L.P., together with Plaintiffs and proposed Class Representatives Terence Isakov, M.D. and William A. Meyer (collectively, "Plaintiffs"), on their own behalf and on behalf of all other similarly situated investors who became members in Defendant, Stewardship Credit Arbitrage Fund, LLC ("Stewardship Fund" or the "Fund"), converted interests or otherwise invested in the Fund between February 6, 2006 and September 25, 2008 (the "Class Period"), for their claims against Defendants, the Stewardship Fund, Stewardship Investment Advisors, LLC ("Advisors"), Acorn Capital Group, LLC ("Acorn"), Marlon Quan ("Quan"), Gustav E. Escher, III ("Escher"), Paul Seidenwar ("Seidenwar") and Robert M. Bucci ("Bucci") (collectively, "Defendants"), allege the following upon knowledge as to themselves and their own acts and, as to all other matters, based upon the investigation made by and through their attorneys, which included the following:

(1)     an examination and review of correspondence and promotional materials provided by Defendants relating to the Stewardship Fund, as well as public filings of Advisors and other entities with the United States Securities and Exchange Commission ("SEC");

(2)     the review and analysis of pleadings and/or other submissions in the following actions: *United States v. Thomas J. Petters, et al.*, No. 08-cr-00364 (RHK/AJB) (D. Minn.) ("*Petters* criminal action"); *United States v. Thomas J. Petters, et al.*, No. 08-cv-05348 (ADM/JSM) (D. Minn.) ("*Petters* civil injunction action"); *U.S. Securities & Exchange Commission v. Thomas J. Petters, et al.*, No. 09-cv-01750 (ADM) (D. Minn.) ("*Petters* SEC action"); *Stoebner, etc. v. Acorn Capital Group, LLC, etc.*, ADV. No. 09-4031 (GFK) (Bankr. D. Minn.) ("*Polaroid-Acorn* adversary proceeding"), brought in connection with *In re Polaroid*

*Corp., et al.*, No. 08-46617 (GFK) (Bankr. D. Minn.); *Kelley, etc. v. Acorn Capital Group, LLC, et al.*, No. 10-04441 (GFK) (Bankr. D. Minn.) ("*Petters-Acorn* adversary proceeding"), brought in connection with *In re Petters Company, Inc., et al.*, No. 08-45257 (GFK) (Bankr. D. Minn.); *Acorn Capital Group LLC v. Wedbush Morgan Securities, et al.*, No. C 06-01674-JSW (N.D. Cal.) ("*Wedbush* action"); *SSR Capital Partners, LP, et al. v. ArrowHead Capital Partners II, LP, et al.*, No. DC-09-08239 (H-160th Jud. Dist., Dallas Cty. (TX)) ("*ArrowHead* (TX) action"); *Sovereign Bank v. ACG II, LLC, et al.*, No. 3:08-cv-1600 (WWE) (D. Conn.) ("*Sovereign Bank* (CT) action"); *BNY AIS Nominees Limited, et al. v. Quan, et al.*, No. 3:08-cv-00796 (AWT) (D. Conn.) ("*Gottex* (CT) action"); and *BNY AIS Nominees Limited, et al. v. Stewardship Credit Arbitrage Fund, Ltd.*, 2008: No. 266 (Comm. Ct. – Bermuda S.Ct.) ("*Gottex* (Bermuda) action"); and

(3)     interviews with a number of former employees (identified herein as confidential witnesses) of the Fund, Advisors and/or Acorn, as well as the review of certain published reports, news articles and other materials relating to, *inter alia*, Thomas J. Petters ("Petters").

Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## II.   OVERVIEW

1.     This is a case about a group of Defendants that created investment entities and vehicles, solicited the placement of funds from investors in return for the promise of strong returns that were backed by the security of hard assets, and then knowingly placed the funds of their clients (*i.e.*, the Class) in fraudulent investment schemes that, in whole or in part, effectively amounted to Ponzi schemes.  The evidence will show that, while Defendants marketed their

investment acumen and the due diligence that they performed on behalf of their clients before investing client funds, in reality, Defendants engaged in virtually no due diligence at all, while (a) voluntarily waiving Defendants' own contractual and other legal rights that would have provided additional security to Defendants' clients, and (b) deliberately ignoring and affirmatively avoiding the discovery of facts staring them in the face that they had placed their clients' funds in fraudulent investments. The facts detailed below, taken together, lead to only one logical conclusion and only one plausible inference: Defendants knew that they were placing their clients' funds in fraudulent and highly speculative investments with inadequate security to protect their clients but deliberately chose to continue to so invest their clients' funds because (a) Defendants could only continue to attract investors by offering high returns based upon these fraudulent investments, and (b) Defendants wanted to continue to earn the lucrative fees and income associated with operating their fraudulent business enterprise, with the hope that the fraud to which they had knowingly exposed their clients would not be uncovered. At the very minimum, as detailed below, the facts establish that Defendants also turned a blind eye and literally "buried their heads in the sand" to avoid gaining specific knowledge of the fraudulent investments in which they were engaging, all so that they could continue to perpetrate their investment scheme and earn fees/income. Any suggestion or argument to the contrary by Defendants is patently absurd.

       2.      The facts and, indeed, the evidence at trial will show that a pre-Class Period investment by Defendants (involving the Inn at Chester in Chester, Connecticut) turned out to be fraudulent in nature and supported by fictitious and fraudulently documented assets and supposed security. Defendants followed this "investment," in which the total sum invested was lost, by

investing virtually all of the Class' funds in, among other things, fraudulent loans to Petters (Minnesota's own version of Bernard Madoff) that were secured by fictitious and fraudulently documented assets and supposed security (accounting for almost 70% of the Fund's holdings), and in loans related to jewelry (accounting for almost 18% of the Fund's holdings) that, again, were secured by fictitiously overvalued jewelry and fraudulently documented assets and supposed security.

3.      It defies credulity to believe that Defendants were simply unlucky enough to happen to only invest in fraudulent schemes.  That is especially true because the facts of record establish that Defendants were literally staring at facts and evidence pointing to the fraudulent nature of the Class Period investments and deliberately waived contractual and other legal rights that would have resulted in the fraud being discovered.  As a direct and proximate result of Defendants' misconduct (specifically the failure and refusal to disclose that no due diligence was being exercised on behalf of the Class, that the performance of the loans that comprised the majority of the Fund's investments were not being monitored and that Defendants were ignoring their own contractual rights to create and/or maintain security in the Fund's investments -- even though, at all pertinent times, Defendants had duties to disclose these facts), as detailed below, Plaintiffs and the Class suffered severe economic damages.  As explained below, Plaintiffs are entitled to prevail with respect to their powerful claims of violations of the federal securities laws, as well as under state law.

4.      As noted above, this action seeks recovery on behalf of Plaintiffs and other investors in the Stewardship Fund for Defendants' violations of federal and state securities laws. Simply, Plaintiffs' claims are based upon Defendants' material omissions throughout the Class

Period and their callous and deliberate decision to keep Plaintiffs and the Class ignorant of how the Fund's assets were actually being invested and the manner in which those assets were being "safeguarded."  The Fund's name is particularly ironic because although "stewardship" is defined as the act of "careful and responsible management of something entrusted to one's care," Defendants' actions (and their failures to act with respect to the Fund and its investments) amounted to the exact opposite of those of any steward.

5.      As explained more fully below, the Stewardship Fund was created by Quan for the purpose of purchasing loans originated exclusively by Acorn (another limited liability company created by Quan, and controlled by him, Seidenwar and Bucci), which purportedly was a finance company and loan originator specializing in asset-based lending that shared offices with the Fund, with Advisors (yet another entity controlled by Quan) as the Fund's managing member. As such, the Fund, Advisors and/or Acorn had a duty to advise and inform the Fund's members (*i.e.*, Plaintiffs and other members of the proposed Class) of material information and developments, and/or correct and update such information.  Because Quan, together with Seidenwar and Bucci, also controlled Acorn and had an apparent conflict of interest (since they were on all sides of each deal), Escher was installed as a nominal "Independent Manager" with responsibility to independently evaluate any transaction between Acorn and the Fund.  In fact, Escher (a friend and former colleague of Quan) also was conflicted because he was a director of one or more related entities, including the Off-Shore Fund (defined below) and Livingston Acres, LLC.  Despite his duties and title as "Independent Manager," in recognition of his conflicted role, Escher never engaged in any independent evaluation or investigation of any transaction between Acorn and the Fund.  Indeed, upon information and belief, Escher never challenged or voiced any

objection to any transaction foisted upon the Fund by Acorn.

6.     Unbeknownst to Plaintiffs and other Class members, a substantial majority of loans owned by the Fund were with entities controlled by Petters, a well-known Minnesota-based entrepreneur and, as Plaintiffs and the Class subsequently learned, a convicted felon, who had orchestrated a massive Ponzi scheme involving billions of dollars.  In connection with surveillance conducted by federal authorities shortly before Petters' October, 2008 arrest, he was recorded commenting that "the only due diligence [lenders] want is a check or a wire transfer." As if to prove Petters right, Defendants, in fact, performed no due diligence regarding the loans made to the entities controlled by Petters and never verified that the loan proceeds were actually used to purchase the merchandise that was supposed to serve as the collateral for the loans, or even determined whether the collateral existed.

7.     In deliberate disregard of the obligations of the Fund, Advisors, Acorn, Quan, Seidenwar and Bucci to the proposed Class, and/or with the active assistance of all Defendants (other than the Fund), Defendants omitted from periodic communications issued during the Class Period (including the communications that resulted in Plaintiffs and members of the Class acquiring their Class Period interests in the Fund) any mention of: (i) the failure to conduct due diligence regarding the Fund's investments with Petters' entities, as well as other loans purchased from Acorn; (ii) the failure to monitor the performance of those loans and/or the condition of collateral that was intended to secure these loans; and (iii) the failure to insist that terms of the loan agreements (including "Lockbox" arrangements and the provision of audited financial statements and tax returns), ostensibly included to afford more protection to the Fund, were actually followed.

8.    Defendants acted with scienter, in that they consciously knew of, or were shockingly reckless in failing to recognize, facts that contradicted their public statements when they had access to such information.  At a minimum, Defendants failed to review or check information that they had a duty to monitor, and intentionally ignored obvious signs of fraud. Indeed, as reflected in the allegations asserted in the *Wedbush* action (involving the Inn at Chester and discussed fully below), Defendants were all too familiar with doctored financial documents and fraudulently procured loans and, under the maxim "once burnt, twice shy," it is both unbelievable and highly implausible that they could have permitted themselves to be defrauded again in exactly the same way on multiple, additional occasions.  Simply put, it is much more likely that Defendants all knew about or suspected the fraud and were motivated to deliberately avoid investigating obvious "red flags" in order to continue reaping the fees and charges generated by the Fund, Advisors and Acorn.

9.    In the wake of the discovery of Petters' far-reaching fraud and Defendants' extensive involvement in that fraud, perhaps not surprisingly, several courts are currently considering claims brought against Advisors, Acorn, Quan or other related parties.  For instance, in December, 2008, the Commercial Court division of Bermuda's Supreme Court, rejecting the legal arguments and testimony of, *inter alia*, Quan and Escher, ordered that Stewardship Credit Arbitrage Fund, Ltd. (the "Off-Shore Fund"), which is affiliated with the Stewardship Fund under common ownership and control, be placed under the direction and control of provisional liquidators.  In addition, a motion for summary judgment as to whether, *inter alia*, Acorn's acquisition of an interest in the assets of Polaroid Corporation ("Polaroid") (purchased by Petters with the proceeds of his fraud) was done in good faith, is currently pending before the

Bankruptcy Court for the District of Minnesota in connection with the *Polaroid-Acorn* adversary proceeding (although the parties indicated in a November 19, 2010 filing that they had "tentatively reached a global settlement of all matters relating to Acorn in this and related cases," the terms of which are currently unknown to Plaintiffs).  In the same courthouse, the court-appointed Trustee of the Petters' companies recently initiated the *Petters-Acorn* adversary proceeding, asserting claims against Advisors and Acorn for preferential and fraudulent transfers.  As another example, the *Sovereign Bank* (CT) action, in which Sovereign Bank asserts claims against Advisors, Acorn and Quan for, *inter alia*, fraudulent misrepresentations arising from a defaulted loan agreement, is currently pending in this District.  Moreover, there are several individual actions against some of the Defendants pending in courts throughout the country, as well as a shareholder derivative action pending in Connecticut Superior Court.  However, upon information and belief, this is the only action seeking redress under the securities laws for investors in the Fund.

      10.    Independent of the Petters' fraud, Acorn, or its post-Class Period successor, Asset Based Resource Group, LLC (of which Seidenwar is president), is currently pursuing several actions arising from their failed due diligence, including *Stewardship Credit Arbitrage Fund LLC, et al. v. Charles Zucker Cultured Pearl Corp., et al.*, No. 600634/2010 (Sup. Ct. N.Y. County) (the "*Zucker* action"), in which Acorn alleges it was defrauded regarding the value of jewelry that was supposed to serve as collateral for over $50 million in loans.

### III.    <u>JURISDICTION AND VENUE</u>

      11.    This Court has jurisdiction over the subject matter of this action under the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, and 28 U.S.C. §1331.

The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and the rules and regulations promulgated thereunder by the SEC, including Rule 10b-5, 17 CFR § 240.10b-5.  The Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over all remaining state law-based claims asserted herein.

12.     The interests in the Stewardship Fund purchased or acquired by Plaintiffs during the Class Period constitute investment contracts and are "securities" pursuant to Section 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10), in that they constitute investments in a common enterprise from which the interest owners were to receive profits solely from the efforts of the Managing Member (Advisors and, ultimately, Quan).  The interests in the Fund are not "covered securities" as defined by 15 U.S.C. § 77r(b).

13.     Venue is proper in this judicial district pursuant to the provisions of the Exchange Act and 28 U.S.C. § 1391(b).  Some or all of the Defendants have principal offices located in this district, and many of the acts and transactions giving rise to the violations of law complained of herein, including the dissemination and receipt of false and misleading information to the investing public, occurred in this judicial district.

14.     In connection with the acts, conduct and violations of law detailed herein, Defendants, at all relevant times, directly and indirectly, utilized the means and instrumentalities of interstate commerce, including the mails and telephone communications.

## IV.   PARTIES

15.     Lead Plaintiff, Poptech, L.P. ("Poptech"), is a Delaware limited partnership, and its sole general partner, Poptech, LLC, is also a Delaware limited liability company, with its principal place of business in Florida.  In January, 2005, pursuant to a September 1, 2004

Confidential Private Placement Memorandum (the "9/1/04 PPM"), Poptech initially acquired

Class "P" interests in the Stewardship Fund, thereby becoming a "member" of the Fund.  During

the Class Period, in continued reliance on the representations contained in the 9/1/04 PPM and

Defendants' related omissions regarding, *inter alia*, the due diligence and continued monitoring

to be conducted of the Fund's investments, but in ignorance of the true state of the Fund's

investments, Poptech's interests were exchanged and converted for Class "A" interests of the

Fund, and Poptech has been severely damaged thereby.  Poptech's Certification was submitted in

connection with the June 18, 2010 Complaint commencing this action, as well as the Poptech

Group's August 23, 2010 Motion for Appointment as Lead Plaintiff, and is incorporated herein

by reference.

        16.     Plaintiff and proposed Class Representative, Terence Isakov, M.D. ("Isakov"), is

an individual residing in Ohio.  Following his spouse's initial personal investment in the Fund in

2003, Isakov, as manager of the Isakov Family LLC, his family's investment vehicle, invested in

the Stewardship Fund in January, 2005.  On or about September 1, 2006, pursuant to a July 1,

2005 Confidential Private Placement Memorandum (the "7/1/05 PPM"), as a pre-existing

"member" of the Fund (through the Isakov Family LLC) and in reliance on the representations

contained therein and Defendants' related omissions regarding, *inter alia*, the due diligence and

continued monitoring to be conducted of the Fund's investments, Isakov acquired additional

Class "A" interests in the Stewardship Fund for his individual retirement account and has been

severely damaged thereby.  Isakov's Certification was submitted in connection with the Poptech

Group's August 23, 2010 Motion for Appointment as Lead Plaintiff, and is incorporated herein

by reference.

17.     Plaintiff and proposed Class Representative, William A. Meyer ("Meyer"), is an individual residing in Florida.  On or about June 1, 2007, pursuant to a May 1, 2006 Confidential Private Placement Memorandum (the "5/1/06 PPM") and in reliance on the representations contained therein and Defendants' related omissions regarding, *inter alia*, the due diligence and continued monitoring to be conducted of the Fund's investments, Meyer acquired Class "A" interests in the Stewardship Fund, thereby becoming a "member" of the Fund, and has been severely damaged thereby.  Meyer's Certification was submitted in connection with the Poptech Group's August 23, 2010 Motion for Appointment as Lead Plaintiff, and is incorporated herein by reference.

18.     The Stewardship Fund was created in 2001 and is organized as a limited liability company under the laws of Delaware, with its principal offices located in Greenwich, Connecticut.[1]  As of November, 2007, the Fund created two wholly-owned subsidiaries, Putnam Green LLC and Livingston Acres, LLC (the "Subsidiaries"), "to facilitate a leverage facility with AG Deutsche Zentral-Genossenschaftsbank Frankfurt Am Main ('DZ Bank')."  Quan is president of both Subsidiaries.  Upon information and belief, the Fund has no board of directors and is controlled and dominated by Quan, directly through Advisors, the Fund's Managing Member, and/or Acorn, which originated loans to third parties that the Fund was forced to purchase, and which was also controlled and dominated by Quan , as well as Seidenwar and Bucci.  During the

---

[1]The Stewardship Fund was affiliated with the Off-Shore Fund, which was organized as a mutual fund company under the laws of Bermuda in May, 2001.  Like the Stewardship Fund, Advisors acted as the Off-Shore Fund's investment advisor and the Off-Shore Fund purchased loans originated by Acorn.  However, unlike the Stewardship Fund, the Off-Shore Fund did have a board of directors, of which Quan and Escher were members.  Pursuant to an Order of the Bermuda Supreme Court, since late December, 2008, the Off-Shore Fund has been under the direction and control of court-appointed provisional liquidators.

Class Period, according to monthly statements and other information provided to Plaintiffs and other members of the proposed Class, the total assets under management by the Fund fluctuated between approximately $120 million and $160 million, and were likely higher for at least a portion of the Class Period.  Pursuant to the 9/1/04 PPM, the 7/1/05 PPM and the 5/1/06 PPM issued in connection with investing in the Fund (collectively, the "PPMs"), the terms of which did not materially differ during the Class Period, the required minimum initial contribution throughout the Class Period was $1 million, although subsequent contributions by existing "members" of the Fund could be in lesser amounts.  Among other things, prospective investors were required to attest that they were "accredited investors."  The PPMs and other communications from the Fund throughout the Class Period all omitted highly material facts (as detailed below) that rendered them false and misleading when issued and throughout the Class Period (because they never were corrected) and these material omissions caused Plaintiffs and the Class to suffer losses and damages.

19.     Advisors, also structured as a Delaware limited liability company, is the Managing Member of the Stewardship Fund, and its principal place of business also is in Greenwich, Connecticut, in the same offices as the Fund.  As Managing Member of the Fund, at all relevant times, Advisors managed and controlled the Stewardship Fund.  Advisors is also the investment manager of both the Fund and the Off-Shore Fund.   Advisors is an investment advisor and, as such, is registered with the SEC.  In connection therewith, Advisors is required to disseminate certain information on Form ADV to investors in the Stewardship Fund.  Among other things and at all relevant times, the Form ADV filed and disseminated by Advisors (the "Form ADV") explained that it provides "investment advisory services" to both the Stewardship

Fund and the Off-Shore Fund and, consistent with the PPMs, disclosed that "all or substantially all" of the loans originated and serviced by Acorn would be purchased by the Stewardship Fund and the Off-Shore Fund.  It never was disclosed by Advisors that substantially all of Acorn's investments were with Petters and Petters-related entities, that virtually all of Acorn's investments were fraudulent in nature or that Acorn systematically failed and refused to enforce existing contractual and other legal rights that would have immediately uncovered the fraudulent nature of these investments.  The Form ADV also identifies Advisors' principal executive officers as Quan, who was Advisors' Managing Member, and John Ruggiero, its Vice President and Chief Compliance Officer.

20.     Acorn, like the Fund and Advisors, was (a) created in 2001, (b) structured as a Delaware limited liability company, and (c) located in Greenwich, Connecticut, in the same offices as the Fund and Advisors.  Acorn was purportedly a finance company and loan originator specializing in asset-based lending, in which short-term financing would be provided to newer companies or companies with limited capital or financing options, as well as the subsequent servicing of such loans.  According to the complaint it filed in the *Wedbush* action (involving the Inn at Chester), "[a]s an experienced asset-based lender, Acorn fills the gap between traditional lenders and high-cost niche financing."  Upon information and belief, Acorn ceased operations on June 30, 2009, and has been succeeded for all intents and purposes by Asset Based Resource Group, LLC ("ABRG"), with offices in Stamford, Connecticut, and whose principals, Seidenwar and Mark Sullivan, were formerly members of Acorn's senior management team.  At all times relevant to these allegations, Acorn shared, *inter alia*, office space and personnel with Advisors and the Fund itself without regard for any corporate formalities.

21.     Quan is an individual resident of Connecticut.  Quan is the sole member of Advisors, and under Quan's control and direction, Advisors made all investment and trading decisions on behalf of the Stewardship Fund.  Quan was also the sole member and/or Managing Member of Acorn and, at all times relevant hereto, represented that he was Acorn's President and "owner."  According to the PPMs, "Quan effectively controls both Acorn and the [Stewardship Fund] through his ownership interests in [Advisors] and Acorn."  The PPM and other promotional materials emphasized Quan's "significant knowledge of credit, legal and accounting standards" gained through his public accounting and investment banking career (which included Donaldson, Lufkin & Jenrette, Artemis Capital Group, Inc. and Dain Rauscher, Inc.), all of which was supposedly directed toward advancing the financial success of the Fund – "[d]rawing from his understanding of credit concerns, risk mitigation and the need for structuring efficiencies, Mr. Quan has helped to reduce the overall costs of financing to borrowers and maximize returns to the investors."  Indeed, although prospective investors were warned that the Fund had "a limited prior operating history," they were assured that Quan had "extensive prior experience related to the [Fund's] principal investment strategy."  In fact, Quan operated Acorn, Advisors and the Fund for his own personal benefit to earn lucrative fees and income from each such entity while deliberately and recklessly placing the investments of Plaintiffs and the Class at significant risk.

22.     Escher is an individual residing in New Jersey.  Escher is currently the Managing Director of Bergen Capital, a division of Scott & Stringfellow, but during the Class Period, he was Vice President of New Jersey Public Finance at PNC Bank, in East Brunswick, NJ.  Prior to joining PNC Bank, he was affiliated with, *inter alia*, MERL Financial Group, Inc., and provided

financial advisory services in both the housing and governmental sectors.  Escher was a former colleague of Quan's at Artemis Capital/Dain Rauscher.  Pursuant to the PPMs, Escher was identified as an "independent manager" of the Fund, meaning that he was "neither affiliated with, nor has a direct or indirect material interest in any transaction of the [Fund], Acorn, Mr. Quan or any affiliate or service provider of the foregoing ... and that [he was] qualified to evaluate any transaction between Acorn and the [Fund]."  Notwithstanding these supposed conditions, during the Class Period, Escher served as one of four directors of the Off-Shore Fund, as well as a director of Livingston Acres, LLC, one of the Fund's Subsidiaries created in November, 2007.

23.     Seidenwar is an individual residing in New York.  He is currently President of ABRG, the successor-in-interest to Acorn.  During the Class Period, Seidenwar was President of Acorn, and previously served as Acorn's Chief Credit Officer.

24.     Bucci is an individual residing in Connecticut.  At all times relevant hereto, Bucci served as Chief Financial Officer of Acorn.

25.     As alleged herein, the Fund, Advisors and Acorn were alter egos of each other, and each was the alter ego of Quan.  Quan created, operated, dominated and controlled the Fund, Advisors and Acorn.  Moreover, either directly or through his control of Advisors or Acorn, Quan controls the Fund.  As alleged herein, the Fund, Advisors and Acorn were used by Quan to further an unfair, unjust or fraudulent purpose, and the continuing recognition of the Fund, Advisors and Acorn as entities separate and apart from each other and Quan would only serve to perpetuate the fraudulent or otherwise wrongful purposes for which they were created.  More specifically, the Fund, Advisors and Acorn operated as a single economic entity because, *inter alia*, each was grossly undercapitalized, each failed to observe corporate formalities in that

officers and employees were treated as interchangeable without regard for which entity was paying the employees' compensation and/or for the services being performed by these employees, and the roles of officers and employees at the Fund, Advisors and Acorn were not separate or distinct.  At all pertinent times, the Fund, Advisors and Acorn were effectively insolvent.  Quan created the Fund, Advisors and Acorn for his own personal benefit, and neither the Fund, Advisors nor Acorn ever paid any dividends or returns.  Quan dominated each to such an extent that the distinction between the Fund, Advisors and Acorn was merely a facade with Plaintiffs and the Class, at all times, being unwittingly duped by this charade.  In sum, the Fund, Advisors and Acorn existed to permit Quan to use those corporate forms to perpetuate his fraudulent investment scheme, and the failure to recognize the alter ego nature of the Fund, Acorn, Advisors and Quan would result in grave injustice and unfairness to Plaintiffs and the Class.

## V.   <u>BACKGROUND</u>

### A.   THE PRIVATE PLACEMENT MEMORANDUM AND OTHER ASSURANCES REGARDING INVESTING IN THE STEWARDSHIP FUND

26.    As a "hedge fund," the Stewardship Fund is an investment vehicle by which its members' "capital contributions" (*i.e.*, minimum initial investments of $1 million) are pooled to be collectively invested using a specific strategy.  Although the PPMs mentioned other types of investments, the Stewardship Fund's primary investment strategy was purportedly asset-based lending ("ABL").  In general, ABL seeks to, *inter alia*, invest in privately originated loans to companies or other entities, which are secured by a specific asset or pool of assets.  More specifically, the Stewardship Fund's investment strategy was to purchase short-term notes, or

loans, that were used to finance the purchase of non-perishable consumer merchandise inventory.

Such a strategy can be attractive to sophisticated investors because it is supposed to be based on

loans of relatively short duration (*i.e.*, 90 to 180 days – from when the consumer merchandise is

acquired by the intermediary or broker to when the merchandise is purchased by the retailer and

the loan is repaid), and typically creates a steady cash flow, as the cash received from repayment

of one loan is rolled over into new loans of similar maturity.

27.     As described in the PPMs, the Stewardship Fund was to "seek a high level of

current income and capital appreciation while minimizing risk by (1) purchasing a broad range of

secured high-yield short-term notes from, or issued by, Acorn ..., a financing company ... engaged

in providing commercial financing generally on a transaction-by-transaction basis ...."  As the

PPMs made clear, "all or substantially all of the Short-Term Notes that the [Fund] will purchase

will be sold to it by Acorn ...."[2]  Elsewhere in the PPMs, Acorn was described as "the only or

primary seller of Short-Term Notes to the [Fund] for the foreseeable future."

28.     Acorn's symbiotic role with the Fund was stressed in presentation materials used

in or around September, 2004 and, upon information and belief, continuously thereafter, to solicit

new "members" to the Stewardship Fund.  Therein, Acorn is portrayed as lending "to

intermediaries typically involved in service businesses, product brokerage and distributors

[which] often have high quality assets but lack strong balance sheets [and] typically have a need

to match their short-term liabilities against longer-term receivables."  Financing companies such

as Acorn are represented as having the capability to "bridge that gap."  By the same token, after

---

[2]The Off-Shore Fund was engaged in the same type of investment strategy and also relied exclusively on Acorn.  The *Gottex* (CT) action complaint alleged that Acorn "is the financing company that sources and originates the loans that are sold to the [Off-shore] Fund."

the Stewardship Fund purchased the promissory notes from Acorn, Acorn would continue, for a fee, to service the notes.  Of course, Advisors also was being paid a fee for effectively the same "service."

29.     In sum, the creation of the Fund, Acorn and Advisors simply allowed Quan to impose multiple layers of fees upon Plaintiffs and the Class even though the "services" being performed were those of one economic entity, while shielding the unscrupulous business practices of Quan and the other Defendants from scrutiny behind the alleged corporate form of multiple limited liability companies.

30.     Notwithstanding its intention to lend to entities lacking "strong balance sheets," both the presentation materials and all versions of the PPMs emphasized the ability of the Fund, through Acorn, to manage the risk.  As stated in the presentation materials, "[t]o ensure principal protection, securities are over collateralized" and the Fund would employ "many safeguards to lower the risk profile" of its investments, including "[o]nly short term note exposure – under 180 days," "[s]trong capital reserves and collateral" and "'A' rated receivable exposure or better." The presentation materials identified a diverse collection of nine different "types of asset based trades."  In a slide titled "Collateral Risk Management," the Stewardship Fund stressed that:

–     types of collateral considered are cash (or cash equivalent), inventory and accounts receivable;

–     only notes with 180 day tenor or less are considered;

–     all deals include the filing of a UCC-1 assigning the collateral; and

–     additional cash collateral is held in a segregated account.

31.     In a slide captioned "Borrower Risk Management," the Stewardship Fund stated

that, notwithstanding that "[s]ecuritized transactions have little exposure to the borrower, []

several precautions have been taken," such as Acorn's demand for "additional collateral against

the loan to compensate for less or poor quality collateral, such as corporate guarantees, personal

guarantees [and] other tangible assets."  In addition, "[a]ll deals with same borrowers are cross

collateralized" and a "major accounting firm has been retained to examine the books of

intermediaries [*i.e.*, the companies to which Acorn would make the loans]."  Moreover, the

Stewardship Fund's investors were promised that, since they would "rely on Acorn to manage

debt servicing, investors receive audits from both the [Fund] and Acorn."

      32.    The PPMs specified that Acorn's notes would be primarily issued by the

following entities:

> companies that provide assets for collateral including, without limitation,
> companies such as:  merchandise distributors ("distribution companies") who are
> engaged in the business of buying excess high-quality, consumer merchandise
> inventory arising, for example, from manufacturing overruns, wholesale inventory
> overages and retail bankruptcies, at distressed prices and selling the merchandise
> to retailers at a profit....

The PPMs also stated that such collateral "may include, without limitation, high-quality

consumer merchandise and other inventory, work in the process of manufacture, ... general

accounts receivables and purchase order receivables."  The PPMs further provided that Acorn

would, "with respect to each Distribution Company and related transactions:"

> –     enter into a Credit Agreement, Security Agreement(s) and Lock-Box Agreement
> (and certain ancillary agreements);
>
> –     receive a Secured Promissory Note;
>
> –     be designated as a co-beneficiary on policies of insurance with respect to various
> defaults or other risks of loss on the Short-Term Notes;

– confirm that the underlying assets fall into an acceptable category;

– confirm that the accounts receivable counterparty has an "A" or higher credit rating prior to acquisition, inclusive of any credit insurance coverage;

– obtain a security interest in the underlying assets and accounts receivable proceeds;

– require payment of the accounts receivable into a lock-box account; and

– perform ongoing quantitative and qualitative analysis or similar protracted procedure to determine the fair market value of underlying assets of the short-term commercial credit market and the financial conditions of the borrower and its customers.

33.     The PPMs generally provided that investors would receive "an annual report with respect to the prior Fiscal Year," although an earlier version of the PPMs specified that each member would "be furnished with monthly updates and annual reports containing audited financial statements with respect to the prior year."  Among other things, the PPMs identified "Ernst & Young, Hamilton, Bermuda" as the Fund's auditors.

34.     The PPMs provided that "[m]embers do not take part in the management or control of the [Fund]" and although the Fund would "make all required state and federal filings with respect to the sale of Interest ... [m]embers will not receive copies of these filings." Prospective "members" of the Fund were advised that "[a]ll decisions with respect to the investment activities of the [Stewardship Fund] are made exclusively by the Managing Member [*i.e.*, Advisors]," that "[m]embers will not have the opportunity to evaluate fully for themselves the relevant economic, financial, and other information regarding the [Fund's] investments" and that "[n]o person should purchase Interests unless he is willing to entrust all aspects of the [Fund's] investment activities to the Managing Member."

35.     The PPMs made clear that Quan was at the apex of the Fund, as well as Advisors

and Acorn.  The PPMs stated that Quan, as its sole member, controlled Acorn.  Furthermore, not

only did all investment and decision-making authority reside with Quan, through his control of

Advisors, but all interaction between the Fund and its investors likewise would be through him.

For example, the PPMs directed that all requests for additional information should be directed to

Quan, and potential members of the Fund had to deliver original copies of all subscription (*i.e.*,

investment) documents to Quan's attention.

36.     Former employees of the Fund, Advisors and/or Acorn likewise confirm that the

presence and control of Quan was ubiquitous.  For example, Confidential Witness No. 1 ("CW

1"), who worked at Acorn for approximately a year, including an early portion of the Class

Period, and who was involved in Acorn's efforts to locate new lending opportunities, described

Quan as "very hands on" and a "micromanager" who presided over weekly meetings.

Confidential Witness No. 2 ("CW 2"), whose Class Period responsibilities at Acorn included

monitoring collateral underlying Acorn's loans, such as verifying accounts receivables (but who,

amazingly, was never given any Petters' related loans to monitor), confirmed Quan's attendance

at these weekly "portfolio" meetings.  Other former employees, such as Confidential Witness No.

3 ("CW 3"), who was involved with marketing and underwriting for potential loans at Acorn for

approximately one year during the Class Period, and Confidential Witness No. 4 ("CW 4"), who,

likewise, had a marketing and business development role at Acorn for a majority of the Class

Period, confirm that all potential lending deals had to be approved by Quan.  CW 4 described

Quan as the ultimate decision maker at Acorn regarding all deals, said that Quan himself

originated most of the deals that were ultimately approved at Acorn, and noted that these were

almost always loans to Petters entities.

37.     From all accounts, the Fund, Advisors and Acorn were all operated as a single integrated enterprise, all housed in the same offices in Greenwich, Connecticut, and with one identity and purpose.  Several former employees recalled that the three operations – combined – never employed more than twenty persons.  Moreover, it appears that no differentiation was made between the business of the Fund, Advisors or Acorn.  CW 2 observed that duties and titles were fluid between the Fund, Advisors and Acorn, and another former employee, Dominick Miele, testified at his deposition taken in connection with the *Polaroid-Acorn* adversary proceeding, that he was initially performing Fund-related responsibilities, such as handling subscription and redemption requests, and then transitioned into a loan monitoring role for Acorn.  Another individual apparently simultaneously acted as general counsel to both Advisors and Acorn during a portion of the Class Period.[3]

## B.     THE PETTERS' PONZI SCHEME – BY FAR, THE FUND'S LARGEST "ASSET" – COMPRISING ALMOST 70% OF THE FUND'S "INVESTMENTS"

38.     In early September, 2008, an inter-agency federal task force assembled in the District of Minnesota began investigating allegations of a massive fraud being committed by Petters, a well-known Minnesota entrepreneur and (less well-known at the time) convicted felon who, through his ownership of Petters Group Worldwide LLC ("PGW"), controlled an empire of

---

[3]According to this person's employment history, at the same time that she was acting as counsel to Advisors and Acorn, she was also general counsel to PineRidge Capital, LLC (the president of which, according to Advisors' Form ADV, is John Ruggerio, who was also simultaneously serving as Advisors' Chief Compliance Officer), as well as FAM Global Investments, Inc. (which, upon information and belief, is a hedge fund headed by Timothy Eng, a friend of Quan's).

companies, including Polaroid and Sun Country Airlines,[4] and who operated a company issuing

short-term trade finance notes to facilitate "diverting" transactions, Petters Co., Inc. ("PCI"),

since the mid-1990s.  The investigation quickly uncovered that, throughout this time frame,

Petters had been operating a massive Ponzi scheme, involving over $40 billion and resulting in

losses of more than $3 billion.  By December, 2008, Petters and five other individuals

(collectively, the "Accomplices") – Deanna Coleman (PCI's Vice President of Operations),

Robert White (PCI's Chief Financial Officer), Jim Wehmhoff (PCI's Executive Vice President -

Tax), Larry Reynolds (owner of Los Angeles-based Nationwide International Resources, Inc.

("NIR"), a supposed liquidator of consumer merchandise), and Michael Catain (owner of

Excelsior, MN-based Enchanted Family Buying Company ("Enchanted"), the other supposed

liquidator) – had been arrested and charged for their respective roles in the fraud.

       39.     Specifically, according to information gathered from the federal investigation,

media reports and subsequent related bankruptcy proceedings, Petters formed PCI in 1994 and

appointed himself Chairman of the Board, Chief Executive Officer and President, positions he

retained up to shortly after his arrest.  Petters portrayed PCI as a "diverter" or "middleman" that

purchased high-end consumer electronics, such as flat-screen televisions, from brokers or

liquidators (NIR and Enchanted) and resold the merchandise to large "big box" retailers such as

_____

       [4]Petters founded PGW in 2001, and he made himself the sole owner, Chairman and Chief
Executive Officer.  Although PGW was the umbrella company under which Fingerhut Direct
Marketing (acquired in 2002), uBid (acquired in 2003), Polaroid (acquired in 2005) and Sun
Country Airlines (acquired in 2006) were managed, PCI was at the core, and it was PCI's
fraudulently obtained investor funds that supported PGW's daily and long-term operations from
its inception.  According to filings in connection with the *Polaroid-Acorn* adversary proceeding,
PGW had no independent financial resources and was never capitalized to operate apart from
PCI.  As an example, PCI paid all annual bonuses for Petters-entity employees, including those at
PGW and Polaroid.

Costco, Sam's Club (owned by Wal-Mart) and BJ's Wholesale Club (collectively, the "Retailers").  In exchange for funds contributed to finance the supposed acquisition of the consumer goods, Petters, through PCI, provided investors with promissory notes.  Investors would also be provided with a security interest in the consumer goods by PCI, which, after "delivery" of the merchandise, would become a security interest in the (non-existent) accounts receivable.

40.     Petters referred to this investment "strategy" as "purchase order inventory financing."  Because of end runs, over-production or liquidations, excess consumer electronic equipment allegedly would be available for purchase from foreign-based manufacturers, and the Retailers would be willing recipients of such overstock merchandise.  NIR or Enchanted, in conjunction with PCI, would act as the "middleman."  According to Petters, these transactions usually took up to 180 days to complete, but the manufacturers demanded payment up-front while the Retailers did not pay until the merchandise was delivered.  Thus, the financing represented by the PCI promissory notes was needed for the 180-day period between the purchase of the merchandise and its delivery to the Retailers.

41.     Petters represented that the promissory notes would be accompanied by a high rate of return, beginning at an annualized 11%, and would entail minimal risk – in addition to being short term, each promissory note was secured by the underlying merchandise being financed by the note.  In addition to a funding request from the Petters companies, potential note purchasers would be presented with a series of documents relating to the transaction, including an executed note document reflecting the investment and the guaranteed rate of return within 180 days, purchase orders from a Retailer, bills of sale from manufacturers to the liquidators, and an

-24-

assignment of a security interest in the underlying merchandise to the note purchasers.

42.     However, investors in PCI were actually financing the purchase of non-existent merchandise secured by fabricated purchase orders.  According to the October 2, 2008 affidavit of F.B.I. Special Agent Eileen Rice, filed in connection with the *Petters* civil injunction action (the "Rice Aff."), Deanna Coleman ("Coleman"), who had joined with Petters early on, created false purchase orders and invoices related to the purchase of merchandise from NIR and Enchanted.  Robert White ("White"), who joined PCI in or around 1999, was responsible for creating the false purchase orders related to the fictitious sale of the merchandise to the "big box" Retailers.  Neither NIR nor Enchanted ever purchased or sold any merchandise on behalf of PCI, but instead were merely conduits for wired funds from investors which were then transferred to PCI.

43.     Consistent with a "classic" Ponzi scheme, PCI investors receive payments – not from the earnings or proceeds of the fabricated transactions for which the financing was obtained (because there were no such earnings) – but with funds obtained from later investors.  The payments would often consist of repayment of the principal amount invested, as well as an amount comprising the purported "profit."  Petters' clear intention was that sizeable payments back to earlier investors would spur repeated, greater and more widespread investment in the PCI diverter transactions and thereby extend the life of the Ponzi scheme.

44.     As Petters later would be recorded admitting, it was all "one big [expletive deleted] fraud."  No merchandise was ever ordered, let alone purchased, and there were no sales to the Retailers.  NIR and Enchanted were essentially shell companies, with no assets or operations, the principals of which were co-conspirators with Petters.  Coleman and White

created the purchase orders, bills of sale and other documentation by "cutting and pasting" from once-legitimate documents.  The supposed assignments of security interests were worthless, as there was no merchandise to be secured, and the promissory notes themselves were likewise without any value.  According to the SEC Complaint, as of September, 2008, the combined balance sheet of PCI and its related entities reflected total current liabilities, including outstanding notes to approximately 20 entities and individuals, of $3.5 billion.

45.     As indicated in the Rice Aff. and as alleged herein, the fraud would have been easy to detect if someone had bothered to look.  As one of Petters' co-conspirators was recorded as observing, since there was no merchandise (nor, in some instances, even a warehouse), the scheme would "implode" if note purchasers' auditors ever attempted to "visit warehouses."  Federal investigators were able to establish the falsity of the "hard copy" purchase orders and bills of sale by simply showing them to one of the Retailers, who confirmed that the PCI vendor numbers, as well as the Retailer's purchase order numbers, were fictitious.  Moreover, at least one of the Retailers requires that all vendors use an internet-based system, thus eliminating the need for traditional "paper" documents.[5]

_____

[5]In other words, even though Petters' accomplices, Coleman and White, were manually creating paper documents purporting to be Sam's Club purchase orders, during this same time frame, Sam's Club required that such information be entered electronically.  According to an affidavit of a F.B.I. agent submitted in support of the October 2, 2008 complaint in the *Petters* criminal action, all of Sam's Club vendors use EDI ("electronic data interchange") to exchange purchase orders, invoices and all other transactional documents electronically.  Another requirement imposed by Sam's Club was that suppliers use "Retail Link," an internet-based application, to submit information to the Retailer.  In the complaint filed in another "clawback" proceeding arising from *In re Petters Company, Inc., et al.*, No. 08-45257 (GFK) (Bankr. D. Minn.), the Trustee cites the testimony of Coleman, Petters' accomplice, regarding one hedge fund, Opportunity Finance, LLC, which confronted Petters with the Sam's Club notification that, as of November 6, 2003, it would accept only PDF files, submitted electronically.  This complaint alleges that Opportunity Finance, LLC was effectively "bought-out" in exchange for

46.      It is a general truth that no Ponzi scheme can survive without a constant influx of fresh capital.  Through Defendants' wrongful acts and deliberate omissions, the investments of Plaintiffs and other members of the Fund unwittingly provided Petters with the requisite stream of cash.

47.      As alleged in the complaint filed in the *Petters-Acorn* adversary proceeding (brought by the court-appointed Chapter 11 Trustee of PCI), RedtagBiz, Inc. ("Redtag") was formed in 2000 by Petters and thereafter controlled by him, and ultimately merged into PGW in 2006.  Acorn first transacted with Redtag in May, 2001, whereby Acorn made funds available to Redtag to finance account receivables resulting from the purchase and sale of electronic goods by PCI.  Acorn received a promissory note, secured by interest in "any or all Receivables arising from the Purchase Orders" and "any and all Merchandise."  According to this pleading, between 2001 and 2003, Acorn entered into approximately 33 separate note transactions with Redtag, worth over $88 million.

48.      In November, 2002, Acorn entered into a separate transaction directly with PCI. The *Petters-Acorn* adversary proceeding complaint alleges that Acorn made funds available to PCI to finance account receivables resulting from the purchase and sale of electronic goods, and Acorn was granted a security interest in the PCI-financed assets, including "any or all Receivables arising from the Purchase" and "any and all Merchandise."  This complaint further alleges that Acorn and PCI entered into approximately 149 separate note transactions worth over $585 million.

---

its silence, as it demanded and received, over $165 million from PCI at an accelerated rate over a short period of time.

49.     In November, 2004, following formation of PAC Funding, LLC ("PAC

Funding"), a special purpose entity wholly owned by PCI (and completely under Petters'

control), Acorn entered into the first of a series of transactions with this entity.[6]  Initially, Acorn

agreed to make loans of up to a total of $200 million, in which each loan to PAC Funding would

be separate and distinct, and limited to the lesser of $6 million or the total purchase price of all

purchase orders allegedly associated with the loan (the "Initial Credit Agreement").  Although

the purchase orders and corresponding accounts receivable would act as the primary security for

these loans, Acorn and PAC Funding also entered into a security agreement (contemporaneous

with the Initial Credit Agreement), whereby (1) Acorn was granted a security interest in certain

of PAC Funding's assets, (2) the parties agreed that the loans would be further secured by a

lockbox agreement, which would receive payments directly from Retailers, as well as a block

account in which PAC Funding would deposit 10% prior to requesting each loan, and (3) Petters

granted Acorn his personal guaranty of up to $50 million.

50.     Thereafter, as alleged in the *Petters-Acorn* adversary proceeding complaint, Acorn

and PAC Funding entered into a number of amendments to the Initial Credit Agreement: in

December, 2005, the parties renewed the outstanding loans and extended the commitment period

by an additional year; in September, 2006, the parties renewed the outstanding loans and

increased the total commitment amount from $200 million to $217 million; in November, 2006,

by letter agreement, the parties further extended the commitment period to January 31, 2008 and

---

[6]According to the October 7, 2010 affidavit of Theodore F. Martens ("Martens Aff."), a
forensic accountant with PriceWaterhouseCoopers LLP, which was submitted in connection with
the *Polaroid-Acorn* adversary proceeding, Petters formed eight different special purpose entities
("SPEs") to serve as pass-through entities for the financing activities of Petters' principal
investors.  PAC Funding was specifically created and assigned for Acorn.

increased the total commitment amount to $250 million; in December, 2006, again by letter
agreement, the parties renewed the outstanding loans and further extended the commitment
period to July 31, 2008; in January, 2007, the parties again renewed the outstanding loans and
again extended the commitment period; and in October, 2007, the parties renewed the
outstanding loans, extended the commitment period to July 31, 2009, and increased the
commitment amount to $300 million.

51.     The *Petters-Acorn* adversary proceeding complaint alleges that, as of May 14,
2008, the outstanding PAC Funding loans owed to Acorn were $289 million, which represented
approximately 60-70% of Acorn's entire portfolio of loans.  From the first transaction in late
2004, PAC Funding engaged in approximately 491 separate note transactions with Acorn, for a
principal sum in excess of $1.9 billion.

52.     In addition to the transactions with PAC Funding, the *Petters-Acorn* adversary
proceeding complaint also alleges that Acorn entered into two separate loan transactions, on July
18, 2007 and August 20, 2007, with Petters Aircraft Leasing, LLC ("PAL"), in the aggregate
principal amount of $21,500,000.  In connection with these transactions, PCI, PAC Funding and
Petters Aviation, LLC ("Petters Aviation") entered into an unlimited guaranty, which provided
for the continuing, absolute and unconditional guaranty of payment of the borrower, PAL.  PAL
engaged in two separate note transactions with Acorn in the principal sum of $21,500,000.

53.     The complaint filed in the *Petters-Acorn* adversary proceeding further alleges that,
on March 30, 2007, Acorn entered into a credit agreement with Petters Aviation, whereby Acorn
provided an initial $10 million line of credit.  On April 17, 2007 and January 17, 2008, the
agreement was amended and the commitment amount was increased to $12,810,590.  Pursuant to

-29-

this agreement, Acorn received several promissory notes from Petters Aviation in the aggregate

principal amount of $13,486,450.  On the same date as the credit agreement (and similar to the

transaction with PAL), PCI and PAC Funding entered into an unlimited guaranty, which

provided the continuing, absolute and unconditional guaranty of payment of the obligations owed

by Petters Aviation to Acorn.  Petters Aviation engaged in three separate note transactions with

Acorn in the principal sum of no less than $13,486,450.

54.    As the foregoing reflects, from 2001 through 2007, Acorn entered into over 670

separate loan transactions with companies owned or otherwise controlled by Petters, at an

aggregate value of over $2.6 billion.  As suggested in the Trustee's summary judgment motion

filed in the *Polaroid-Acorn* adversary proceeding, but for the worsening economy and tightening

credit in 2007, "*[t]his mutually beneficial relationship – with Acorn asking no questions and*

*funneling money to Petters, and Petters using the money and then funneling it back to*

*Acorn*," likely would have continued for some time.  (Emphasis added.)

55.    According to a post-Class Period memorandum sent by Quan (therein identified as

"Investment Manager") to Stewardship Fund members on or about October 17, 2008, the gross

amount owed to the Fund by PAC Funding and the other Petters entities as of April 30, 2008 was

over $85 million, or almost 70% of the Fund's combined portfolio of approximately $127

million.

56.    From late 2007 and continuing to early 2008, PAC Funding was falling behind in

payments; indeed, within months of the October, 2007 amendment, PAC Funding was in default

on the Initial Credit Agreement, as amended.  According to the *Petters-Acorn* adversary

proceeding complaint, by February, 2008, PAC Funding had borrowed approximately $275

-30-

million against its line of credit with Acorn, and more than $100 million of that was in default.

57.     Over the next two and one-half months, Petters, PAC Funding and Acorn (through Quan) attempted to "restructure" the loans – first, on or about February 29, 2008, Petters, PAC Funding and Acorn entered into a Forbearance Agreement, whereby, in exchange for Acorn's agreement to refrain for 120 days from filing an action, or foreclosing on the supposed collateral secured by the November, 2004 security agreement (which would effectively end the Ponzi scheme), Petters agreed to exchange the (bogus) purchase orders that were collateralizing Acorn's loans for a security interest in Polaroid's inventory and accounts – even though Polaroid had not previously been a party to any transactions between PAC Funding and Acorn.[7]  In addition, for the first time, PAC Funding and Petters agreed to provide Acorn with proof that PAC Funding was the legal owner of at least $112 million worth of accounts receivables from various retailers.

58.     That same day – February 29, 2008 – PAC Funding agreed to make loans to Polaroid, and Polaroid issued a note in favor of PAC Funding in the amount of $15 million in return (the "Polaroid Note").  In addition, on the same day, Acorn, PAC Funding and PCI entered

_____

[7]As alleged in the Trustee's summary judgment motion, filed in the *Polaroid-Acorn* adversary proceeding, Petters purchased Polaroid in 2005 for $425 million, all of which came from PCI's fraudulently obtained investor funds.  Among other things, Polaroid was purchased to "bury the debt" created by the Ponzi scheme, to give Petters increased credibility to investors and to induce potential investors to make loans to further his Ponzi scheme.  Following the acquisition, Petters appointed himself chairman and sole board member of Polaroid, positions he retained during all relevant time periods.  Upon information and belief, Petters also installed Mary Jeffries ("Jeffries"), formerly an executive at PCI and PGW, as Chief Executive Officer of Polaroid.  Given his ownership and control of Polaroid, the Trustee's summary judgment motion charged that Petters "used Polaroid, as he used the other Petters' entities, as a personal piggy bank, taking cash from Polaroid to pay other hedge fund loans to PCI, to meet short term cash needs of other Petters entities, and to continue his lavish personal lifestyle."

into a Subordination Agreement, whereby PCI, among other parties with liens in Polaroid assets, purportedly subordinated the right to repayment of its $20 million promissory note until the Polaroid Note between Polaroid and PAC Funding was fully repaid.

59.     In late April, 2008, PAC Funding and Acorn restructured the credit facility of the Initial Credit Agreement from a revolving credit facility to a term facility, in which, *inter alia*, PAC Funding would receive a 30-day moratorium on all payment obligations and Acorn would receive a minimum monthly payment of $10 million.  Thereafter, commencing on August 1, 2008, PAC Funding was required to make monthly payments of $10 million to Acorn.

60.     After further defaults, on or about May 14, 2008, Acorn and PAC Funding further amended the Initial Credit Agreement, which imposed onerous obligations on Polaroid, as well as requiring that Acorn be provided with an additional security interest in Polaroid's valuable intellectual property, all of which was intended to further secure PAC Funding's obligations to Acorn.  In other words, pursuant to the Initial Credit Agreement and the November, 2004 credit agreement, all of Acorn's loans to PAC Funding were primarily secured by (phony) purchase orders, (fake) account receivables and Petters' Limited Personal Guaranty of $50 million.  As alleged, even though Polaroid had never before been a party to any transactions with Acorn or otherwise involved with the loans provided to PAC Funding pursuant to the Initial Credit Agreement, as amended, the May 2008 "restructuring" was intended to retire and replace the PAC Funding promissory notes, totaling $289 million (principal and capitalized interest) and collateralized by purchase orders supposedly issued by the Retailers, with Polaroid inventory, account receivables and Polaroid's North American trademarks.

61.     The Trustee's summary judgment motion, filed in the *Polaroid-Acorn* adversary

proceeding, describes Polaroid's reaction to the use of its resources by Petters to essentially "buy time" from Defendants for Petters' sole benefit.  For example, although the only consideration Polaroid received as a result of the May, 2008 "restructuring" were two loans from PAC Funding for $15 million and $10 million, respectively (the $15 million was repaid by Polaroid within 45 days), it nevertheless had to pledge to Acorn, at Petters' direction, an interest in inventory, accounts receivable and its North American trademarks in order to secure all of the outstanding investment from Acorn to PAC Funding (approximately $280 million).  According to the summary judgment motion, Jeffries, Polaroid's Chief Executive Officer, testified that she opposed the use of Polaroid's assets as collateral for the $280 million in PAC Funding obligations if Polaroid would only receive $15 million, but Quan assuaged her concerns by promising that Acorn would re-send the $15 million immediately after Polaroid paid the $15 million note, and that Acorn would then provide a $50 million asset-based line of credit to Polaroid.

### C.   DEFENDANTS' OFF-SHORE FUND LIABILITIES

62.     As reflected in the May, 2008 complaint and other items filed in the *Gottex* (CT) action, as well as the December, 2008 ruling issued in the *Gottex* (Bermuda) action, between October, 2005 and March, 2007, the Gottex Funds (consisting of Gottex ABL (Cayman) Ltd., Gottex Matrix Asset Focused Master Fund Ltd., Gottex/Nomura Market Neutral Fund (USD) Ltd., Gottex ABI Master Fund Ltd., and Hudson ABL Fund Ltd.), either directly or indirectly, invested more than $100 million in the Off-Shore Fund.[8]  However, in mid-2006, the Gottex

---

[8]According to the June 26, 2008 Declaration of J.P. Bailey (the "Bailey Dec."), an investment manager of the Gottex Funds with extensive experience in hedge funds, which was filed in support of the Gottex Funds' emergency motion for expedited discovery and temporary

Funds' representative met with Quan to express dissatisfaction with the Off-Shore Fund's relatively low returns and its high management fees, with the result that an alleged agreement was reached between the parties, whereby Advisors would lower its management fee if the Gottex Funds' returns fell below a certain level.

63.     By February, 2007, the agreement had never been reduced to writing and Quan allegedly refused to honor its terms.  Thereafter, on or about May 31, 2007 and July 31, 2007, the Gottex Funds provided notice of redemption of all shares in the Off-Shore Fund as of August 31, 2007 and October 31, 2007, respectively.  However, according to the complaint filed in the *Gottex* (CT) action, Quan induced the Gottex Funds to postpone the dates of redemption until March 31, 2008.  In early April, 2008, Quan notified the Gottex Funds that, contrary to the standard in the hedge fund industry, the planned redemption would not be in cash, but rather "in kind" in the form of "participation notes."[9]

64.     Concerned over the liquidity of the Off-Shore Fund's proposed "in kind"

---

preliminary injunction, the Gottex Funds are "funds of funds" (*i.e.*, funds that invest in hedge funds).  Among the Gottex Funds' investing strategies is "asset-based lending," like that employed by the Stewardship Fund and the Off-Shore Fund.

[9]The *Gottex* (CT) action complaint, as well as the Bailey Dec., emphasize how unusual it was for a hedge fund, particularly one such as the Off-Shore Fund that purported to hold short-term, highly-liquid assets, not to redeem an investor in cash.  Because a large proportion of the Off-Shore Fund's holdings consisted of 90-day receivables, which create a steady cash flow, there should have been little or no need for the Off-Shore Fund to liquidate any assets in order to satisfy the Gottex Funds' redemption requests.  In other words, as the short-term notes came due, the proceeds could have been simply set aside and not reinvested.  The Bailey Dec. reiterates this point by contrasting the experience with Arrowhead Capital Finance Ltd. ("Arrowhead"), in which the Gottex Funds also invested and which also held a substantial majority of its assets in loans made to entities controlled by Petters – in response to the Gottex Funds' December, 2006 redemption requests, Arrowhead paid 90% of the value of the redemptions in cash within 90 days.

redemption, in May, 2008, the Gottex Funds simultaneously commenced actions in the District

of Connecticut and in the Commercial Court division of Bermuda's Supreme Court.  The former

(the *Gottex* (CT) action), in which the Gottex Funds asserted claims against Quan and Advisors

for, *inter alia*, fraud, misrepresentation and breach of contract, was dismissed for improper venue

by order dated April 22, 2009.  However, the *Gottex* (Bermuda) action, in which the Gottex

Funds initially asserted that the attempted "in kind" redemption breached the terms of their

investment in the Off-Shore Fund, resulted in the June, 2008 issuance of a "worldwide *Mareva*

injunction" (essentially an asset freeze recognized by Commonwealth jurisdictions) and

ultimately the court-ordered appointment of provisional liquidators in connection with the

"winding up" of the Off-Shore Fund because of insolvency.

65.   The December, 2008 Ruling in the *Gottex* (Bermuda) action (the "Bermuda

Ruling") contains, among other things, Quan's admission that the Off-Shore Fund had "liquidity

problems" in late 2007 (which is approximately the same time that PAC Funding began to fall

behind in its payments), and a chronology of increasingly strident communications and meetings

between Quan, Advisors and representatives of the Gottex Funds from late April to mid-May,

2008 regarding the scope and value of the "in kind" redemption (which is contemporaneous with

the "restructuring" negotiations by Quan and Acorn over the PAC Funding credit agreement and

the attempt to access Polaroid's inventory and intellectual property).  The Bermuda Ruling also

determined that, as of November 12, 2008, the Off-Shore Fund was "cash flow insolvent."[10]  In

---

[10]The Bermuda Ruling notes that Quan attempted to dispute this finding, arguing that,
because the Off-Shore Fund had additional collateral in the form of security in Polaroid's assets,
it was not insolvent on a balance sheet basis.  The Bermuda court discounted the significance of
the Polaroid assets, noting that the supposed value was based upon a dated valuation by Duff &
Phelps, the use of which was specifically limited by Duff & Phelps to another transaction.  In

addition, the Bermuda Ruling quotes from minutes of the Off-Shore Fund's June 9, 2008 board of directors meeting, which stated that the Off-Shore Fund had received approximately $50 million in redemption requests against the Off-Shore Fund's total value of $125 million, and which approved Quan's recommendation that determination of the Off-Shore Fund's NAV ("net asset value") be suspended indefinitely and that no redemptions would be accepted or paid out during the period of suspension.

66.     With respect to Quan, the Bermuda Ruling concluded that he was "very much the key player, and companies controlled by him such as [Advisors] and Acorn also perform key roles in relation to the business of the [Off-Shore Fund]," whose acts were "for the most part affected through Mr. Quan ...."  The Bermuda Ruling continues by reviewing "a number of instances where it cannot be said that the [Off-Shore Fund] has acted as one might expect a Company in its position to act," including the failure of Quan and Advisors to notify the Gottex Funds when PAC Funding defaulted in or before February, 2008.

**D.     THE STEWARDSHIP FUND'S OTHER INVESTMENTS WERE ALSO BASED ON FRAUDULENT REPRESENTATIONS, THEREBY CONFIRMING DEFENDANTS' WILLINGNESS TO TURN A BLIND EYE TO "RED FLAGS" WHILE THEY EARNED FEES**

67.     The claims asserted in the *Zucker* action arise from Acorn's receipt of, and reliance on, fraudulent appraisals of jewelry and other antiquities from Benjamin Zucker ("Zucker") that were to serve as collateral for loans made by Acorn to a "noted jewelry and antiquity magnate," Ralph Esmerian ("Esmerian") and his partner, Mitchell May.  As more

---

addition, Quan's estimate that recovery of the Polaroid assets would translate into between 28% and 50% of $456 million was similarly discounted because the year-old Duff & Phelps valuation estimated the Polaroid collateral was worth between $310 and $380 million.

specifically alleged in the plaintiffs' Amended Complaint[11] filed on or about June 14, 2010:

> In December 2006, Acorn Capital Group LLC ("Acorn") agreed to loan approximately $40 million to R. Esmerian, Inc. ("REI") – an entity owned and controlled by Ralph Esmerian – to be used as working capital for REI's operations (the "REI Loan").  As a condition to funding, Acorn required that REI pledge, as security for the loan, collateral with an aggregate appraised value of at least three times the outstanding principal amount of the loan (the "REI Collateral").

> Approximately a year later, in December 2007, Acorn agreed to loan $13.5 million dollars to Vassal Jewels LLC ("Vassal"), which represented that the funds would be used, *inter alia*, to purchase REI stock (the "Vassal Loan").  Like the REI Loan, Acorn required that Vassal pledge, as security, collateral with an aggregate appraised value that met or exceeded specified benchmarks based on the outstanding principal amount of the loan (the "Vassal Collateral").

> In order to satisfy these appraisal requirements, Acorn, REI, and Vassal agreed that two different appraisers – one of whom was Benjamin Zucker of Precious Stones – would appraise the REI and Vassal Collateral.  These appraisal requirements were a material condition of the underlying loan agreements. Because of the unique nature of the REI and Vassal Collateral, which included collections of art, antiquities, jewels, and jewelry, Acorn did not have the expertise to determine the market value of the REI and Vassal Collateral on its own and, therefore, needed to obtain appraisals from qualified and reputable appraisals [sic] in order to conduct its due diligence on the potential loans.

68.     Through the plaintiffs in the *Zucker* action, as its assignees, Acorn alleged that its due diligence was more than adequate and that it had no "reason to suspect Zucker's qualifications, ability, or intentions to perform the appraisals at issue in a good faith and accurate manner ... nor suspect he would perform the appraisals fraudulently or in a grossly negligent manner."  However, elsewhere in the Amended Complaint, it is alleged Esmerian was Zucker's "long-time friend."

69.     The Amended Complaint further alleges that Zucker "provided Acorn with a

---

[11]Also named as plaintiffs in the *Zucker* action is the Off-Shore Fund, Northflight Fund LP and PrideCo Secured Loan Fund LP, all of whom received a portion of the underlying loans upon transfer and assignment from Acorn.

number of appraisal reports that valued the Collateral well in excess of the various loan agreements' requirements," on which Acorn reasonably relied in proceeding with the loans to REI and Vassal.  However, at an unspecified time in 2008, after both REI and Vassal defaulted under the terms of their respective loan agreements, it is alleged that Acorn:

> discovered that [Zucker] had significantly and systematically overstated the value of the REI and Vassal Collateral.  For example, Defendants represented that the Vassal Collateral had a market value of $42.5 million in late 2007.  After taking possession of the Vassal Collateral, Plaintiffs' expert appraiser has determined that the Vassal Collateral's market value was actually between $191,000 and $293,000 in late 2007 – less than one percent of Defendants' appraised values.  Similarly, after taking possession of the REI Collateral, Plaintiffs' expert determined that the REI Collateral was worth only a small fraction of the values set forth in the Appraisal Reports as of the time of those appraisals.

70.     The Fund and the other assignees of Acorn assert claims for, *inter alia*, fraud, negligent misrepresentation, and professional negligence.  In July, 2010, Zucker moved to dismiss the Amended Complaint.

71.     The fact that Defendants permitted the longtime friend of Esmerian to conduct the appraisal of jewelry and other items to determine if Esmerian's representations regarding the value of such items was accurate smacks again of intentional fraud on the part of Defendants or, at a minimum, a shocking and implausible degree of recklessness.  Moreover, the fact that the Fund, Advisors and Acorn allege that they mistakenly invested in jewelry that was worth 120 times less than represented defies the bonds of credulity beyond the breaking point.  The pattern and practice of the Stewardship Fund systematically investing in alleged assets that were almost entirely non-existent on multiple occasions leads to one inexorable conclusion: Defendants were knowing or, at the very minimum, exceedingly reckless participants in these fraudulent schemes.

## VI.  THE CLASS PERIOD STATEMENTS AND MATERIAL OMISSIONS OF ADVISORS AND QUAN

### A.    THE STATEMENTS

72.    As demonstrated above, the Stewardship Fund, as the passive recipient of every note or other security sold to it by Acorn, was beholden to, and dependent on, not only the initial due diligence of Acorn regarding the loans being purchased by the Fund, but also Defendants' supposedly continuous monitoring and evaluation of, *inter alia*, the collateral underlying all the loans purchased from Acorn.  However, by February 2008, PAC Funding was in default and over $100 million of the loans from Acorn (now owned by the Fund) were past their maturity date. Furthermore, other assets held by the Fund, such as allegedly antique, heirloom jewelry, which was supposed to serve as collateral for other loans made by Acorn, although unrelated to the Petters Ponzi scheme, were likewise illusory assets that were worth far less (a shocking 120 times less) than anticipated.  However, at the time (and throughout the Class Period), this dire situation was unknown by and undisclosed to Plaintiffs and the Class.

73.    The Class Period begins on February 7, 2006, when Poptech, along with other Fund members who had purchased Class P interests, received an invitation from Quan to convert their Class P interests into Class A interests.  Poptech and other "Preferred Shareholders" were told that the conversion opportunity was prompted by "[e]conomic events over the past year."  In continued reliance on the claims of due diligence in the 9/1/04 PPM, which were perpetuated in all other versions of the PPMs, and without the benefit of knowing the true condition of the Fund's investments, Poptech and other Class P investors passed up the chance to "cash out" and, to their detriment, instead traded in their Class P interests for the same value of Class A interests.

-39-

74.     Subsequent investors in the Stewardship Fund, whether contributing additional funds, such as Isakov, or those becoming a Member of the Fund for the first time, such as Meyer, similarly did so in reliance on, *inter alia*, the claims of due diligence contained in the PPMs. Subsequent communications from Defendants omitted any mention of the failure to conduct such investigations regarding the loans purchased by the Fund, and contained no information regarding the performance of those loans or otherwise corrected previous claims.

75.     Thereafter, other than the occasional letter broadly commenting on a new ABL strategy or otherwise extolling the Fund and its practices, the most consistent information received from Advisors and Quan was a monthly newsletter – a single page with a paragraph of text and some graphs.  These newsletters were extremely general; they failed to specifically mention any particular investment (including the incredible concentration of investments with Petters) and omitted any material information regarding the manner in which the Fund's assets were being invested and whether those assets were being safeguarded.  For example, the monthly Fund newsletter for January, 2008, disseminated to Plaintiffs and other investors by Advisors, stated as follows:

> Stewardship Credit Arbitrage Fund, LLC returned 0.84% in January.  The life-to-date net return since the Fund's May [2001] inception is approximately 92.19%. January's activity included purchases of 14 new transactions and 6 payoffs.  The Fund's portfolio as of month end consisted of 44 transactions involving varied underlying collateral including but not limited to trade receivables, finance companies, insurance, and inventory.  Additionally, in the month of January the Fund purchased notes from a new borrower that has posted inventory of high end quality jewelry as primary collateral.  This new facility is strongly collateralized in excess of more than 3x the outstanding loan committment [sic] which also includes strong side collateral coverage, as well as a limited personal guarantee from the Borrower's principal.

In the graphs that were usually contained in the single-page monthly mailing, the growth of a

hypothetical $1,000 invested in the Fund at its inception, which would have almost doubled by

early 2008, was depicted, while the average monthly preferred Class returns of well over .60%

for the past three years were tracked, and the Fund's statistics showed that there were never any

unprofitable months over the life of the Fund and that the Fund never had a consecutive loss.

76.     The Stewardship Fund's newsletter for February, 2008, sent by Advisors to

Plaintiffs and other members of the Fund, similarly reported:

> Stewardship Credit Arbitrage Fund, LLC returned 0.85% in February.  The life-to-
> date net return since the Fund's May [2001] inception is approximately 93.83%.
> February's activity included purchases of 3 new transactions and 3 payoffs.  The
> Fund's portfolio as of month end consisted of 44 transactions involving varied
> underlying collateral including but not limited to trade receivables, finance
> companies, insurance, and inventory.  In the month of February the economy
> continued to show signs of weakness, as consumers spent less.  Additionally,
> banks credit policies continued to tighten creating a greater need for asset based
> lending resulting in a number of opportunities today.  As bank financing becomes
> more difficult to obtain, the asset based lending industry is experiencing an
> increase in viable borrowers looking for financing from non-traditional sources.
> Given these opportunities the Fund has placed greater emphasis on raising capital
> to act on these conditions.

77.     The text of the March, 2008 newsletter provided as follows:

> Stewardship Credit Arbitrage Fund, LLC returned 0.83% in March.  The life-to-
> date net return since the Fund's May 2001 inception is approximately 95.44%.
> March's activity included purchases of 14 new transactions and 19 payoffs.  The
> Fund's portfolio as of month end consisted of 38 transactions involving various
> underlying collateral including but not limited to trade receivables, finance
> companies, insurance, and inventory.  As first quarter of 2008 comes to end we
> see continued volatility in the US market place, slow consumer spending, banks
> and lending companies further tightening standards.  Due to the increasing need
> for financing, the asset based lending industry is experiencing an increase in deal
> flow from potential borrowers with a higher quality collateral, and willingness to
> pay interest rates that are more in line with the Fund's requirements.  Given these
> situations the Fund has placed greater emphasis on raising capital to act on such
> opportunities.

78.     The Fund's April, 2008 newsletter was notable because the text lacked any

specifics.  As the following illustrates, it is more akin to a promotional message:

> Stewardship Credit Arbitrage Fund's principal investment objective is to invest in short-term notes collateralized by inventory, equipment, purchase orders and receivables of U.S. businesses.  The Investment Manager's primary focus is the preservation of capital.  Portfolio risk is mitigated by attempting to invest in short-term notes with maturities under 1 year.  Additionally, the Investment Manager attempts to purchase notes that are collateralized by approximately 1.3 times the loan amount.  Risk mitigation is enhanced by controlling credit on a transaction-by-transaction basis and additionally by evaluating and diversifying a base of credit-worthy counterparties to the collateral.  Traditionally sources of financing are slow decision makers in the $400 Billion Asset-Based Lending market, which often results in inadequate response times.  The Fund purchases investments originated by efficient financiers that secure transactions via high yielding short-term notes issued by Borrowers.[12]

79.     Predecessors to the January through April, 2008 newsletters were similarly rosy

and superficial.  For instance, the newsletter for October, 2005, provided as follows:

> Stewardship Credit Arbitrage Fund's activity is up slightly, with purchases of fifteen transactions in October, having an aggregate value of approximately $41 million.  The total number of outstanding transactions in the portfolio remain unchanged at approximately 100.  The overall portfolio transaction is up slightly at $2.7 million.  New deals financed in October included a strongly collateralized short term bridge financing.  Utilization peaked due to volume early in the month. The Fund anticipates purchasing a new line that refinances an existing borrower. Refinancing of other existing borrowers may be imminent, and the Fund may have interest in adding to its portfolio.  A new borrower of consumer receivables for PC purchases appears to have collateral coverage advantageous to the Fund and is under review.  The Fund is also reviewing an interesting new concept of a deal collateralized by pension benefits payable by the Armed Forces.

80.     The newsletter for December, 2005 was similar, stating that:

Stewardship Credit Arbitrage Funds (Domestic and Offshore) collectively enjoyed

---

[12]The statistical portion of the April, 2008 newsletter was also notable in that it showed that assets under management ("AUM") for year end were "approximately $120MM," while the AUM for month end were "approximately $108MM."  It also included subscription and redemption information, which, upon information and belief, had never been provided on earlier newsletters.  Upon information and belief, the April, 2008 newsletter was the last one disseminated during the Class Period.

an ongoing trend of vigorous activity during the month of December.  Both funds ended 2005 with a 12 month return in the target range, despite robust increases to AUM in the second half with its related cash management challenges.  The total aggregate transactions in both funds popped back up to slightly above October levels, now at approximately 106.  New transactions added this month for both funds slightly surpassed last month's rate, accounting for approximately a 10% increase in month over month in total dollar volume.  These transactions include collateral of museum quality collectable antiquities and a small tranche of notes on a refinanced health care deal.  The average transaction size overall in both funds is down slightly at $2.8 million.  Pipeline remains robust.

The charted growth of the hypothetical $1,000 invested at the Fund's inception showed a steady increase through the end of 2005, impervious to economic events such as the WorldCom bankruptcy, political events such as the start of the Iraq War, or natural disasters like Hurricane Katrina.

81.     Subsequent newsletters likewise did not enlighten investors to any problems with the Fund or its investments.  To the contrary, the June, 2006 newsletter merely stated:

The Stewardship Credit Arbitrage Funds returned to a normal level of activity throughout the month of June.  Total transactions, for both domestic and offshore funds combined, ended at approximately 120 with an approximate average transaction size of $2.7MM.  Payoff activity moderately outpaced new transactions dollars added during this month.  During the month of June, a number of the portfolio's notes collateralized by insurance were paid down, and therefore have performed to our expectations.

82.     As an example of the other form of communication received from Advisors, on or about February 20, 2008, Plaintiffs and other members of the Fund received a letter responding to the ongoing "sub-prime credit" situation, which explained that Advisors was not subject to such risks as it "has continually employed the philosophy of top down economic reevaluation of the assets held in its portfolio in order to determine the sensitivity of the portfolio to changing economic environments" and Advisors has "been proactive in the removal of deteriorating assets

and the inclusion of new assets as the opportunities arise."  Continuing, this letter stated as

follows:

> Due to the standards, policies and procedures that the Funds seek to see involved in each underwriting concerning a potential note purchase by the Funds, including that the underlying collateral is valued by third parties and then in turn is haircut to obtain the level of comfort in relying on that collateral under stress market conditions it has experienced little no write downs in the portfolios.

> * * *

> Further distinction between various Asset Based Lending Strategies ("ABL") and the Stewardship Credit Arbitrage Funds, ("the Fund") are their short duration. Because of the velocity of capturing actual cash from its loan portfolio and short maturity date, the intrinsic value of each portfolio holding is confirmed and stated at its "true-value", and therefore there is no need to mark to market or mark to model its values.

> * * *

> The Fund has provided consistent returns since its inception on April 2001 of approximately 10% per annum.  The volatility in the Funds performance continues to track an attractive .20% ( monthly Vol). ...  In the history of the Fund's performance, there have been several defaults which were successfully resolved and returned full value to the Fund inclusive of any fees, expenses and interest. ...  The Fund's Investment Manager is actively seeking additional capital to take advantage of the many opportunities available in today's market.  Banks are not only suspending their new loan origination activity, but they are also actively seeking to reduce their loan portfolio.  This is a unique opportunity not readily available over the last 10 years.  In Summary, in a market wrought with huge volatility, unforeseen risks and low returns in other strategies, the Fund provides stability with consistent returns, extremely low volatility and an attractive spread to the risk free rate.

83.     On or about May 29, 2008, Plaintiffs and other members of the Fund were

informed of the commencement of the *Gottex* (Bermuda) action and the *Gottex* (CT) action.

According to the letter, signed by Quan as "Investment Manager," the claims asserted in both

actions were "entirely without merit and will ultimately be dismissed."  The letter advised

-44-

plaintiffs and other investors in the Fund that "[n]either of these two lawsuits involve the

Stewardship Credit Arbitrage Fund, LLC" and were expected "to have no effect on the day to day

operations of the Fund or its investments."

84.     However, less than a month later, in a letter from Advisors dated June 20, 2008,

signed by Quan (now as "Managing Member"), Plaintiffs and other members of the Fund were

informed that Advisors "suspended the calculation of the net asset value of the Domestic Fund,

subscription requests and all withdrawal requests from the Fund, with immediate effect."

According to the letter, there were several reasons for the suspension: (i) "markets in general, and

the U.S. lending markets in particular, have become extremely volatile and illiquid in the last

approximately 8 months;" (ii) "a Bermuda based fund also managed by [Advisors], Stewardship

Credit Arbitrage Fund, Ltd. (the 'Off-Shore Fund') has received a large amount of redemptions

which have caused the bank leverage provider to both funds to notice an Event of Default to the

Off-Shore Fund" and Advisors was "in the process of working out an arrangement with the bank

leverage provider which includes the Domestic Fund;" and (iii) "certain underlying loans are not

current in payment," and Advisors has "begun analyzing the portfolio [including] the review of

collateral and collections to determine the extent of any issues concerning any underlying assets

that may have become impaired in an effort to do everything appropriate to protect the Domestic

Fund investors' interests."  According to the letter, "the suspensions referenced above [were

made] in order to avoid prejudice to investors by liquidating assets at a discount, to ensure

adequate liquidity to meet future obligations and to avoid dramatically altering the position and

risk profile of the Funds."

85.     Later that summer, Acorn commenced an action against Petters individually,

*Acorn Capital Group, LLC v. Thomas J. Petters*, No. 08 Civ. 7236 (S.D.N.Y.), on August 14,

2008.  The complaint (the "*Acorn* complaint") alleged that Acorn, beginning in November, 2004

(*i.e.*, the Initial Credit Agreement), had made a series of loans to PAC Funding, the collective

amount of which exceeded $273 million, exclusive of interest, all of which were past due and

outstanding.  Acorn further alleged that "certain" of the promissory notes pursuant to which the

loans had been made to PAC Funding (and other Petters entities) had been assigned by Acorn to

six other funds (upon information and belief, all related or ultimately controlled by Quan),

including the Stewardship Fund and the Subsidiaries.  The *Acorn* complaint specifies that, as a

result of Acorn's assignment, the Stewardship Fund was owed over $9 million by PAC Funding

and/or other Petters entities, and the Subsidiaries were owed over $50 million.  The *Acorn*

complaint further alleges that, because PAC Funding and/or other Petters entities were in default

to Acorn, Petters had breached his personal guaranty (limited to $50 million) for repayment of

the promissory notes.  The *Acorn* complaint also alleges that Petters individually breached certain

related representations and warranties because, in an August 4, 2008 telephone call with Quan,

Petters had admitted that the collateral underlying the promissory notes was worth less than the

contractual limit and that some of the collateral consisted of inventory, rather than accounts

receivable.[13]  Amazingly, despite the initiation of this action, no disclosure was made to Plaintiffs

and the Class at this time as to the true state of the Fund.

86.     On September 25, 2008, the last day of the Class Period, the *Minneapolis Star*

---

[13]In his deposition taken in connection with the *Polaroid-Acorn* adversary proceeding, Quan denied that Petters had made these statements, testifying that Petters was not referring to underlying collateral.  The "mistake" in the *Acorn* complaint was never corrected, virtually no activity took place in this action and it was voluntarily dismissed by Acorn on December 18, 2008.

*Tribune* reported that federal agents had executed a wide-ranging search warrant on the offices of PCI.  A spokesperson for PCI was quoted as saying that "[t]he investigation pertains to one financial entity that Petters is involved with."  The next day, the *Minneapolis Star Tribune* reported that, according to an affidavit submitted by the federal government in support of its search warrant application, just unsealed that afternoon, it was alleged that Petters and the Petters entities had engaged in a massive fraud, involving phony purchase and sales orders used to document that funds loaned to PCI and other Petters entities were "secured by property, principally retail goods, that were purchased at wholesale from vendors ... and sold to retailers such as Wal-Mart and Sam's Club for a profit."  By October 1, 2008, *Bloomberg.com* was reporting that Acorn was "among at least 20 investors the F.B.I. said may have been victimized by [Petters'] fraudulent lending scheme that could exceed $2 billion."[14]

87.    Thereafter, by memorandum dated October 17, 2008, Plaintiffs and other members of the Fund were informed (upon information and belief, for the first time) by Quan (as "Investment Manager") that "[t]he Federal Government is conducting an investigation into allegations of fraud allegedly perpetrated by Thomas Petters and others associated with Petters Company, Inc." and that a majority of the Fund's assets consisted of loans to Petters entities. Recipients of the October 17, 2008 memo were also informed, for the first time, that "there are also other defaulted issuers of notes owned by the Stewardship Funds from whom [Advisors] is assisting in the process of asset recovery and repayment."  Several days later, by memorandum dated October 22, 2008, Plaintiff and other Members of the Fund were further informed that:

---

[14]In a May 26, 2010 Final Proposed Restitution Order filed by the federal government in the *Petters* criminal action, it was estimated that Acorn sustained losses of almost $140 million as a result of Petters' fraud.

Because of the unprecedented set of facts and circumstances being presented by the Petters situation, which were unknown at the time, we have been requested by Ernst & Young LLP to notify you that their audit opinions and financial statements produced for the year ended December 31, 2007 and issued on March 31, 2008 for Stewardship Credit Arbitrage Fund, LLC, and Acorn Capital Group, LLC can no longer be relied upon.

88.     Before the September 25, 2008 news reports, Plaintiffs and the Class had no reason or basis to know, and could not have conceivably discovered, that the vast majority of the Stewardship Fund's assets consisted of Acorn's loans in the Petters Ponzi scheme.  Moreover, prior to October 17, 2008, Defendants never provided any notice to Plaintiff or the other members of the proposed Class of the Fund's investments in the Petters entities or the extent of such investments.

**B.     DEFENDANTS OMIT THAT NO DUE DILIGENCE HAS BEEN CONDUCTED PRIOR TO ENTERING INTO THE NOVEMBER 2004 INITIAL CREDIT AGREEMENT**

89.     Prior to entering into the Initial Credit Agreement, neither Advisors, Acorn, Quan, Seidenwar nor Bucci performed any due diligence regarding Petters or PAC Funding, Acorn's specially-created SPE, and Defendants omitted this fact from all of their communications with members of the Fund.  Instead, Defendants allegedly relied solely on the previous lending relationships with Redtagbiz and other Petters' companies, as Quan testified during his July 2, 2010 deposition taken in connection with the *Polaroid-Acorn* adversary proceeding: "We had an established track record with the Petters companies through the prior financings, so we had done due diligence on an ongoing basis. ...  [T]here was no specific due diligence related specifically to this transaction."  Likewise, CW 4 recalled that he was told by Quan that, with respect to loans to PAC Funding and Petters entities, due diligence was unnecessary.  CW 3 said that during his

tenure at Acorn (2007 to 2008), Petters was never vetted.

90.     Quan did testify that, on one occasion in 2004, he made a single telephone call to Larry Reynolds, the supposed principal of NIR (and Petters' accomplice), who Acorn understood was facilitating PAC Funding's merchandise purchases.  Even though Reynolds merely "confirmed" that NIR was selling merchandise to one of Petters' entities, and told Quan that he could not provide any other information because of non-disclosure agreements and "confidentiality concerns," neither Quan nor Acorn did anything more to verify the underlying PAC Funding transactions.

91.     The absence of due diligence is further confirmed by the October 27, 2004 PAC Funding LLC Approval Memorandum (the "10/27/04 memo").  Among other things, the 10/27/04 memo, which was approved by Quan, Seidenwar (Acorn's then-Chief Credit Officer), Bucci (Acorn's Chief Financial Officer) and Mary Ammon (underwriter), states as follows:

> PAC Funding was bourne [sic] out of previous historical fundings by sister companies of the same owner, Redtagbiz and Petters Company, LLC for purchase order financings ("PO financings"). ...  We have had over a four year history with these related parties with no defaults or late payments.  Further, we have had several other transactions, unrelated to PO financings: $40 million for inventory financing, $13 million A/R financings Petters Consumer Brands, and $50 million for FingerHut, Inc. as bridge financing.
>
> As stated in the termsheet of the proposed transaction, documentation is required for each funding, not to exceed $6 million.  The requirement of both a deposit reserve (blocked account) and a Lock Box account for collections adds to the comfort level of the transaction. ...

Thus, the 10/27/04 memo recommends approval of the Initial Credit Agreement because of, *inter alia*, "the relationships with the borrower throughout a ten year period."

92.     Another reason for approval of the transaction with PAC Funding noted by the

-49-

10/27/04 memo was the "personal guarantee of the Principal Owner ..."  CW 3 was told by Quan that Petters' personal guarantee obviated the need for due diligence.

93.     However, there was no due diligence conducted regarding Petters' own personal worth, and his personal guarantee of $50 million was apparently accepted at face value.  For example, Quan testified that he could not recall whether a request for Petters' tax returns was ever made, but it would have been impossible for Acorn to ever have received any of Petters' personal tax returns since he failed to file any after 2005 – a fact that any modicum of due diligence would have revealed.  Quan testified that the only thing Acorn received regarding Petters' own net worth was "personal financial statements ... internally generated" by Wehmhoff, PCI's Executive Vice President - Tax, who was subsequently convicted for assisting Petters in falsifying corporate and personal tax returns.  According to Quan, these "personal financial statements" showed that "most of [Petters'] financial strength was in the investments in his companies."

94.     At least in some instances, part of Acorn's pre-Class Period due diligence involved the use of Beau Dietl & Associates, a New York-based private investigator, to conduct background checks of the individuals involved in proposed lending transactions.  For example, such a "personal background check" was conducted in June, 2005 in connection with Esmerian's colleague, Mitchell May, who sought a $5 million credit secured by "high quality jewelry."  However, it is clear that no such investigation was conducted regarding Petters because it would have revealed Petters' previous and serious criminal record.  According to the complaint filed in the *Petters* SEC action, Petters had multiple felony convictions, including 1989 charges in Colorado for forgery, larceny and fraud, for which he served a prison sentence in May, 1990.

That same year, Petters was charged in Minnesota with two counts of theft by check, to which he

pled guilty to one count.  Furthermore, as reported on October 26, 2008 in the *Minneapolis Star-*

*Tribune*, similar disturbing information regarding Petters' background was relatively easy to find:

> New York hedge fund manager Richard Bookbinder of Bookbinder Capital
> Management passed on an investment after he learned that Petters had lied on a
> Dun & Bradstreet questionnaire about earning a degree from St. Cloud State
> University.
>
> "Things popped up and we didn't feel comfortable. When people gave money [to
> Petters] they didn't ask, 'Who's this guy? What's his background?'" he said. "The
> question is: This information was out there in 2002. We looked at it and we're a
> small firm; why didn't other people look at it?"
>
> Randy Shain, vice president of First Advantage Investigative Services, which did
> the due diligence for Bookbinder, said he investigated Petters and his Petters
> Company, Inc. (PCI) for four different clients. Each client looked at his findings
> and walked away.
>
> "The amount of litigation involving Petters was pretty startling," Shain said.  "We
> don't tell clients what to do. We let the clients decide. But a background report
> tells you what has happened in the past, and human beings tend to do the same
> thing again, especially under stress."

95.     Defendants clearly engaged in essentially no due diligence with respect to almost

70% of the investments undertaken on the part of the Class and failed and refused to disclose this

fact throughout the Class Period.

**C.      DEFENDANTS OMIT THAT THEY HAVE FAILED TO MONITOR AND
         ENFORCE COMPLIANCE WITH THE LOAN AGREEMENTS AND
         LOAN PERFORMANCE**

96.     Section 5.1 of the Initial Credit Agreement required PAC Funding to provide

Acorn with audited financial statements.  Despite this requirement, Quan testified at his

deposition in connection with the *Polaroid-Acorn* adversary proceeding that Acorn never

received audited financial statements of PAC Funding.  This material information was omitted

from all of Defendants' communications with Plaintiffs and other members of the Fund during the Class Period. Although Acorn received unaudited monthly balance sheets, Dominic Miele ("Miele"), Acorn's analyst responsible for monitoring and servicing the loans it originated, testified at his deposition in connection with the *Polaroid-Acorn* adversary proceeding that nothing was ever done to verify this information. In a similar context, Seidenwar noted in an August 14, 2008 email to a potential lender that "there's a wide range between internal and audited statements."

97. The 10/27/04 memo specifically identified the "Lock Box account" as adding to the "comfort level" for the Initial Credit Agreement with PAC Funding. Indeed, pursuant to the Initial Credit Agreement, PAC Funding was required "to direct payees on receivables constituting Collateral under the Security Agreement [*i.e.*, the high-end consumer electronics] to remit their payments to a lockbox ... established with [Crown Bank] for the benefit of [Acorn]." The November 1, 2004 Lockbox Account Agreement between PAC Funding, Acorn and Crown Bank (the "Lockbox Agreement"), entered into at the same time as the Initial Credit Agreement, provided Acorn with a security interest in, *inter alia*, the lockbox and specifically acknowledged that the lockbox account would be "under the sole dominion and control" of Acorn.

98. Miele testified at his deposition, taken in connection with the *Polaroid-Acorn* adversary proceeding, that part of his monitoring duties at Acorn was the daily review of anticipated payments to the Lockbox account, and his understanding of the Lockbox Agreement was that proceeds of the sales transactions would be wired from the Retailers to the Lockbox

account.[15]   However, Miele also testified to "one incident" in 2006 where he discovered a late

payment to the Lockbox account which, following verification with a Crown Bank employee,

had not come directly from one of the Retailers, but rather had originated from PCI.  Miele then

informed Acorn's Chief Financial Officer, Robert Bucci, who, after consulting with Quan and

Seidenwar, told Miele that, because PAC Funding had the ability to prepay a note, "everything

was okay with regards to them sending the money."  Miele did not follow-up with Bucci or

anyone else at Acorn about the fact that this particular payment had been late.  Miele testified

that he had not previously monitored the source of payments to the Lockbox account, and that

after this one incident, he ceased any attempts to verify the source of payments to the Lockbox

account.  Of course, given that there were never any sales to Retailers, the only source of funds to

the Lockbox account would have been PCI or another Petters entity.

       99.    Confidential Witness No. 5 ("CW 5"), hired to development new loans for Acorn,

reported that, even before the Class Period, Petters was making only one payment per month.

Since the ABL loans were designed to be staggered, with payments that should have been

received continually as 90 to 180 days lapsed, even Acorn's own management admitted that this

payment arrangement was unusual and suspicious.

       100.    Miele, who was hired by Quan in 2001 while still in college, testified that

although he initially worked with subscription and redemption requests on behalf of the

Stewardship Fund, his primary function changed over time and after 2003, he became

---

[15]Contrary to the terms of the Initial Credit Agreement and the understanding of other
personnel at Acorn, Quan testified that Acorn never intended to enforce the Lockbox
requirement, and that he understood from the beginning that purported payments from retailers
would initially go through PCI's bank account and then to the Lockbox at Crown Bank, rather
than coming directly from retailers.

increasingly focused on servicing Acorn's loans to PCI and PAC Funding (even though he had

no experience in conducting due diligence or monitoring loan performance).[16]  In this function,

Miele reported directly to Mark Sullivan, Acorn's then-Operations Supervisor.  Miele testified

his monitoring duties of the PCI and PAC Funding notes consisted of creating and reviewing

credit rating reports of the Retailers (*i.e.*, Costco or BJ's) via Dunn & Bradstreet and making

quarterly visits to PCI's offices in Minnesota.

101.    The purpose of Miele's site visits was to review recent purchase orders from the

Retailers, the invoices from NIR, the liquidator, and the purchase orders from PAC Funding (or

PCI depending on the time frame) to ensure that they all corresponded and that the SKU numbers

for the merchandise were consistent throughout.  Each visit was basically the same, and would

last two to three hours as Miele reviewed approximately 10 to 20 sets of purchase documents.

Miele did not know why, after the Initial Credit Agreement was entered into, Acorn was only

permitted to review the documentation in PCI's offices or why he was instructed to

surreptitiously photograph the purchase orders he was reviewing, thereby confirming, at a

minimum, that Defendants knew that they should have serious concerns about the legitimacy of

their investments with PAC Funding and the other Petters' entities (and were suspicious

regarding the same).  Of course, if Defendants had checked the legitimacy of any of these

photographed purchase orders (and, as explained below, it appears they did), they would have

immediately uncovered Petters' fraudulent enterprise.

---

[16]In fact, CW 2, whose job at Acorn involved keeping collateral and funding records current, and verifying the existence and amounts of accounts receivable, discussed with Miele the fact that she performed no such duties with respect to any PAC Funding or Petters'-related loans. Miele replied that CW 2 should "go ask Marlon," which CW 2 perceived as ending her inquiry.

102.    In June, 2008, Acorn discovered, through its counsel's search of UCC liens, that

five purchase orders were apparently "double-pledged" – although Acorn was supposed to have

priority over the merchandise represented by the purchase order, the same purchase orders were

registered as collateral for loans made by another "feeder fund" for the Petters' entities, Metro

Gem, Inc.  In a memo to Quan, Seidenwar and Sullivan regarding the July, 2008 site visit to

PCI's offices in response to this discovery (the "7/08 Miele memo"), Miele stated that Coleman

explained that the double-pledge was the result of a "typo."  Miele dutifully reported that the

"physical appearance of the documentation [regarding the Acorn purchase orders] ... did not

appear altered or tampered with" and that he had "inspected" the Metro Gem purchase orders and

confirmed that they were "clearly ... separate orders as the goods are not alike and the ship dates

are not on the same dates."  In her deposition taken in connection with the *Polaroid-Acorn*

adversary proceeding, Coleman testified that she corrected this problem by simply adding a

number to the end of the purchase orders assigned to Acorn.

103.    During an initial site visit to PCI's offices in March, 2005, Quan and Miele were

told that the merchandise was picked up from the liquidator's warehouse by the Retailers and that

copies of the shipping documents (*i.e.*, bills of lading) were maintained by the Retailers (but

available by request through PCI).  Upon information and belief, Acorn never requested such

documentation - because, if it had, it would have learned that the documentation did not exist.

104.    Stephen Foster ("Foster"), the principal of Foster Consulting, based in Walpole,

MA, performs, *inter alia*, asset-based loan audits and other advisory services for banks and other

lending institutions.  In connection with the *Polaroid-Acorn* adversary proceeding, Foster

testified regarding the September, 2008 field examination of ACG II, LLC ("ACG"), a special

purpose vehicle created by Acorn, which he conducted on behalf of Sovereign Bank ("Sovereign").[17]  Among other things, Foster testified that it is standard procedure for banks and other lenders in connection with receivable or purchase order transactions to verify in person or in writing that the underlying transaction for which the loan had been made had occurred on the date and in the amount indicated in the credit documentation.  Sullivan testified in connection with the *Polaroid-Acorn* adversary proceeding that it had been Acorn's "standard operational procedure" to make verification calls, but he had been told by Quan early on that a confidentiality agreement prohibited direct contact with the Retailers with which Petters transacted.  Miele testified that he had been told by Quan that the Retailers could not be contacted because Petters was "paranoid."

105.    Foster further testified that the Acorn records he examined indicated that major retailers had used their own trucks and had not signed any shipping documents, which was contrary to Foster's experience and inconsistent with good auditing practices.  Foster also testified that there were ways in which verification could be performed without implicating confidentiality concerns.

106.    Foster's October, 2008 Field Examination Report of ACG's collateral as of August 31, 2008 (the "ACG Collateral Report"), provided to Sovereign's Field Exam Group, was based primarily on the records of ACG and Acorn (although it was noted that "cooperation and

---

[17]ACG was created by Acorn in 2007 to pool certain short-term purchase order loans that would serve as exclusive collateral for the $22.5 million line of credit provided by Sovereign to ACG.  In or around September, 2008, ACG defaulted on the credit agreement with Sovereign and this default is the subject of the *Sovereign Bank* (CT) action.

access was limited")[18] and discussions with Seidenwar, Sullivan and other Acorn personnel.

Among the ACG Collateral Report's conclusions was that "due diligence conducted over the past

year, at least, has been sorely lacking."  More specifically, the ACG Collateral Report stated that:

> [ACG] does not perform verification on purchase orders or receivables that are in
> its collateral pool.  Actual purchase orders were not reviewed for the last year, but
> instead a list of P.O.'s was received [from] PAC Funding.  The ACG field exams
> did not confirm shipping documents for any receivables. [ACG] stated that
> shipping documents were not available when major retailers use their own trucks
> to pick-up merchandise, which is clearly erroneous and could indicate fraud. ...  It
> is disconcerting that a portfolio that reached $300M would have such a low level
> of review.  We were informed by President Paul Seidenwar that ACG had grown
> overly confident in its relationship with PCI and reduced its oversight over the last
> year due to its increasing familiarity and comfort and the relationship.  We
> recommend that the Bank accompany ACG and perform a full audit on PCI
> collateral including purchase order, receivables and inventory testing.  ACG did
> not allow us to retain the prior examinations conducted internally, and we
> recommend that the Bank require full access from the loan guarantor.

> * * *

> ACG prides itself on the ABL background of its executives.  Even so, it appears
> that [the] credit methodology used has been poor.  When loans were made against
> purchase orders, actual purchase order documents were not required, at least for
> the past year. [ACG] received a list of purchase orders signed by PAC Funding
> with each funding request.  The purchase orders were never verified, which is an
> essential due diligence requirement in purchase order financing.  Our review of
> the field exams showed that the methods used to check the collateral were
> insufficient.  We were not allowed to retain the field exams for further analysis.
> As discussed earlier, when A/R collateral was taken in May 2008, proper review
> of shipping documents was not conducted as [ACG] was told by PAC Funding
> that there were no signed documents due to the customer base (Sam's, Costco,
> Target, BJ's).  The lack of extensive due diligence enabled the financing of
> apparently fraudulent purchase orders and receivables.

> * * *

---

[18]Specifically, the ACG Collateral Report notes that ACG "declined to provide some
information and blacked out information on certain schedules, while other data was provided for
eyes only with no copies allowed to be retained."

Verifications are not performed on this account.  More troublesome is the fact that Acorn has not performed verifications on the purchase orders or receivables that are part of the borrowing base.

107.    Later, during the July 3, 2008 site visit to PCI (and as reported in the 7/08 Miele memo), Miele asked Coleman for copies of any correspondence from the Retailers reflecting the causes of purported shipping delays.  Coleman told him that because the Retailers "have their own logistics" and pick up the merchandise themselves, "there are no third party Bills of Lading or manifest exhibiting the shipments."  This was contrary to what Miele was told in March, 2005.

108.    Remarkably, in February, 2008, at the same time that PAC Funding had begun to fall behind on its payments to Acorn, which ultimately resulted in the May, 2008 "restructuring," Coleman proposed to Quan that Acorn enter into "roundtrip" transactions, whereby PAC Funding's payments to Acorn would be conditioned on Acorn's agreement to immediately send the funds back to PAC Funding.

109.    On February 25, 2008, Coleman sent an email to Petters stating:

Had a nice call with Marlon and I believe we'll be able to bring him 90 to 100% current.  I'm going to have to use his 22MM from the blocked account to do so but he promised me he'll turn the 22MM around into new deal right away.  So Wednesday when I get the 22MM from him I would use that to pay off old notes and he would turn it around and do new notes.

According to the Martens Aff., which was filed in connection with the *Polaroid-Acorn* adversary proceeding, on March 6, 2008, PAC Funding wired a total of $22,499,956.41 to Acorn and, over the next four days, Acorn wired $22,599,123 back to PAC Funding.  This sequence of events and Quan's acquiescence to the "roundtrip" transactions, which are classic indicia of a Ponzi scheme, demonstrate that Quan knew exactly what kind of investments (*i.e.*, fraudulent) he was engaged in when dealing with Petters or, at a minimum, should have had serious concerns with respect to

the same.

110.    On March 12, 2008, Coleman sent an email to Miele and Quan stating:

I'll have about 6.5mm to 7MM on Friday that I can use to pay off a couple of
notes Friday if you're able to put the money back to work on Monday or Tuesday.
The funds are PCI's and needs to be used for a couple of deals, but if you're able
to do the deals Monday or Tuesday I could use the funds to pay off a couple of old
notes.
The 2 new deals are with Sam's for $3,281,595 and $3,639,593.75.

According to the Martens Aff., on March 14, 2008, PAC Funding wired $6,998,949.70 to Acorn

and, the next business day, Acorn wired $6,921,188.75 million back to PAC Funding.  The

Martens Aff. reflects that Acorn entered into several other "roundtrip" transactions, whereby it

received payments totaling $16.7 million on March 24, 2008, only to wire back $15.9 million

over the next three days.

111.    As the forbearance period ended in or around June, 2008, Miele testified that

Acorn was continually informed that the justification for PAC Funding's inability to make

payments to Acorn was because the Retailers were delaying shipments following a sluggish

holiday season.  Miele further testified that Acorn confirmed the general state of the economy via

the internet and *Bloomberg*, but also conceded that no attempt was made to verify this

information with the Retailers.  Quan testified that, between January and February, 2008, he had

a conversation with Timothy Eng, the manager of FAM Global, a fund of hedge funds, who told

Quan that he had not heard of any other investors encountering difficulties in receiving payments

because of retailing delays.  In the face of this contradictory information, Quan did nothing and

continued to invest with Petters.

## VII.  ADDITIONAL SCIENTER ALLEGATIONS

112.   As more fully alleged above, Defendants ignored the following "red flags":

• Petters personally represented to Acorn's personnel that the reason PAC Funding had fallen behind (as of February, 2008) was because Retailers were delaying shipments after a slow holiday season.  However, Acorn took no steps to confirm Petters' representations and did not ask for written correspondence from the Retailers regarding the purported delays until at least six months later.

• Although it was standard practice in the industry and part of Acorn's standard operating procedures, Acorn had never verified with any of the Retailers that they were actually doing business with Petters or any of his companies.  Although Acorn reviewed purchase orders, Acorn had nothing against which to verify the purchase orders' accuracy.  For example, Petters, Coleman and White manually fabricated Sam's Club purchase orders.  However, Sam's Club was not even using manual purchase orders at the time and instead required all vendors to use electronic purchase orders.

• Acorn contacted NIR and spoke with Reynolds on one occasion (in 2004), but Reynolds refused to provide any information, citing supposed confidentiality concerns.  Acorn never followed up with Reynolds again and never contacted any of the manufacturers who were purportedly selling merchandise to Reynolds.

• Although it was standard in the industry, Acorn had no shipping information or warehouse information regarding the merchandise relating to the purchase orders securing its loans.

• Although the applicable credit agreement required PAC Funding to provide audited financials on an annual basis, Acorn never requested or received audited financials from PAC Funding, even though Acorn knew that internal financial documents were inherently unreliable compared to audited financial statements.

• Acorn did not enforce the Lockbox Agreement.  In fact, Petters could not have set up an actual Lockbox account to receive payments directly from Retailers because there were no actual sales to nor payments from Retailers.

• At this same time (February, 2008), Coleman, Petters' accomplice, began asking Acorn to "roundtrip" payments – *i.e.*, Coleman represented that PAC Funding could make repayments on its outstanding loans on the condition that Acorn would re-invest the money with PAC Funding in a matter of days.  Acorn willingly participated in the roundtrip transactions and received millions of dollars of payments between February 2008 and May 2008 that it permitted to literally get

away by re-investing with PAC Funding mere days later.

Moreover, despite the initial representations in the PPMs, material information, including (but not limited to) the preceding information alleged herein, was omitted from disclosure to Plaintiffs and other members of the Class.  Taken together, these material omissions reflect participation in an intentional fraud or, at the very minimum, severe recklessness and an intentional refusal to investigate for fear of uncovering the true state of the financial condition of PCI or PAC Funding.

113.    Any claim by Defendants that they were unwittingly duped by Petters, or that the supposed complexity of his scheme caught them unawares, rings hollow for the simple reason that Quan and Acorn had been down this road before.  The *Wedbush* action was ultimately settled on August 29, 2008 shortly before trial was to begin, for an undisclosed payment to Acorn, and the allegations made in that action demonstrate that, at a minimum, Acorn, Quan, Seidenwar and Bucci must have had a heightened apprehension for the possibility of fraud during the Class Period.

114.    In its March 3, 2006 complaint filed in the *Wedbush* action (the "*Wedbush* complaint"), Acorn alleged that it had been defrauded out of over $3 million in loans provided to Ed Safdie ("E. Safdie"), a reputed developer, between February, 2003 and January, 2004, in connection with E. Safdie's purchase and subsequent renovations to the Inn at Chester in Chester, Connecticut.  According to this pleading, E. Safdie's fraud was substantially assisted by his brother, Max Safdie ("M. Safdie"), a then-licensed broker and Senior Vice President of Investments at Wedbush Morgan Securities ("Wedbush") in San Francisco, who misrepresented to Acorn, both in telephone conversations and in writing, the existence and value of E. Safdie's personal brokerage account maintained at Wedbush which was to serve as collateral for the

loans.

115.    Specifically, the *Wedbush* complaint alleges that, in January, 2003, in connection with E. Safdie's request for a short-term $1 million bridge loan to finalize the purchase of the Inn at Chester, he provided Acorn with (i) a personal financial statement indicating E. Safdie's net worth, as of March 1, 2002, was over $11 million; (ii) a copy of a Sutro & Co. brokerage account statement for the "Edward Safdie Family Trust" reflecting a total account value of more than $5 million, also as of March, 2002; and (iii) a copy of an August 1, 2002 letter from M. Safdie, on Wedbush letterhead, addressed "To Whom It May Concern," confirming that "the Safdie brokerage account formally [sic] held at Sutro & Co. and valued at the mid seven figures range, is now held and managed at Wedbush Morgan Securities." In lieu of the family trust, E. Safdie offered as collateral his own personal brokerage account at Wedbush, valued at more than $3.7 million based on a copy of his Wedbush account statement. The *Wedbush* complaint alleges that Seidenwar, Acorn's then-Chief Credit Officer, telephoned M. Safdie in February, 2003, who generally confirmed the value of E. Safdie's personal brokerage account, and agreed to execute, on behalf of Wedbush, an agreement providing Acorn with control over E. Safdie's brokerage account. Furthermore, later that month but shortly before the proceeds of the loan were disbursed, an Acorn employee telephoned M. Safdie to confirm that his brother's brokerage account remained in excess of $3 million. M. Safdie provided the confirmation, the proceeds were disbursed, and E. Safdie repaid the loan, with interest, within the specified time.

116.    The *Wedbush* complaint alleges that, in April or May, 2003, E. Safdie approached Acorn again, requesting a $1 million credit line for renovations to the Inn at Chester. In connection with this request, E. Safdie provided Acorn with a copy of a more current Wedbush

account statement, showing a value in excess of $7.8 million.  Acorn alleged that, based on E.

Safdie's prompt repayment of the first loan and the apparent value of his Wedbush account

which would be used as security, the $1 million line of credit was approved.  In connection

therewith, M. Safdie sent a letter to Acorn, on Wedbush's behalf, confirming the terms of the

earlier control agreement and that the value of his brother's account was at least $4 million.  The

day after this letter, the proceeds of the line of credit were disbursed to E. Safdie.  Thereafter,

Acorn received monthly Wedbush account statements, showing that the value of E. Safdie's

account ranged from $4.5 million to almost $10 million as of December, 2003.

117.   In early January, 2004, E. Safdie approached Acorn seeking to double the

available credit line to $2 million.  As alleged in the *Wedbush* complaint, this request was

promptly approved given the stated value of E. Safdie's account and Acorn's control as

confirmed by M. Safdie's letter.  However, in connection with this extension, E. Safdie also

agreed that Wedbush would provide his original account statements directly to Acorn on a

monthly basis.  On January 14, 2004, the proceeds of this extended credit line were disbursed to

E. Safdie.

118.   In February, 2004, Acorn allegedly received a copy of E. Safdie's Wedbush

account statement from E. Safdie, rather than Wedbush as agreed.  Miele contacted E. Safdie and

reminded him that account statements were to be received directly from Wedbush.  Shortly

thereafter, E. Safdie provided Acorn with a copy of his letter to M. Safdie, instructing that all

future account statements should be sent directly to Acorn.

119.   The *Wedbush* complaint then alleges that, in March, 2004, Miele received, in a

Wedbush envelope with a postmark indicating that it had been mailed from San Francisco, what

purported to be E. Safdie's Wedbush account statement for February, 2004. "However, when Miele reviewed the statement, he noticed, among other things, that the coloring was inconsistent page to page, and that the standard terms that typically appeared on the reverse side of the statement were printed upside down." As further alleged in the *Wedbush* complaint, on or about March 18, 2004, Miele attempted to contact M. Safdie regarding the inconsistencies, but he was out and instead spoke with his assistant. Miele asked M. Safdie's assistant to confirm the account's value, and she responded that the account number was not under E. Safdie's name (it was actually in the name of E. Safdie's sister) and that it had been worth approximately $1,000 since October, 2002.

120. Thereafter, in quick succession, Acorn issued a notice of default and acceleration for repayment of the $1.3 million then outstanding on the line of credit, contacted Wedbush regarding its control agreement – which Wedbush refused to honor because M. Safdie had no authority to sign on behalf of Wedbush – and confronted E. Safdie regarding the phony account statements, to which he admitted. Based on these allegations, the *Wedbush* complaint asserted claims for, *inter alia*, fraud, civil conspiracy and aiding and abetting against M. Safdie and for fraud and negligent supervision against Wedbush.

121. Therefore, as of March 2004, almost nine months before entering into the Initial Credit Agreement with PAC Funding, Defendants knew, at a minimum, that (i) past lending experience was not a basis to avoid future fraudulent activity; (ii) financial documents, such as account statements, could be easily fabricated; and (iii) verification by telephone, even with someone purportedly with knowledge or authority, was not foolproof. Despite this knowledge, Acorn entered into the Initial Credit Agreement (the resulting notes from which were purchased

-64-

by the Fund) purportedly based solely on the past lending experience with Petters and his related entities, and thereafter never received any original documents from any of the Retailers and did not attempt even a telephone verification to verify that merchandise was actually being purchased.

122.    Furthermore, former employees of the Fund, Advisors and/or Acorn report that all loans and other transactions between Acorn and PAC Funding or any of the other Petters entities were shrouded in secrecy and treated differently from all other deals with other borrowers.  For example, CW 3 reported that it was a recurring topic of conversation and speculation that no one knew what was in the PAC Funding loan portfolio nor was given access to such information. CW 2 remembered that although due diligence for prospective deals was discussed at the weekly meetings, no Petters-related transactions were ever discussed at these meetings.  Moreover, as mentioned earlier, although CW 2's job involved the monitoring of collateral and accounts receivable for Acorn loans, and PAC Funding and other Petters entities represented Acorn's largest borrower, CW 2 was never responsible for any Petters-related loans.  CW 1 remembered that, toward the latter part of her tenure at Acorn (which coincided with an earlier portion of the Class Period), there were frequent private, closed door meetings between Quan, Seidenwar and Bucci, who were described as senior management and aware of, *inter alia*, all transactions with Petters.  CW 4 stated that such meetings between Quan, Seidenwar and Bucci were presumed to concern Petters.  Also, CW4 described this group has being unusually secretive, so much so that CW 4 could never determine how any deals, other than those involving Petters, were ever approved.

123.    Former employees uniformly recounted the difficulty in getting any non-Petters

deals approved.  For example, CW 4 recalled that he had presented a condominium deal to Quan

and Seidenwar in the latter half of 2006, which involved a $12 million bridge loan, with a term of

twelve months and 17% return, to be secured by the building itself.  At the last minute,

Seidenwar inexplicably demanded additional cash security and the deal fell through.  Similarly,

CW 4 noted that a $30 million revolver loan in Texas and a bridge loan, also for $30 million,

involving a Las Vegas property, that was brokered by a Los Angeles investment bank, were

unexpectedly rejected by Seidenwar and Quan.  Based on these and other experiences, CW 4

concluded that the way in which Quan and Seidenwar had rejected these proposed business deals

was suspicious.  CW 3 recalled the rejection of a loan involving aircraft by Quan, who said he

had better ideas for lending opportunities that involved the Petters' guarantee.  CW 5 reported

that, during his time at Acorn, he had presented over $600 million in prospective deals, all of

which ostensibly met Acorn's lending criteria.  Yet not one of these loans was accepted by Quan

or Seidenwar, who instead proceeded to invest with PAC Funding and other the Petters entities.

124.    In addition to the foregoing, the fees generated from the investments of Plaintiffs

and other Members of the Fund were significant.  The PPMs provide that Advisors, as the

Stewardship Fund's Managing Member (of which Quan was the sole member), received "a

monthly 'management fee' equal to 0.0833% of the Net Asset Value of each Member's Capital

Account(s) on the first Business Day of each month," which would not be reduced by any

distributions paid to a member during that month.  For example, if a Member's capital account

showed a NAV of $1.5 million at the beginning of the month, the monthly management fee

assessed for that one account would be approximately $1,250.  Even assuming only fifty

Members, the management fee would equal over $60,000 a month, or $7.5 million a year.

125.    In addition to the management fee assessed by Advisors, the PPMs also provided that, at the end of each quarter, "20% of that Fiscal Quarter's Net Capital Appreciation of each Interest [also defined as the capital contribution] (both realized and unrealized), will be reallocated to the Managing Member's Capital Account (the 'Performance Allocation')."  The PPMs specify that "[p]erformance allocations will be made on an Interest-by-Interest basis." Penalties were imposed on the withdrawal of Interests prior to two years, in the amount of 2% of the withdrawal proceeds if before one year and 1% of the withdrawal proceeds if before two years, which would be payable to the Fund.

126.    The PPMs also disclosed that Acorn charged the Stewardship Fund "a mark-up, or its equivalent, of between 50 and 75 basis points of the principal amount of each Acorn Financed Note sold to the [Fund]."  The December, 2005 monthly newsletter reported that the average note sold by Acorn to the Fund was $2.8 million, so Acorn's average "mark-up" per note was between $140,000 and $210,000.  The December, 2005 newsletter also reported that there were approximately 106 transactions for the month, so the approximate total mark-up assessed by Acorn for that time period was between $14.8 million and over $22 million.  In addition, the PPM provided that "Acorn may be paid commissions, transaction points or other consideration based on the loan amount ..."

127.    The Stewardship Fund also was required to pay fees and expenses, such as Escher's undisclosed "customary fee" as "Independent" Manager, regardless of whether it experienced any profit.  Specifically, the PPM stated as follows:

> The [Fund] will incur obligations to pay various fees, costs and expenses, including the mark-up on the Acorn Financed Notes, which may be substantial regardless of whether the [Fund] realizes any profits.  In addition, the [Fund] pays

the Managing Member a quarterly Performance Allocation (on both realized and unrealized profits) with respect to appreciation in each Series of Interests and also pays the monthly Management Fee to the Managing Member.

128.     Although the precise amount received by Defendants during the Class Period cannot be determined without the benefit of discovery, it was, as the PPM describes, "substantial."  Accordingly, the profitability of continuing the mutually beneficial relationship between Acorn and PAC Funding (and other Petters' entities) must be considered as an additional motivation for Defendants' alleged intentional or severely reckless actions as alleged herein.

## VIII.  CLASS ACTION ALLEGATIONS

129.     Plaintiffs bring this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, on behalf of themselves and all other persons who invested or otherwise contributed to the Stewardship Fund during the Class Period (*i.e.*, between February 6, 2006 and September 25, 2008).  Excluded from the Class are Defendants, their officers, their subsidiaries and affiliates, any entities in which they have a controlling interest, the legal representatives, heirs, successors, predecessors in interest, affiliates or assigns of any of the Defendants, and the Judge(s) to whom this case is assigned.

130.     This action may properly be maintained as a class action as a result of the following facts:

a.     During the Class Period, at least 60 entities or individuals were members of the Fund, who are located throughout the United States, and are so numerous that joinder of all members of the putative Class is impracticable;

b.     Plaintiffs' claims are typical of the claims of the other members of the

Class, and Plaintiffs and all members of the Class sustained damages as a result of Defendants'
wrongful conduct complained of herein;

       c.     Plaintiffs are representative parties that will fairly and adequately protect
the interests of the other members of the Class, have retained counsel competent and experienced
in class action securities litigation and have no interests antagonistic to, or in conflict with, the
Class they seek to represent;

       d.     A class action is superior to all other available methods for the fair and
efficient adjudication of the claims asserted herein, because joinder of all members is
impracticable.  Furthermore, even though the damages suffered by the individual Class members
may be significant, the expense and burden of individual litigation may make it difficult for the
Class members to separately redress the wrongs done to them.  Although some individual actions
have been commenced by Class members, upon information and belief, none have asserted
claims under the federal securities laws;

       e.     Plaintiffs anticipate no unusual difficulties in the management of this
action as a class action; and

       f.     The questions of law and fact common to the members of the Class
predominate over any questions affecting any individual members of the Class.

      131.    The questions of law and fact which are common to the Class include, among
others:

       a.     Whether the federal and state securities laws were violated by the acts of
Defendants, as alleged in this Complaint;

       b.     Whether the communications and other statements to members of the

Class by Defendants during the Class Period omitted material facts about the Fund, including, but not limited to, the due diligence performed on loans sold to the Fund, the subsequent performance of those loans, the quality of collateral underlying those loans, and the Fund's financial condition and business prospects;

       c.    Whether Defendants breached their duties and failed to update or correct information previously issued that they knew to be false, had become false, or the truth or falsity of which they had recklessly disregarded;

       d.    Whether Defendants failed to disclose material, adverse information at a time when they were in possession of such information;

       e.    Whether Defendants acted with knowledge or reckless disregard for the truth in omitting material facts from their Class Period statements; and

       f.    Whether Plaintiffs and other the members of the proposed Class have sustained damages as a result of Defendants' omissions and other wrongful conduct and, if so, what is the proper measure thereof.

## IX.  <u>ALTER EGO ALLEGATIONS</u>

132.    The Fund, Advisors and Acorn were alter egos of each other, and each was the alter ego of Quan.  As alleged herein, Quan created, operated, dominated and controlled the Fund, Advisors and Acorn.  Quan was the sole member of Advisors, the sole member of Acorn and, as the PPMs explicitly state, Quan "effectively controls both Acorn and the [Fund] through his ownership interests in [Advisors] and Acorn."  Therefore, either directly or through his control of Advisors or Acorn, Quan controlled the Fund at all times.

133.    As alleged herein, the Fund, Advisors and Acorn were used by Quan to further an

unfair, unjust or fraudulent purpose, including the perpetuation of Petters' Ponzi scheme (as well as the Ponzi scheme that the Fund effectively amounted to), and the continuing recognition of the Fund, Advisors and Acorn as entities separate and distinct from each other and from Quan would only serve to continue the fraudulent or otherwise wrongful purposes for which they were created. More specifically, the Fund, Advisors and Acorn operated as a single economic entity because, *inter alia*, each was grossly undercapitalized. For example, CW 1 indicated that Acorn was merely a conduit for the Fund's investments to be loaned to PAC Funding and other Petters entities, as well as other borrowers; once these loans were consummated, they were sold to, *inter alia*, the Fund. Thus, Acorn kept nothing on its books – any expense of monitoring the performance of the loans sold to the Fund was charged to the Fund. Acorn maintained a cash position only as large as needed to originate the loans. This was also confirmed by CW 5, who succinctly stated that the Fund's role was to raise money, which Acorn would use to make loans. Of course, since Acorn's loans were essentially worthless throughout the Class Period and the Fund's only assets were its investments in Acorn, the Fund and Acorn were severely undercapitalized throughout the Class Period.

134.    Advisors was equally undercapitalized. Confidential Witness No. 6 ("CW 6") worked for Advisors in an accounting function, which included maintaining bank statements, handling wire transfers and duties relating to payroll taxes and W-2s, and said that she and three other accounting personnel comprised the totality of Advisors' payroll. CW 3 said that in the summer of 2008, Quan informed all Acorn employees that they would have to begin paying for their own health insurance, and that the only exceptions were the office manager, Bucci (Acorn's Chief Financial Officer), and John Ruggerio (identified in the Form ADV as Advisor's Chief

Compliance Officer). Even though Advisors was charging, *inter alia*, a considerable amount through its monthly management fee, it had little in operating costs or expenses. As Advisors' sole member, the great percentage of the monthly management went directly to Quan.

135.    Even though he was nominally Advisors' Chief Compliance Officer, CW 1 thought John Ruggerio was Acorn's "computer guy." CW 3 mentioned that Ruggerio's job involved access of all employees' (*i.e.*, Acorn's) computers. Bucci was Acorn's Chief Financial Officer, but Ernst & Young sent its 2002 engagement letter for the audit of the Stewardship Fund to him on behalf of Advisors. A January 15, 2008 assignment between the Fund and Northlight Fund, LP bears Bucci's signature on the Fund's behalf as Assistant Portfolio Manager. CW 5 mentioned that, for at least some portion of the time that he was at Acorn, there was not even a separation with respect to the physical layout of the Greenwich office space, and that Advisors' employees and Acorn's personnel were all mixed together. None of the former employees understood Escher's role – his name was not familiar to CW 3 or CW 4, while CW 6 thought perhaps he was Quan's partner, and CW 1 believed he may have been an investor or a consultant. None of these former employees understood that Escher played any kind of independent role with respect to any of Acorn's transactions.

136.    At a minimum, the foregoing strongly supports the conclusion that Quan created the Fund, Advisors and Acorn for his own personal benefit. Neither Acorn nor Advisors paid dividends to anyone other than Quan (for each, their only member), and the PPMs stated that the Fund would make no distributions. Based on former employees and the PPMs themselves, Quan dominated the Fund, Advisors and Acorn to such an extent that any distinction between the three, or with Quan himself, was merely a facade. In sum, the Fund, Advisors and Acorn existed only

to permit Quan to use those corporate forms to perpetuate his fraudulent investment scheme, and

the failure to recognize the alter ego nature of the Fund, Advisors Acorn and Quan would result

in grave injustice and unfairness to Plaintiffs and the Class.

<div align="center">

**COUNT I**

**VIOLATION OF SECTION 10(b) OF THE
EXCHANGE ACT AND RULE 10b-5 THEREUNDER**
**(Against Stewardship Fund, Advisors, Acorn and Quan)**

</div>

137.    Plaintiffs incorporate by reference the foregoing paragraphs as if set forth herein

at length.

138.    Throughout the Class Period, the Fund, Advisors, Acorn and Quan, directly or as

alter egos of the other, orchestrated a scheme, plan or course of conduct in connection with the

sale of the Fund's securities, that was intended to, and throughout the Class Period, did deceive

Plaintiffs and other members of the proposed Class, omitted to state material facts necessary in

order to make the statements made, in light of the circumstances under which they were made,

not misleading to Plaintiffs and other members of the proposed Class, and engaged in acts,

practices, or a course of business which operated as a fraud or deceit upon Plaintiffs and other

members of the proposed Class.  The Fund, Advisors, Acorn and Quan, individually and in

concert, directly or indirectly, by the use of means and instrumentalities of interstate commerce

and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse

material information from Plaintiffs and other members of the proposed Class as specified

herein.

139.    The Fund, and as Managing Member of the Fund, Advisors, directly, and Acorn

and Quan, indirectly or as alter egos of the other, owed duties to Plaintiffs and other Members of

<div align="center">-73-</div>

the Class to timely disclose material information relating to the condition and performance of the promissory notes and other loans which Acorn sold to the Fund, and which were funded by the investments and/or contributions of Plaintiffs and other Class members.  At the time the PPMs were provided to Plaintiffs and other members of the proposed Class, but unbeknownst to them, the Fund, Advisors, Acorn and Quan knew that adequate due diligence and/or effective loan performance monitoring would not be conducted, or knew that such due diligence and monitoring could not be so conducted after such representations were made.  As alleged herein, the claims of the Fund, Advisors, Acorn and Quan, made directly or indirectly in the PPMs, regarding, *inter alia*, due diligence, loan performance and monitoring of collateral, placed upon the Fund, Advisors, Acorn and Quan a continuous duty to correct or update these representations when they became known to be misleading.  Rather than fulfilling these duties, the Fund, Advisors, Acorn and Quan engaged in active concealment and, to the detriment of Plaintiffs and other members of the proposed Class, omitted to disclose that, *inter alia*, no due diligence had been performed regarding a majority of the notes or other loans sold to the Fund, and neither the performance nor the condition (or even the existence) of the collateral underlying the notes or other loans had been monitored or verified.  Plaintiffs and other members of the proposed Class relied on the experience and expertise in asset-based lending allegedly possessed by the Fund, Advisors, Acorn and Quan.  By undertaking to prepare and issue the monthly newsletters regarding the Fund's performance to Plaintiffs and other members of the proposed Class, the Fund, Advisors, Acorn and Quan, directly or indirectly, undertook a duty to disclose all material information concerning the underlying investments of the Stewardship Fund, including, *inter alia*, the loans to PAC Funding and other Petters entities, the failure of these borrowers to adhere

-74-

to, or Acorn to enforce, contractual commitments and the conditions of PAC Funding's default, as more fully alleged herein, especially given the amount and frequency of the notes and other loans to these entities sold to and/or among the assets owned by the Stewardship Fund.

140.    Instead of millions of dollars, as represented, virtually no assets of the Stewardship Fund existed.  In light of the facts alleged herein, the Fund, Advisors, Acorn and Quan were consciously reckless and possessed a state of mind approximating actual intent to deceive given the deceptive course of conduct as alleged.  The Fund, Advisors, Acorn and Quan omitted material facts from Plaintiffs and other members of the proposed Class with reckless disregard for the truth, acting in a highly unreasonable manner, by failing to notify Plaintiffs and other members of the Class that, *inter alia*, no due diligence had been conducted regarding loans that comprised a substantial majority of the Fund's assets and that no monitoring of loan performance or the condition of collateral was being conducted.  Moreover, when they committed their omissions, the Fund, Advisors, Acorn and Quan knew, or had access to information suggesting, that their public statements were inaccurate, or failed to check information they had a duty to monitor and which would have demonstrated the falsity of their statements.  As alleged herein, in an extreme departure from the standards of ordinary care, the Fund, Advisors, Acorn and Quan chose to conceal information and/or not investigate red flags, regarding, *inter alia*, loan performance and the condition of collateral, that would have been material to a reasonable investor, such as Plaintiffs and other members of the proposed Class, in making an investment decision.  These omissions, regarding the due diligence not conducted, the loan performance not monitored and the collateral not verified, were made intentionally, or, at a minimum, with conscious recklessness that approximated intent, and constitute deceptive and

untrue omissions of material fact that were necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

141.    The Fund, Advisors, Acorn and Quan were also motivated, and had the opportunity, to further their fraudulent scheme, as alleged herein, in order to continue to assess and charge Plaintiffs and other members of the Class lucrative fees and expenses, including monthly management fees, performance allocations and mark-ups.

142.    The facts alleged herein compel a strong inference that the Fund, Advisors, Acorn and Quan made material false and misleading statements to Plaintiffs and other members of the Class with scienter, in that the Fund, Advisors, Acorn and Quan knew that their statements were materially false and misleading; knew or recklessly disregarded that such statements would be issued or disseminated to Plaintiffs and other members of the Class; and/or knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements.

143.    In ignorance of the false and misleading nature of the acts and omissions alleged herein and the deceptive and manipulative devices and contrivances employed by the Fund, Advisors, Acorn and Quan, Plaintiffs and other members of the proposed Class relied, to their detriment, on such deceptive conduct and misleading omissions in purchasing and maintaining their investments in the Stewardship Fund.  Moreover, Plaintiffs and other members of the proposed Class were required, as a condition of membership in the Stewardship Fund, to sign, *inter alia*, a Subscription Agreement declaring that, *inter alia*, they had relied on the representations set forth in the PPMs, including those related to conducting due diligence and monitoring loan performance and the condition of collateral.

144.    The deceptive conduct and materially false omissions particularized herein were

-76-

material to, and directly or proximately caused or were a substantial contributing cause of the damages sustained by, Plaintiffs and other members of the proposed Class.

145.    The losses of Plaintiffs and other members of the proposed Class were proximately caused by the active and primary participation of the Fund, Advisors, Acorn and Quan in the scheme to defraud and omissions alleged herein.  If the Fund, Advisors, Acorn and Quan had not engaged in the wrongdoing alleged herein, Plaintiffs and other members of proposed Class would not have invested, continued to invest, or converted one class of interests to another class of interests in the Stewardship Fund, or would have redeemed those interests long before Petters' Ponzi scheme was revealed.  Following the revelation of Petters' Ponzi scheme, the investments of Plaintiffs and other members of the proposed Class were decimated. Defendants' conduct, as alleged herein, proximately caused foreseeable losses to Plaintiffs and other members of the proposed Class.

146.    By reason of the foregoing, the Fund, Advisors, Acorn and Quan, directly or indirectly, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs and other members of the proposed Class in connection with their purchases of interests in the Stewardship Fund.

147.    As a direct and proximate result of the wrongful conduct of the Fund, Advisors, Acorn and Quan, Plaintiffs and the other members of the proposed Class have suffered damages in an amount to be proved at trial.

**COUNT II**

**VIOLATION OF SECTION 20(a)**
**OF THE EXCHANGE ACT**
**(Against Advisors, Acorn, Quan, Seidenwar and Bucci)**

148.     Plaintiffs incorporate by reference the foregoing paragraphs as if set forth herein at length.

149.     Advisors, Acorn, and Quan, directly or as alter egos of the other, and/or Quan, Seidenwar and Bucci, by virtue of their control and domination, were controlling persons of the Fund, Advisors and Acorn, within the meaning of Section 20(a) of the Exchange Act.  Moreover, during the Class Period, by virtue of their position of control and domination vis-a-vis the Fund, Advisors and Acorn, Advisors, Acorn, Quan, Seidenwar and Bucci , and each of them, was a controlling person within the meaning of Section 20(a) of the Exchange Act.

150.     Advisors, Acorn and Quan, directly or as alter egos of the other, and/or Quan, Seidenwar and Bucci controlled, participated in and/or were aware of the operations of the Fund, Advisors and Acorn, and/or had intimate knowledge of the statements issued regarding the Stewardship Fund, and had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Fund, Advisors and Acorn, including the content and dissemination of such statements and the information omitted therefrom which rendered the statements false and misleading.

151.     Advisors, Acorn and Quan, directly or as alter egos of the other, and/or Quan, Seidenwar and Bucci, had direct and supervisory involvement and control in the day-to-day operations of the Fund, Advisors and Acorn and, therefore, are presumed to have had the power to control or influence the statements and omissions giving rise to the securities violations as

-78-

alleged herein, and exercised the same.

152.    By virtue of the conduct described above, and/or their status as alter egos of each other, Advisors, Acorn, Quan, Seidenwar and Bucci are liable to Plaintiffs and the other members of the Class for the substantial damages that they have suffered in connection with their investment or contribution to the Stewardship Fund during the Class Period.

## COUNT III

## VIOLATION OF THE CONNECTICUT UNIFORM SECURITIES ACT
### (Against Stewardship Fund, Advisors, Acorn and Quan)

153.    Plaintiffs incorporate by reference the foregoing paragraphs as if set forth herein at length.

154.    The Fund, Advisors, Acorn and Quan, directly or as alter egos of the other, violated Section 36b-29 of the Connecticut General Statutes by offering to sell interests in the Stewardship Fund during the Class Period by means of untrue statements of material fact in the PPMs and thereafter omitting to state, in all subsequent statements, those material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.  As alleged herein, the Fund, and as Managing Member of the Fund, Advisors, directly, and Acorn and Quan, indirectly or as alter egos of the other, owed duties to Plaintiffs and other Members of the Class to timely disclose material information relating to the condition and performance of the promissory notes and other loans which Acorn sold to the Fund, and which were funded by the investments and/or contributions of Plaintiffs and other Class members.  At the time the PPMs were provided to Plaintiffs and other members of the proposed Class, but unbeknownst to them, the Fund, Advisors, Acorn and Quan knew that

adequate due diligence and/or effective loan performance monitoring would not be performed, or knew that such due diligence and monitoring could not be so conducted after such representations were made.  As alleged herein, the claims of the Fund, Advisors, Acorn and Quan, made directly or indirectly in the PPMs, regarding, *inter alia*, due diligence, loan performance and monitoring of collateral, placed upon the Fund, Advisors, Acorn and Quan a continuous duty to correct or update these representations when they became known to be misleading.  Rather than fulfilling these duties, the Fund, Advisors, Acorn and Quan engaged in active concealment and, to the detriment of Plaintiffs and other members of the proposed Class, omitted to disclose that, *inter alia*, no due diligence had been performed regarding a majority of the notes or other loans sold to the Fund, and neither the performance nor the condition (or even the existence) of the collateral underlying the notes or other loans had been monitored or verified.

155.    As alleged herein, the Fund, Advisors, Acorn and Quan knew, or in the exercise of reasonable care should have known, that they had omitted material facts from Plaintiffs and other members of the proposed Class, and thereafter failed to notify Plaintiffs and other members of the Class that, *inter alia*, no due diligence had been conducted regarding loans that comprised a substantial majority of the Fund's assets, and no monitoring of loan performance or the condition of collateral was being conducted.

156.    Plaintiffs and other members of the Class did not know, and in the exercise of reasonable care, could not have known, of the material omitted information because, as alleged herein, the Fund, Advisors, Acorn and Quan, either directly or as alter egos of the other, at all times during the Class Period, were in possession of superior and/or total information regarding the absence of due diligence that had been conducted regarding a majority of the notes or other

loans sold to the Fund, the performance of those loans and the monitoring of the collateral underlying the notes or other loans.

157.     As a direct and proximate result of the wrongful conduct alleged herein, Plaintiffs and other members of the proposed Class have suffered damages in an amount to be established at trial.

158.     As a registered investment advisor, Advisors is further liable to Plaintiffs and other members of the Class under Section 36b-29(b) for the consideration they paid, or which Advisors received, during the Class Period and for all losses sustained by Plaintiffs and other members of the Class resulting from the acts of Advisors as alleged herein.

159.     By reason of the foregoing, the Fund, Advisors, Acorn and Quan, directly or as alter egos of the other, have violated Section 36b-29 of the Connecticut General Statutes and are liable to Plaintiffs and the other members of the Class for the damages which they suffered in connection with their purchase of Stewardship Fund interests during the Class Period.

## COUNT IV

### AIDING AND ABETTING VIOLATIONS THE
### VIOLATION OF THE CONNECTICUT UNIFORM SECURITIES ACT
### (Against Advisors, Acorn, Quan, Seidenwar, Bucci and Escher)

160.     Plaintiffs incorporate by reference the foregoing paragraphs as if set forth herein at length.

161.     As set forth above, the Fund, Advisors, Acorn and/or Quan, directly or as alter egos of the other, violated Section 36b-29 of the Connecticut General Statutes.

162.     Advisors materially assisted the Fund, Acorn and/or Quan in their violations of Section 36b-29 of the Connecticut General Statutes.  As alleged herein, Advisors, *inter alia*,

knew but failed to disclose that no due diligence had been conducted with respect to a substantial majority of the notes and other loans owned by the Fund, and thereafter knew but failed to disclose that there was no monitoring being conducted of the performance of those notes and other loans, or the condition of the collateral underlying the notes or other loans. Advisors knew that such material information had not been disclosed to Plaintiffs and other members of the proposed Class.

163.    Acorn materially assisted the Fund, Advisors and/or Quan in their violations of Section 36b-29 of the Connecticut General Statutes. As alleged herein, Acorn, *inter alia*, originated all the notes and other loans that were sold to the Fund, but failed to conduct any due diligence with respect to a substantial majority of those notes and other loans, and thereafter failed to monitor the performance of those notes and other loans, or the condition of the collateral underlying the notes or other loans. Acorn knew that such material information had not been disclosed to Plaintiffs and other members of the proposed Class.

164.    Quan materially assisted the Fund, Acorn and/or Advisors in their violations of Section 36b-29 of the Connecticut General Statutes. As alleged herein, Quan, *inter alia*, knew but failed to disclose that no due diligence had been conducted with respect to a substantial majority of the notes and other loans owned by the Fund, and thereafter knew but failed to disclose that there was no monitoring being conducted of the performance of those notes and other loans, or the condition of the collateral underlying the notes or other loans. Quan knew that such material information had not been disclosed to Plaintiffs and other members of the proposed Class.

165.    Seidenwar materially assisted the Fund, Acorn, Advisors and/or Quan in their

violations of Section 36b-29 of the Connecticut General Statutes.  As alleged herein, Seidenwar,

*inter alia*, knew that no due diligence had been conducted with respect to a substantial majority

of the notes and other loans owned by the Fund, and thereafter knew that there was no

monitoring being conducted of the performance of those notes and other loans, or the condition

of the collateral underlying the notes or other loans.  Seidenwar knew that such material

information had not been disclosed to Plaintiffs and other members of the proposed Class.

166.    Bucci materially assisted the Fund, Acorn, Advisors and/or Quan in their

violations of Section 36b-29 of the Connecticut General Statutes.  As alleged herein, Bucci, *inter*

*alia*, knew that no due diligence had been conducted with respect to a substantial majority of the

notes and other loans owned by the Fund, and thereafter knew that there was no monitoring being

conducted of the performance of those notes and other loans, or the condition of the collateral

underlying the notes or other loans.  Bucci knew that such material information had not been

disclosed to Plaintiffs and other members of the proposed Class.

167.    Escher materially assisted the Fund, Advisors, Acorn and/or Quan in their

violations of Section 36b-29 of the Connecticut General Statutes.  As alleged herein, Escher,

*inter alia*, acted and served, at all times during the Class Period, as Independent Manager of the

Stewardship Fund, creating the appearance and deception that the inherent conflict of interest

between Advisors, Acorn and Quan with respect to the notes and loans to be purchased by the

Fund had been either ameliorated or eliminated, when in actuality, by virtue of his director-

positions with the Off-Shore Fund and Livingston Acres, LLC, Escher was not disinterested and

did not exercise any independence with regard to the review and/or approval of any proposed sale

of a note or loan from Acorn to the Fund.

168.     At all times, Advisors, Acorn, Quan, Seidenwar, Bucci and Escher knew, or reasonably should have known, of their respective roles in the securities fraud committed by the Fund, Advisors, Acorn and/or Quan.

169.     By reason of the foregoing, Advisors, Acorn, Quan, Seidenwar, Bucci and Escher aided and abetted the violations of the Connecticut Uniform Securities Act committed by the Fund, Advisors, Acorn and/or Quan and are liable to Plaintiffs and the other members of the Class for the damages which they suffered in connection with their purchase of Stewardship Fund interest during the Class Period.

170.     As a direct and proximate result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

WHEREFORE, Plaintiffs, on behalf of themselves and the other members of the proposed Class, demand judgment against Defendants as follows:

a.      Determining that this action is properly maintainable as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

b.      Certifying Plaintiffs as the Class Representatives and their counsel as Class Counsel;

c.      Declaring and determining that Defendants violated the federal securities laws by reason of their conduct as alleged herein;

d.      Awarding monetary damages against Defendants;

e.      Awarding Plaintiffs all statutory damages, penalties, costs and assessments, including interest as provided by the relevant provisions of the Connecticut General Statutes;

f.      Awarding Plaintiffs the costs, expenses, and disbursements incurred in prosecuting this action, including reasonable attorneys' fees and other recoverable expenses of litigation; and

g.      Awarding Plaintiffs and the other members of the Class such other and further relief as the Court may deem appropriate and just under all of the circumstances.

## JURY DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a trial

by jury in this action for all claims so triable against Defendants.

DATED: December 13, 2010       Respectfully submitted,

THE PLAINTIFFS

  /s/ Patrick A. Klingman
James E. Miller (ct21560)
Patrick A. Klingman (ct17813)
Karen Leser-Grenon (ct23587)
SHEPHERD, FINKELMAN, MILLER & SHAH, LLP
65 Main Street
Chester, CT  06412
Telephone: (860) 526-1100
Facsimile: (860) 526-1120
Email: jmiller@sfmslaw.com
       pklingman@sfmslaw.com
       kleser@sfmslaw.com

Scott R. Shepherd
Lawrence D. Berger
SHEPHERD, FINKELMAN, MILLER & SHAH, LLP
35 E. State Street
Media, PA 19063
Telephone: (610) 891-9880
Facsimile: (610) 891-9883
Email: sshepherd@sfmslaw.com
       lberger@sfmslaw.com

Lesley E. Weaver
SHEPHERD, FINKELMAN, MILLER & SHAH, LLP
199 Fremont Street, 20th Floor
San Francisco, CA  94105
Telephone: (415) 992-7282
Facsimile: (415) 489-7701
E-mail: lweaver@sfmslaw.com

Attorneys for Plaintiffs

-86-

**CERTIFICATE OF SERVICE**

I hereby certify that on December 13, 2010, a copy of the foregoing Amended Class Action Complaint was filed electronically and served by mail on anyone unable to accept electronic filing.  Service on Paul Seidenwar and Robert Bucci will be undertaken upon receipt of a summons from the Clerk of Court.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

 /s/ Patrick A. Klingman
Patrick A. Klingman (ct17813)