# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| POPTECH, L.P., individually, and on behalf of a class of others similarly situated, | : <br> : <br> : |
| Plaintiff, | :     No. 3:10-cv-967 (MRK) |
| v. | : |
| STEWARDSHIP CREDIT ARBITRAGE FUND, LLC, *et al.*, | : |
| Defendants. | :     March 22, 2011 |

## LEAD PLAINTIFF'S CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO THE MOTIONS TO DISMISS OF THE STEWARDSHIP DEFENDANTS

SHEPHERD, FINKELMAN, MILLER
  & SHAH, LLP
James E. Miller (ct21560)
Patrick A. Klingman (ct17813)
Karen Leser-Grenon (ct23587)
65 Main Street
Chester, CT  06412
Telephone: (860) 526-1100
Facsimile: (860) 526-1120
Email: jmiller@sfmslaw.com
      pklingman@sfmslaw.com
      kleser@sfmslaw.com

SHEPHERD, FINKELMAN, MILLER
  & SHAH, LLP
Lesley E. Weaver
199 Fremont Street, 20th Floor
San Francisco, CA  94105
Telephone: (415) 992-7282
Facsimile: (415) 489-7701
Email: lweaver@sfmslaw.com

SHEPHERD, FINKELMAN, MILLER
  & SHAH, LLP
Scott R. Shepherd
Lawrence D. Berger
35 E. State Street
Media, PA  19063
Telephone: (610) 891-9880
Facsimile: (610) 891-9883
Email: sshepherd@sfmslaw.com
      lberger@sfmslaw.com

Attorneys for Plaintiffs

**ORAL ARGUMENT REQUESTED**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

I.   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

II.  SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

III. PROCEDURAL HISTORY AND STATEMENT OF FACTS . . . . . . . . . . . . . . . .  6

     A.   Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

     B.   Statement Of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  7

IV.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

     A.   Standard Of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

     B.   The Complaint Alleges Direct, Not Derivative, Claims . . . . . . . . . . . . . . . .  15

     C.   Plaintiffs' Securities Fraud Allegations Are Sufficient . . . . . . . . . . . . . . . .  22

          1.   Loss Causation Is Adequately Pled . . . . . . . . . . . . . . . . . . . . . . . . . .  22

          2.   The Alleged Omissions Are Sufficiently Specific . . . . . . . . . . . . . . .  25

          3.   Omissions That Post-Date Plaintiffs' Investments Are Actionable . . .  29

          4.   Any Challenge To The Sufficiency Of The Stewardship
               Defendants' Due Diligence, If Any, Is Inappropriate At
               This Stage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  31

          5.   The Allegations Support A Strong Inference Of Scienter . . . . . . . . . .  34

     D.   Section 20(a) Liability Is Adequately Pled . . . . . . . . . . . . . . . . . . . . . . . . .  41

     E.   Liability Under The CUSA Is Adequately Pled . . . . . . . . . . . . . . . . . . . . . .  46

V.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  52

**TABLE OF AUTHORITIES**

Page

CASES

*Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . .   14

*Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) . . . . . . . . . . . . . . . .   31

*Akerman v. Arotech Corp.*, 608 F.Supp.2d 372 (E.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . .   35

*Albert v. Alex. Brown Management Services, Inc.*, Nos. Civ. A. 762-N, 763-N,
    2005 WL 2130607 (Del. Ch. Aug. 26, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

*Anwar v. Fairfield Greenwich Ltd.*, 728 F.Supp.2d 372 (S.D.N.Y. 2010) . . . . . . . . . .   *passim*

*Arce v. Walker*, 139 F.3d 329 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

*Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13, 14

*Auburn Chevrolet-Oldsmobile-Cadillac, Inc. v. Branch*, No. 5:06-CV-0362 GTS/GJD,
    2009 WL 667430 (N.D.N.Y. March 10, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19, 26

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12, 14

*Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975) . . . . . . . . . . . . . . . . . . . . . .   16

*Ceribelli v. Elghanayan*, 990 F.2d 62 (2d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . .   12

*Chiarella v. United States*, 445 U.S. 222 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   26, 27

*Chien v. Skystar Bio Pharm. Co.*, 566 F.Supp.2d 108 (D. Conn. 2008) . . . . . . . . . . . . . . . .   30

*City of Brockton Ret. Sys. v. Shaw Group Inc.*, 540 F.Supp.2d 464 (S.D.N.Y. 2008) . . . . . . .   35

*Connecticut National Bank v. Giacomi*, 242 Conn. 17 (1997) . . . . . . . . . . . . . . . . . .   47-49, 51

*Debussy LLC v. Deutsche Bank AG*, No. 05 Civ. 5550 (SHS),
    2006 WL 800956 (S.D.N.Y. March 29, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

*Diaz-Bernal v. Myers*, No. 3:09-CV-1734 (SRU),
    2010 WL 5211494 (D. Conn. Dec. 16, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

*DiBlasio v. Novello*, 344 F.3d 292 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   32

*DirecTV Latin America, LLC v. Park 610, LLC*, 691 F.Supp.2d 405 (S.D.N.Y. 2010) . . . . .   26

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005) . . . . . . . . . . . . . . . . . . . . . . . . .   23

*Ernst & Young Ltd. v. Quinn*, No. 09-cv-1164 (JCH),
    2009 WL 3571573 (D. Conn. Oct. 26, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

*Excimer Assocs., Inc. v. Vision, Inc.*, 292 F.3d 134 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . .   21

*Freudenberg v. E*Trade Financial Corp.*, 712 F.Supp.2d 171 (S.D.N.Y. 2010) . . . . . . .   33-34

*Furchtgott-Roth v. Wilson*, No. 09 Civ. 9877 PKC,
    2010 WL 3466770 (S.D.N.Y. Aug. 31, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19, 26

*Ganino v. Citizens Utilities Co.*, 228 F.3d 154 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . .   22, 35

*Glazer v. Formica Corp.*, 964 F.2d 149 (2d Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

*Grimes v. Donald*, 673 A.2d 1207 (Del. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

*Gurary v. Winehouse*, 235 F.3d 792 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   30

*Hall v. Children's Place Retail Stores, Inc.*, 580 F.Supp.2d 212 (S.D.N.Y. 2008) . . . . . .   43, 46

*Halo Tech Holdings, Inc. v. Cooper*, No. 3:07-CV-489 (AHN),
    2008 WL 4080081 (D. Conn. Aug. 29, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15, 18

*Hemi Group, LLC v. City of New York*, 130 S.Ct. 983 (2010) . . . . . . . . . . . . . . . . . . . . . .   12

*In re American Intern. Group, Inc. 2008 Sec. Litig.*, 741 F.Supp.2d 511,
    2010 WL 3768146 (S.D.N.Y. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   21

*In re Beacon Associates Litig.*, No. 09 Civ. 777 LBS,
    2010 WL 3895582 (S.D.N.Y. Oct. 5, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   23

*In re Donna Karan Int'l Sec. Litig.*, No. 97-CV-2011,
    1998 WL 637547 (E.D.N.Y. Aug. 14, 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   34

*In re Fannie Mae 2008 Sec. Litig.*, 742 F.Supp.2d 382 (S.D.N.Y. 2010) . . . . . . . . . . . .   41-43

*In re Fischbach Corp. Sec. Litig.*, No. 89 Civ. 5826 (KMW),
    1992 WL 8715 (S.D.N.Y. Jan. 15, 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36, 40

*In re Initial Public Offering Sec. Litig.*, 358 F.Supp.2d 189 (S.D.N.Y. 2004) . . . . . . . . . . .   46

*In re Initial Pub. Offering Sec. Litig.*, 383 F.Supp.2d 566 (S.D.N.Y.2005) . . . . . . . . . . . . .   13

*In re Issuer Plaintiff Initial Public Offering Antitrust Litig.*, No. 00 Civ. 7804 (LMM),
    2004 WL 487222 (S.D.N.Y. March 12, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

*In re J.P. Jeanneret Associates, Inc.*, No. 09 Civ. 3907 (CM),
    2011 WL 335594 (S.D.N.Y. Jan. 31, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . .  12, 23

*In re New Century*, 588 F.Supp.2d 1206 (C.D. Cal. 2008) . . . . . . . . . . . . . . . . . . . . . . . . .  32

*In re NovaGold Resources Inc. Sec. Litig.*, 629 F.Supp.2d 272 (S.D.N.Y. 2009) . . . . . . .  19, 26

*In re Openwave Systems Sec. Litig.*, 528 F.Supp.2d 236 (S.D.N.Y. 2007) . . . . . . . . . . . . . .  37

*In re Parmalat Sec. Litig.*, 598 F.Supp.2d 569 (S.D.N.Y. 2009) . . . . . . . . . . . . . . . . . . . . . .  41

*In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir.2001) . . . . . . . . . . . . . . . . . .  14, 35-36

*In re Smith Barney Transfer Agent Litig.*, No. 05 Civ. 7583 WHP,
    2011 WL 350289 (S.D.N.Y. Jan. 25, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17, 21

*In re Sturm, Ruger & Co., Inc. Sec. Litig.*, No. 3:09-CV-1293 (CFD),
    2011 WL 494753 (D. Conn. Feb. 7, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  22

*In re Text Messaging Antitrust Litig.*, 630 F.3d 622 (7th Cir. 2010) . . . . . . . . . . . . . . . . . . .  13

*In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259 (2d 1993) . . . . . . . . . . . . . . . . . . . . . . . . . .  27

*In re Warner Comm. Sec. Litig.*, 618 F.Supp. 735 (S.D.N.Y. 1985) . . . . . . . . . . . . . . . . . . .  20

*In re Xerox Corp. Sec. Litig.*, 165 F.Supp.2d 208 (D. Conn. 2001) . . . . . . . . . . . . . . . . . . .  37

*Internat'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1359 (2d Cir.),
    *cert. denied*, 417 U.S. 932 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

*JHW Greentree Capital, L.P. v. Whittier Trust Co.*, No. 05 Civ. 2985 (HB),
    2006 WL 1080395 (S.D.N.Y. April 24, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  48

*Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147 (2d Cir. 2007) . . . . . . . . . . . . . . . . . . . .  22

*Lehn v. Dailey*, 77 Conn.App. 621 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  47

*Lerner v. Fleet Bank, N.A.*, 459 F.3d 273 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . .  14

*Lonegan v. Hasty*, 436 F.Supp.2d 419 (E.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  32

*Matignon Finance, Inc. v. Ameritel Comm. Corp.*, No. 88 Civ. 5742 (JFK),
    1989 WL 153282 (S.D.N.Y. Dec. 14, 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

*McLoughlin v. People's United Bank, Inc.*, 586 F.Supp.2d 70 (D. Conn. 2008) . . . . . . . . . .   47

*Mills v. Polar Molecular Corp.*, 12 F.3d 1170 (2d Cir.1993) . . . . . . . . . . . . . . . . . . . . . . . .   14

*Nemec v. Shrader*, No. 09 Civ. 7466 (LAK),
       2010 WL 3958655 (S.D.N.Y. Sept. 27, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . .   19, 26

*Norman v. Salomon Smith Barney, Inc.*, 350 F.Supp.2d 382 (S.D.N.Y. 2004) . . . . . . . . . . .   32

*Novaks v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . .   14, 35-36

*Packer v. SN Servicing Corp.*, 250 F.R.D. 108 (D. Conn. 2008) . . . . . . . . . . . . . . . . . . . .   24, 41

*Panos v. Island Gem Enterprises, Ltd., N.V.*, 880 F.Supp. 169 (S.D.N.Y. 1995) . . . . . . . . . .   20

*Pension Committee of University of Montreal Pension Plan v. Banc of America
       Securities, LLC*, 446 F.Supp.2d 163 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . .   17

*Quinn v. Stewardship Credit Arbitrage Fund, LLC*, No. X03 CV 09-4046467-S,
       slip op. (J.D. of Hartford (CLD) Aug. 6, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   20

*RBCI Holdings, Inc. v. Drinks Americas Holdings, Ltd.*, No. 07 CIV. 2877 (DC),
       2008 WL 759339 (S.D.N.Y. March 20, 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

*Realmonte v. Reeves*, 169 F.3d 1280 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   24

*Rizzo v. MacManus Group, Inc.*, 158 F.Supp.2d 297 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . .   27

*Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38 (2d Cir.),
       *cert. denied*, 439 U.S. 1039 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   36

*7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211 (5th Cir.1994) . . . . . . . . .   24

*S.E.C. v. DiBella*, 587 F.3d 553 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   27

*Schnall v. Annuity and Life Re (Holdings), Ltd.*, No. 3:02-CV-2133(GLG),
       2004 WL 515150 (D. Conn. March 9, 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   37

*Sedona Corp. v. Ladenburg Thalmann & Co., Inc.*, No. 03 Civ. 3120 (LTS)(THK),
       2005 WL 1902780 (S.D.N.Y. Aug. 9, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   42, 46

*Shomo v. City of New York*, 579 F.3d 176 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

*Skinner v. Switzer*, No. 09-9000, 2011 WL 767703 (U.S. March 7, 2011) . . . . . . . . . . . . . .   13

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008) . . . . . . . .   30-31

*South Cherry Street, LLC v. Hennessee Group LLC*, 573 F.3d 98 (2d Cir. 2009) . . . . . . . . . 40

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) . . . . . . . . . . . . . . . . . 34-35

*Tischmann v. ITT/ Sheraton Corp.*, 145 F.3d 561 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . 24

*Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004) . . . . . . . . . . . . . 17

*United States v. Chestman*, 947 F.2d 551 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Valencia ex rel. Franco v. Lee*, 316 F.3d 299 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . 47

*Vento & Co. of New York v. Metromedia Fiber Network, Inc.*, No. 97 Civ. 7751 (JGK),
    1999 WL 147732 (S.D.N.Y. March 18, 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Williams v. Fischer*, No. 08-CV-4612 (DLI) (VVP),
    2010 WL 3924688 (E.D.N.Y. Sept. 30, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Yajure v. DiMarzo*, 130 F.Supp.2d 568 (S.D.N.Y. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

STATUTES, RULES AND OTHER AUTHORITIES

15 U.S.C. § 78c . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
15 U.S.C. § 78j . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
15 U.S.C. § 78t . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
15 U.S.C. § 78u-4 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

28 U.S.C. § 1332 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47
28 U.S.C. § 1367 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

17 C.F.R. § 240.10b-5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Federal Rule of Civil Procedure 8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
Federal Rule of Civil Procedure 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14
Federal Rule of Civil Procedure 12 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Conn. Gen. Stat. § 36b-29 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

5 C. Wright & A. Miller, *Federal Practice & Procedure* § 1219
    (3d ed.2004 and Supp.2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

II L. Loss & J. Seligman, *Securities Regulation* (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Lead Plaintiff, Poptech, L.P. ("Poptech" or "Lead Plaintiff"), together with Plaintiffs and proposed Class Representatives, Terence Isakov, M.D. and William A. Meyer (collectively, "Plaintiffs"), on their own behalf and on behalf of the proposed class (the "Class") they seek to represent, respectfully submit this Consolidated Memorandum of Law in Opposition to the Motions to Dismiss (collectively, the "Motions" or "Motions to Dismiss") filed by Defendants, Stewardship Investment Advisors, LLC ("Advisors") and Marlon Quan ("Quan"), Acorn Capital Group, LLC ("Acorn"), Stewardship Credit Arbitrage Fund, LLC ("Stewardship Fund" or the "Fund"), Gustav E. Escher, III ("Escher"), Paul Seidenwar ("Seidenwar") and Robert Bucci ("Bucci") (collectively, the "Stewardship Defendants" or "Defendants").[1]

## I.   INTRODUCTION

The Complaint, brought on behalf of persons or entities who became Members of the Fund or otherwise converted their interests in the Fund between February 6, 2006 and September 25, 2008 (the "Class Period"), presents a detailed, fact-based presentation of a hedge fund, its

---

[1] Plaintiffs' December 13, 2010 Amended Class Action Complaint (the "Complaint") asserts four counts: Count I, for violation of Section 10(b) of the Securities Exchange Act ("Exchange Act"), against Advisors, Quan, Acorn and the Fund; Count II, for violation of Section 20(a) of the Exchange Act, against Advisors, Quan, Acorn, Seidenwar and Bucci; Count III, for violation of the Connecticut Uniform Securities Act ("CUSA"), against Advisors, Quan, Acorn and the Fund; and Count IV, for aiding and abetting violation of CUSA, against Advisors, Quan, Acorn, Seidenwar, Bucci and Escher.

Advisors and Quan filed a Motion to Dismiss [docket no. 64] (the "Advisors/Quan Motion"), which consists almost exclusively of a challenge to Plaintiffs' claims under Count I (*i.e.*, Section 10(b) of the Exchange Act) and virtually ignores the claims asserted under the remaining Counts. All of the other Defendants join in and adopt as their own the Advisors/Quan Motion. Neither Acorn [docket no. 65] nor the Fund [docket no. 67] advance any independent grounds for dismissal. The Motions to Dismiss of Seidenwar [docket no. 63] and Bucci [docket no. 69] contest the sufficiency of the Complaint's allegations as their liability for Counts II (Section 20(a)) and IV (aiding and abetting CUSA violation), and Escher's Motion to Dismiss [docket no. 62] challenges the aiding and abetting allegations. Seidenwar, Bucci and Escher are referred to collectively as the "Individual Defendants."

manager and others who controlled or otherwise oversaw the hedge fund's operations who were either impossibly reckless and inept with the money entrusted to them, or who knew, in a conscious and calculating manner, that they were placing their junior partners (*i.e.*, the Class) in, at best, highly suspicious and dubious investments, but simply did not care because they were earning substantial fees and profits in the process.  In either instance, the fact that the Fund at issue was named "stewardship" is quite ironic.  That is because, despite their explicit representations to the contrary, the Stewardship Defendants engaged in no "stewardship" of the Fund's assets at all.  As explained fully below, throughout the Class Period, the Stewardship Defendants omitted highly material facts from their public statements and communications to the Class, which resulted in all of their statements being false and fraudulent when issued. Moreover, as also fully explained below, the Stewardship Defendants not only knew that their Class Period statements were false when issued, but they acted with the requisite state of mind in committing this fraud (*i.e.*, acted knowingly or in a severely reckless manner) and/or otherwise are legally responsible for the securities fraud committed by the other Stewardship Defendants.

The vast majority of the Fund's assets consisted of loans made to one of many corporate entities created by Thomas J. Petters ("Petters"), a career (now imprisoned) con man whose criminal exploits are rivaled only by Bernard Madoff.  Together with Acorn and his other inter-related entities, all of which he controlled, the Complaint demonstrates that Quan (the individual who controlled and/or employed all of the Stewardship Defendants) ignored conspicuous indicia of fraud or, at a minimum, failed to check out highly suspicious facts and evidence that would have been obvious to any investor of average intelligence – and obviously should have been and was obvious to an investor of Quan's supposed experience and acumen.  Such behavior, thoroughly documented and supported from testimonial and documentary evidence presented in

other actions,[2] supports a strong inference of the intentional or severely reckless withholding of material information from Plaintiffs and the other Class members.  When considered in light of the fiduciary duties owed by the Stewardship Defendants to provide such material information to Plaintiffs, the Complaint's allegations of securities fraud under both federal and Connecticut law are overwhelming and it is frankly absurd that the Stewardship Defendants have sought to challenge them.

The Advisors/Quan Motion, the principal motion to dismiss, to put it mildly, meanders and touches upon many of the elements required to successfully plead a cause of action under Section 10(b) of the Exchange Act (and by implication, CUSA, the Connecticut law equivalent), but in the final analysis, the scattered approach, at best, only strike glancing blows.  Some of the arguments raised border on juvenile,[3] and others are so disconnected from the reality of controlling law that they barely merit any response.  *See*, *e.g.*, Motion at 13-14 (apparent challenge to the Stewardship Defendants' duty to disclose within the context of Federal Rule of Civil Procedure 9(b)'s required level of specificity).  None, however, are successful.  As demonstrated below, the Complaint more than adequately alleges that the Stewardship Defendants committed securities fraud when they consciously or recklessly omitted material information regarding their failure to, *inter alia*, conduct due diligence, monitor loan

---

[2]Although the Court is not bound to accept allegations in other pleadings as true, it is important to remember that other pleadings are bound by Rule 11 or its equivalent.  More critically, as is clear from the Complaint, it is the pieces of evidence submitted or excerpted in connection with those pleadings, rather than simply allegations, on which Plaintiffs here rely.

[3]For example, the Motion excoriates Plaintiffs because one heading is titled "Additional Scienter Allegations," but consists of a summary of previous allegations ("[a]s more fully alleged above ....").  *Compare* Motion at 33-34, *with* Complaint, ¶112.  In another instance, the Stewardship Defendants claim to be unaware of "which statements are claimed to be actionable," ignoring that portion of the Complaint entitled "The Class Period Statements of Advisors and Quan."  *Compare* Motion at 15, *with* Complaint, ¶¶72-88.

performance and/or verify the existence of collateral that was supposedly securing the vast majority of the Fund's investment portfolio.

## II.    **SUMMARY OF ARGUMENT**

The Stewardship Defendants' Motions (by adopting *in toto* the arguments set forth in the Advisors/Quan Motion) largely (and desperately) strive to convince the Court that Plaintiffs' securities claims are derivative and thus, since they purportedly belong to the Fund, have been improperly asserted by Plaintiffs.  This argument entirely overlooks the fact that no traditional derivative claims are asserted here – there are no counts for breach of fiduciary duty or waste of corporate assets.  The Stewardship Defendants' argument also ignores that derivative claims and direct claims, such as those asserted here, are not mutually exclusive and the same facts and evidence may support both types of claims.[4]

Defendants' line of argument ignores that Quan, as the Managing Member of a limited liability company, owed certain duties to the Fund's Members (*i.e.*, Plaintiffs and the Class), including the duties to disclose and update, and that, because Quan so thoroughly controls Advisors, Acorn and the Fund (collectively, the "Quan entities"), these entities likewise owed those duties to the Fund's Members.  As a result, Plaintiffs have the absolute and indisputable legal right to assert claims arising from the breach of those direct duties owed by the Quan entities.

Similarly, Defendants' Motions lack any credible challenge to the Complaint's alter ego allegations, which effectively show that the Fund was wholly controlled by Advisors, which in

---

[4]It also bears noting that, if accepted, Defendants' argument would elevate corporate theory over reality: unlike a corporation or company which generally is devoted to a larger purpose or goal and will continue to exist after resolution of derivative claims, as alleged in the Complaint, the Fund was created or evolved into a mere conduit for fresh capital into the Petters' Ponzi scheme.  Thus, there is every indication that the Fund now exists in name only.

turn was wholly controlled by Quan, who also wholly controlled Acorn.  To close this loop (and thereby create a prototypical incubator for fraud), all of the Fund's assets consisted of loans purchased, with the advice and consent of Advisors, from Acorn, which would then ostensibly continue to service the loans.

The remainder of the Advisors/Quan Motion attempts to contest the adequacy of Plaintiffs' allegations under the rules and conventions governing federal securities claims. However, as shown herein, the Complaint fully satisfies the requirements of the Private Securities Litigation Reform Act (the "PSLRA"), as well as Federal Rule of Civil Procedure 9(b), and otherwise pleads actionable conduct on the part of all of the Stewardship Defendants.  Thus, the statements rendered misleading because of the Stewardship Defendants' omissions are clearly identified in the Complaint, which explains how and why they were false and misleading when issued.  Moreover, as discussed below, the Stewardship Defendants' argument that statements rendered after Plaintiffs became Members of the Fund somehow are no longer misleading is entirely fallacious because, in light of the continuing nature of the omissions, those statements remain actionable under applicable and controlling law and should be considered in evaluating the adequacy of the Complaint.  In addition, Defendants' attempt to challenge the adequacy of Plaintiffs' allegations regarding the Stewardship Defendants' due diligence is not only selective (as it largely ignores the allegations of unmonitored loan performance), but also is highly improper at this stage, as all reasonable inferences need be afforded to Plaintiffs (and not to Defendants at the pleading stage).  As discussed below, the circumstantial evidence of recklessness or willful blindness arising from the facts pled in the Complaint is very strong and is at least as compelling as any other non-culpable inference (which the Stewardship Defendants notably fail to present).  Finally, the Motions do not mount a serious challenge to Plaintiffs'

control person claims under Section 20 of the Exchange Act, or to those brought pursuant to the

CUSA, including the claims for aiding and abetting liability.  Those claims are based on the same

facts that support the Section 10(b) claim and, as explained below, are more than adequately

pled.  For all of these reasons, the Stewardship Defendants' Motions should be denied in their

entirety.

**III.      PROCEDURAL HISTORY AND STATEMENT OF FACTS**

        **A.      Procedural History**

Poptech initiated this action on or about June 18, 2010 with the filing of its Class Action

Complaint, which named the Stewardship Defendants, the Individual Defendants and several

other individuals and entities.  On August 23, 2010, pursuant to the provisions of the PSLRA,

Poptech, along with the other Plaintiffs, Dr. Isakov and Mr. Meyer, moved to be appointed as

Lead Plaintiff.  Over the October 1, 2010 opposition of Advisors and Quan (which challenged the

sufficiency of Poptech's PSLRA-mandated notice), the Court's October 28, 2010 Ruling

appointed Poptech as Lead Plaintiff and reserved judgment on the appointment of Dr. Isakov and

Mr. Meyer as co-Lead Plaintiffs.

Meanwhile, on October 15, 2010, Advisors, Quan and Acorn filed motions to dismiss

Poptech's initial Complaint.  Following a conference with the Court and pursuant to this Court's

October 22, 2010 Order, Poptech was afforded until December 13, 2010 in which to amend its

Complaint and Defendants were granted until January 14, 2011 (later extended to February 14,

2011) to respond.  Following the filing of the Complaint and the motions to dismiss, the Court's

March 3, 2011 Order allowed Plaintiffs until March 22, 2011 to submit their opposition

memorandum to the motions to dismiss.  After Defendants submit their reply briefs on or before

April 8, 2011, the motions to dismiss will be fully briefed.

### B.   Statement Of Facts

The Stewardship Fund, organized as a Delaware limited liability company in 2001, is a
Connecticut-based hedge fund primarily focused on investing in asset-based lending ("ABL")
transactions.  Complaint, ¶¶18, 26.  Advisors, the Fund's Managing Member and its registered
investment advisor, is also a limited liability company.  *Id.*, ¶19.  According to Confidential
Private Placement Memoranda (the "PPMs"), disseminated by the Fund or Advisors to
prospective Fund investors (the terms of which were substantially identical throughout the Class
Period), the Fund would purchase "all or substantially all" of the loans originated by Acorn,
another limited liability company.  *Id.*, ¶¶19-20.  Acorn, which was supposedly experienced in
ABL financing, would then service the loans it sold to the Fund.  *Id.*, ¶20.  The same arrangement
was applicable to Stewardship Credit Arbitrage Fund, Ltd. (the "Off-Shore Fund"), a Bermudian
mutual fund company – under Quan's control and pursuant to the direction of Advisors, its
registered investment advisor, the Off-Shore Fund purchased only loans originated by Acorn.
*Id.*, ¶¶18 n.1, 19.  Quan was Advisors' sole member, as well as the sole member or Managing
Member of Acorn.  Complaint, ¶21.  As the PPMs acknowledged, "Quan effectively controls
both Acorn and the [Stewardship Fund] through his ownership interests in [Advisors] and
Acorn."  *Id.*; *see id.*, ¶¶35-36.

The PPMs provided that the Fund would "seek a high level of current income and capital
appreciation ***while minimizing risk*** by (1) purchasing a broad range of secured high-yield short-
term notes from, or issued by, Acorn Capital Group, LLC, a financing company ... engaged in
providing commercial financing generally on a transaction-by-transaction basis ..."  Complaint,

¶27 (emphasis added).  The PPMs and other presentation materials[5] emphasized the ability of the

Fund, through Acorn, to manage any risk presented by lending to companies with less-than-

stellar balance sheets.  *Id.*, ¶30.  The PPMs explained Acorn's intended ABL lending targets and

their strategies as follows:

> companies that provide assets for collateral including ... merchandise distributors
> [] who are engaged in the business of buying excess high-quality, consumer
> merchandise inventory ... at distressed prices and selling the merchandise to
> retailers at a profit ....

*Id.*, ¶32.  With respect to each such "merchandise distributor" to which Acorn loaned capital, the

PPMs assured investors that, *inter alia*, "ongoing quantitative and qualitative analysis or similar

protracted procedure [would be performed] to determine the fair market value of underlying

assets of the short-term commercial credit market and the financial conditions of the borrower

and its customers."  *Id.*

After several years of lending experiences with Petters' entities and affiliates, Complaint,

¶¶47-48, 91, Acorn entered into an Initial Credit Agreement in November, 2004 (the "Credit

Agreement") with PAC Funding, LLC ("PAC Funding"), a special purpose entity specifically

created for Acorn and wholly owned by Petters Co., Inc. ("PCI"), the business entity through

which Petters primarily operated.  *Id.*, ¶¶38, 49.  Despite the assurances of due diligence to be

performed regarding any "merchandise distributor," *id.*, ¶32, the decision to enter into the PAC

Funding Credit Agreement involved no due diligence at all, but rather was primarily based on

Acorn's past lending experience with Petters' entities.  *Id.*, ¶¶89-91.  Several years later,

---

[5]Used to solicit new investors to the Fund from at least in or around September, 2004, the
presentation materials described in the Complaint consist of a series of PowerPoint slides, which
stressed "**Collateral *Risk Management***" and "**Borrower *Risk Management***."  Complaint, ¶¶30-
31 (emphasis added).  These slides represented, *inter alia*, that "many safeguards [would be
employed] to **lower the *risk profile***" of the Fund's investments.  *Id.*, ¶30 (emphasis added).

Seidenwar, Acorn's President, would admit that they "had grown overly confident [with] PCI and reduced its oversight over the last year due to its increasing familiarity and comfort [with] the relationship." *Id.*, ¶106. Given the complete lack of initial due diligence with respect to the Credit Agreement, the only plausible inference is that the Stewardship Defendants' "confidence" in Petters began much earlier than Seidenwar was willing to acknowledge – at or before the beginning of the Class Period. Of course, since all of the Petters investments were entirely fraudulent, this lack of due diligence by the Stewardship Defendants led directly to the losses suffered by Plaintiffs and the Class.

Acorn's supposed over-confidence was based, in whole or part, on the $50 million guaranty that Acorn received from Petters individually. Complaint, ¶¶49, 92-93. Quan told an Acorn employee that the Petters' personal guaranty eliminated the need for due diligence and thereafter it became a benchmark against which other potential lending transactions were judged. *Id.*, ¶¶92, 123. However, due diligence was lacking with respect to the personal guaranty as well because no background check was conducted (which was contrary to Acorn's standard policy and, if performed, likely would have revealed Petters' criminal background), no personal tax returns were requested or, in any event, reviewed (which would have uncovered that, in fact, Petters had not filed any tax returns for several years) and the only personal Petters financial information received by Acorn was produced in-house by PCI (by an individual later convicted for assisting Petters in falsifying tax returns) – even though the personal guaranty was supposed to require the production of audited financial statements. *Id.*, ¶¶93-94. These extreme departures from Acorn's standard lending policies and the lack of any modicum of basic due diligence with respect to the investments of the Stewardship Fund make it more plausible than not that the Stewardship Defendants knew that the Petters investments were highly suspicious (and likely

fraudulent), but they chose to keep their mouths shut because the returns provided by Petters gave them all an ability to attract investors (*i.e.*, the Class) and earn fees and income.

In subsequent years, the amount available under the Credit Agreement steadily increased and was extended; from $200 million initially to $300 million by October, 2007.  Complaint, ¶50.  By May, 2008, the PAC Funding loans constituted between 60-70% of Acorn's entire portfolio of loans; several months later in October, 2008, Quan told Plaintiffs and other Members that loans to PAC Funding and other Petters entities was almost 70% of the Fund's portfolio.  *Id.*, ¶¶51, 55.

The manner in which Acorn ostensibly serviced the PAC Funding loans was unusual and demonstrates that the Stewardship Defendants undoubtedly had suspicions that they were participating in a fraudulent enterprise with Petters.  For instance:

- The Acorn employee responsible for maintaining collateral records and verifying the existence and amount of accounts receivable was not in charge of servicing the PAC Funding loans.  Complaint, ¶100 n.16.  Instead, the person in charge of servicing the PAC Funding loans, Dominic Miele ("Miele"), had no prior experience.  *Id.*, ¶100.

- Starting in approximately March, 2005, Miele would make quarterly visits to PCI's Minnesota offices for the purpose of verifying only that merchandise product identification numbers were consistent between purchase orders from the retailers, purchase orders from PAC Funding and invoices from the liquidator (and to clandestinely photograph the retailer purchase orders); he was never told (and apparently never asked) why he could only view the purchase orders in PCI's offices or why copies sent to Acorn's offices would not suffice.  *Id.*, ¶101.  Later, Miele did little when he found that the supposed collateral (which did not even actually exist) had been "double-pledged."  *Id.*, ¶102.  Of course, a mere telephone call to one of the retailers would have uncovered Petters' fraud.  *Id.*, ¶45 (at least one, if not all, of the retailers to whom the collateral supposedly was being sold no longer used paper purchase orders).  Inexplicably (assuming *arguendo* the existence of any good faith on their part), none of the Stewardship Defendants bothered to make that call.  *Id.*, ¶104 (although verification calls were Acorn's "standard operational procedure," Quan gave strict directions that the retailers involved in the Petters' transactions were never to be contacted).

- Miele also was responsible for monitoring the "lockbox account" created by the

Credit Agreement, which he understood was to receive payments from retailers. Complaint, ¶98. This understanding was consistent with the Credit Agreement, which directed that "payees on receivables constituting Collateral ... remit their payments to a lockbox ..." *Id.*, ¶97. Indeed, the presence of the lockbox, along with the reserve or blocked account, were specifically represented by Acorn as adding "to the comfort level" of the Credit Agreement. *Id.*, ¶¶91, 97. Nevertheless, when Miele discovered that a late payment to the lockbox account originated from PCI, rather than a retailer, he was satisfied with the explanation received from Quan, Seidenwar and Bucci that PAC Funding could prepay a promissory note. *Id.*, ¶98. Thereafter, Miele never again attempted to verify the source of payments to the lockbox account. *Id.*

• With the sole exception of a solitary telephone call made by Quan to Petters' supposed counterparty in the purchase order transactions in November, 2004 (which ultimately revealed nothing), Complaint, ¶90, there was no attempt to verify that the transactions being funded by Acorn-PAC Funding promissory notes actually took place. As mentioned, this failure to make verification calls was not only contrary to Acorn's own "standard operational procedure," but also diverged from the standard in the lending industry. *Id.*, ¶104.

The Stewardship Defendants have no explanation for these utter failures – of course, the most plausible inference is that these Defendants knew exactly what they were doing and the nature of their true involvement with Petters. By October, 2008, it was publically disclosed that Petters had orchestrated a massive Ponzi scheme, resulting in losses of over $3 billion. Complaint, ¶38. Losses to Acorn, constituting the second largest amount resulting from the Petters Ponzi scheme, have been estimated at $140 million; conservatively, losses just to the Fund were over $85 million. *Id.*, ¶55. Now, having engaged in no "stewardship" at all, the Stewardship Defendants have the temerity to seek dismissal of the well-pled Complaint against them. That effort should not be permitted to stand.[6]

---

[6]Significantly, PAC Funding was not the only fraudulent transaction into which Acorn entered. Acorn lent over $50 million that was secured by supposedly valuable jewelry, which was, in fact, significantly overvalued. Complaint, ¶¶67-71. Moreover, as the Complaint chronicles, Acorn had been duped at least once before. In the *Wedbush* action, Acorn, including Seidenwar and Miele, was defrauded out of approximately $1.3 million through the use of, *inter alia*, phony financial documents. Complaint, ¶¶114-120. Despite having been cheated in this manner before with respect to a significant Stewardship Fund investment, Defendants would

IV.   **ARGUMENT**

A.   **Standard Of Review**

This Court's approach to determining a motion to dismiss under Rule 12(b)(6) is well-settled – legal claims should be liberally construed, all facts alleged in a complaint are to be taken as true and all reasonable inferences should be drawn in the plaintiff's favor. *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002); *In re J.P. Jeanneret Associates, Inc.*, No. 09 Civ. 3907 (CM), 2011 WL 335594, at *8 (S.D.N.Y. Jan. 31, 2011); *see Hemi Group, LLC v. City of New York*, 130 S.Ct. 983, 986-987 (2010) (on a motion to dismiss, factual allegations are accepted as true); *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009) (when deciding motion to dismiss, "all reasonable inferences [are drawn] in the plaintiff's favor") (citation and internal quotations omitted).

Regardless of the legal claims advanced, the foregoing steps are undertaken to decide whether a complaint complies with Federal Rule of Civil Procedure 8(a)(2), which the Supreme Court has interpreted as requiring "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  This standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

---

have this Court believe that they were unwittingly duped by Petters and his Ponzi scheme. Nonsense.  The facts of record establish that the Stewardship Defendants had facts staring them in the face that the Petters investments were fraudulent.  Presented with these facts, the Stewardship Defendants did nothing and deviated from their supposed, normal operating procedures to avoid discovering the fraud.  Indeed, the actions of Quan and Advisors in response to liquidation requests for the Off-Shore Fund, Complaint, ¶¶62-66, demonstrate that their sole focus was to "buy time," not to investigate the suspicious investing activity of Petters or perhaps do something to try and recoup their Members' capital.  Worse yet, the Stewardship Defendants omitted from all Class Period statements any disclosure with respect to the lack of due diligence. A jury of Defendants' peers will see through this artifice, as Defendants knew exactly what they were doing and, just like Petters, they engaged in the securities fraud at issue for one reason – the money they were earning.

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 556).[7]  More simply put, "[a] court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently 'raise a right to relief above the speculative level.'" *Anwar v. Fairfield Greenwich Ltd.*, 728 F.Supp.2d 372, 402-403 (S.D.N.Y. 2010) (quoting *Twombly*, 550 U.S. at 555); *see Diaz-Bernal v. Myers*, No. 3:09-CV-1734 (SRU), 2010 WL 5211494, at *5 (D. Conn. Dec. 16, 2010) ("*Plausibility* at the pleading stage is nonetheless distinct from *probability*, and a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claims] is improbable, and ... recovery is very remote and unlikely") (citations and internal quotations omitted; emphasis in original). Ultimately, the Court's task in ruling on a motion to dismiss remains the same – "to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Anwar*, 728 F.Supp.2d at 403 (quoting *In re Initial Pub. Offering Sec. Litig.*, 383 F.Supp.2d 566, 574 (S.D.N.Y.2005)).

In addition, because Plaintiffs allege that the Stewardship Defendants engaged in fraudulent conduct, the enhanced pleading standard of Federal Rule of Civil Procedure 9(b) is applicable to certain of the allegations.  Thus, the Complaint must "(1) specify the statements that

---

[7]Debate continues over what this "plausibility" standard entails.  *See, e.g.*, *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 629 (7th Cir. 2010) (finding *Iqbal* Court's use of "plausibility, probability, and possibility" in defining new standard "unclear" as the meaning of these words "overlap," and concluding that a "complaint must establish a nonnegligible probability that the claim is valid; but the probability need not be as great as such terms as 'preponderance of the evidence' connote") (citation omitted).  The Court itself has been equivocal on the contours of the new standard.  *See Skinner v. Switzer*, No. 09-9000, 2011 WL 767703, at *6 (U.S. March 7, 2011) ("[U]nder the Federal Rules of Civil Procedure, a complaint need not pin plaintiff's claim for relief to a precise legal theory.  Rule 8(a)(2) of the Federal Rules of Civil Procedure generally requires only a plausible 'short and plain' statement of the plaintiff's claim, not an exposition of his legal argument") (citing 5 C. Wright & A. Miller, *Federal Practice & Procedure* § 1219, pp. 277-278 (3d ed.2004 and Supp.2010)).

-13-

the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993)) (internal quotations omitted); *see* Fed. R. Civ. Proc. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake").  Although Rule 9(b) further provides that "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally," *id.*, courts in this Circuit have long rejected "claims of fraud [based only] speculation and conclusory allegations" and have instead required allegations of fact "that give rise to a strong inference of fraudulent intent." *Lerner*, 459 F.3d at 290 (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)).

Finally, because Plaintiffs' claims arise under the federal securities laws, the PSLRA, 15 U.S.C. § 78u-4, adds a similar layer of analysis.  Specifically, the PSLRA requires plaintiffs to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  By this provision, "the PSLRA effectively raised the nationwide pleading standard to that previously existing in this circuit and no higher...." *Novaks v. Kasaks*, 216 F.3d 300, 310 (2d Cir. 2000).

Neither *Iqbal* nor *Twombly* require "detailed factual allegations" for a complaint to survive a motion to dismiss. *Iqbal*, 129 S.Ct. at 1949; *Twombly*, 550 U.S. at 555.  Likewise, Rule 9(b) and the PSLRA do "not require the pleading of detailed evidentiary matter in securities litigation." *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d Cir.2001).  Under both analyses, the allegations in the Complaint should be taken as whole and considered collectively, rather than parsed out and scrutinized out of context. *See*, *e.g.*, *Williams v. Fischer*, No. 08-CV-4612 (DLI) (VVP), 2010 WL 3924688, at *3 (E.D.N.Y. Sept. 30, 2010) (on a motion to dismiss,

a complaint's allegations should be "[r]ead together, construed liberally, accepted as true, and

with all reasonable inferences drawn in Plaintiff's favor") (citation omitted).  Here, Plaintiffs'

Complaint easily meets the pleading requirements under *Iqbal*, *Twombly*, Rule 9(b) and the

PSLRA.  Any suggestion by the Stewardship Defendants to the contrary simply is not persuasive

or supported by applicable law.

**B.**     **The Complaint Alleges Direct, Not Derivative, Claims**

Relying primarily on the October 15, 2010 Motion to Dismiss filed by Advisors and Quan

(the "Initial Motion") and with scant analysis, Defendants first argue that Plaintiffs lack standing

because the claims asserted in the Complaint actually belong to the Fund itself.[8]  According to

Defendants, any claims brought by Plaintiffs are derivative of those that must be brought by the

Fund and, therefore, cannot be direct claims.  Of course, the Stewardship Defendants have no

cases that actually support this position.  As discussed below, despite the apparent and fleeting

popularity of this argument among defendants' counsel as a new way to avoid liability for

misconduct, it is completely inapplicable here.[9]

Initially, it bears noting that standing under Section 10(b) and Rule 10b-5 is clearly

---

[8]Challenges to standing can be raised on either Rule 12(b)(1) motions to dismiss for lack
of subject matter jurisdiction and on Rule 12(b)(6) motions to dismiss for failure to state a claim.
*See, e.g.*, *RBCI Holdings, Inc. v. Drinks Americas Holdings, Ltd.*, No. 07 CIV. 2877 (DC), 2008
WL 759339, at *3 (S.D.N.Y. March 20, 2008).  Although the Advisors/Quan Motion invokes
both subparts of Rule 12, it disputes only the sufficiency of Plaintiffs' standing allegations and
proceeds under a Rule 12(b)(6) analysis.  Thus, for present purposes, the Court should assume
the truth of those allegations.  *See Halo Tech Holdings, Inc. v. Cooper*, No. 3:07-CV-489 (AHN),
2008 WL 4080081, at *3 n.3 (D. Conn. Aug. 29, 2008).

[9]Defendants do not even bother to address the current allegations, relying – *in toto* – on
the allegations in the initial complaint, which asserted derivative claims on behalf of the Fund.
Advisors/Quan Motion at 9.  However, the argument that Plaintiffs are somehow bound by this
initial pleading ignores that an amended complaint "supersedes the original [pleading] and
renders it of no legal effect." *Arce v. Walker*, 139 F.3d 329, 332 n.4 (2d Cir. 1998) (citation
omitted).

afforded to purchasers of securities.  *See, e.g., Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730 (1975) (affirming that standing "for purposes of a private damage action under § 10(b) and Rule 10b-5 [is] limited to actual purchasers and sellers of securities"); *Internat'l Controls Corp. v. Vesco*, 490 F.2d 1334, 1359 (2d Cir.), *cert. denied*, 417 U.S. 932 (1974) ("The protection of the statute and the Rule is extended only to a 'seller or purchaser'").  Similarly, CUSA broadly affords standing to "the person buying the security."  Conn. Gen. Stat. § 36b-29(a).  While Plaintiffs clearly meet these requirements, Complaint, ¶¶15-17, it is questionable whether the Fund could ever have standing under the circumstances alleged here.  *See Matignon Finance, Inc. v. Ameritel Comm. Corp.*, No. 88 Civ. 5742 (JFK), 1989 WL 153282, at *3 (S.D.N.Y. Dec. 14, 1989) ("[A]n issuer, who is neither a buyer nor a seller of securities, lacks standing to sue under section 10(b) for damages") (citations omitted).  Of course, Defendants do not explain how a federal securities claim may be asserted derivatively in a case of this kind – nor could they posit a plausible basis for such a claim where, as here, one defendant was purchasing securities from its own alter egos and would be forced to effectively sue itself.  The fact that Plaintiffs have standing to assert the claims at issue (while Defendants almost certainly do not) speaks volumes about the legitimacy of Defendants' direct/derivative argument.[10]

Defendants explicitly recognized that Plaintiffs' federal securities claims are based upon material omissions.  Advisors/Quan Motion at 7-8.  As a general proposition, even under Delaware law, "non-disclosure claims are direct claims ...."  *Anwar*, 728 F.Supp.2d at 401 n.9 (quoting *Albert v. Alex. Brown Management Services, Inc.*, Nos. Civ. A. 762-N, 763-N, 2005 WL

---

[10]Importantly, the Fund also has not acted to assert any derivative claims of any kind under the federal securities laws or otherwise and, in fact, has vigorously resisted any efforts for traditional derivative claims (for breach of fiduciary duty, waste of corporate assets, etc.) to be asserted on its behalf.

2130607, at *12 (Del. Ch. Aug. 26, 2005));[11] *Pension Committee of University of Montreal Pension Plan v. Banc of America Securities, LLC*, 446 F.Supp.2d 163, 205 (S.D.N.Y. 2006) ("[W]here a claim pertains to fraudulent misrepresentations, not merely mismanagement ... [investors] may assert a fraud claim based on the theory that they were induced to make and/or retain their investments") (citation, internal quotations and alterations omitted).  Here, the basis of the Complaint's federal causes of action are essentially non-disclosure claims, which broadly describe Defendants' wrongful conduct as "the failure and refusal to disclose that no due diligence was being exercised on behalf of the Class, that the performance of the loans that comprised the majority of the Fund's investments were not being monitored and that Defendants were ignoring their own contractual rights to create and/or maintain security in the Fund's investments ...".  Complaint, ¶3.

In determining whether claims are direct or derivative, Delaware employs a two-part inquiry, which looks to who suffered the injury and who would receive the benefit of any recovery.  *See Tooley v. Donaldson, Lufkin, & Jenrette, Inc.*, 845 A.2d 1031, 1035 (Del. 2004).  Here, the alleged omissions regarding the lack of due diligence were directed toward Plaintiffs, not the Fund.  For example, the PPMs upon which Plaintiffs relied in making their initial investments assured them, *inter alia*, that "ongoing quantitative and qualitative analysis or similar protracted procedure" would be performed not only on the Fund's assets, but also on "the financial conditions of the borrower and its customers."  Complaint, ¶32.  Subsequent

---

[11]Plaintiffs do not concede that Delaware law governs whether they have standing to assert claims under the federal securities laws.  *See, e.g., In re Smith Barney Transfer Agent Litig.*, No. 05 Civ. 7583 WHP, 2011 WL 350289, at *4 (S.D.N.Y. Jan. 25, 2011) ("To determine whether a party has standing to raise a claim under § 10(b), a court generally looks to federal rather than state law") (citation, internal quotations and alterations omitted).  Nevertheless, even applying Delaware law, it is clear that Plaintiffs' claims are entirely direct (and not derivative) in nature.

communications directed at Plaintiffs and other investors, but not to the Fund, emphasized the growth of their investments and usually at least remarked on (if not extolled) the collateral securing these investments. *E.g.*, Complaint, ¶¶75-76, 79. The Complaint further alleges that Plaintiffs, not the Fund, were deceived by the Stewardship Defendants' wrongful acts, including their omissions regarding the extent to which they checked on the (nonexistent) collateral. *E.g.*, Complaint, ¶138. Ultimately, the recovery sought is for the benefit of members of the Class, which consists of investors in the Fund, and will not benefit the Fund itself.[12] Complaint, ¶147.

It also bears noting that the Stewardship Defendants owed duties to Plaintiffs (not just to the Fund), which is another distinguishing characteristic of permissible direct claims. *See*, *e.g.*, *Debussy LLC v. Deutsche Bank AG*, No. 05 Civ. 5550 (SHS), 2006 WL 800956, at *3 (S.D.N.Y. March 29, 2006) ("[T]he suit may be direct only when the stockholder can demonstrate 'that the duty breached was owed to the stockholder'") (quoting *Tooley*, 845 A.2d at 1039); *see also Halo Tech Holdings*, 2008 WL 4080081, at *4 ("[A] shareholder may have standing to bring a direct action and recover individually, not on behalf of the corporation [, where ...] the duty breached was owed to the shareholder ....") (citations, internal quotations and alterations omitted); *Ceribelli v. Elghanayan*, 990 F.2d 62, 63-64 (2d Cir. 1993) (consistent with the general common law rule, "[u]nder New York law, a shareholder may bring an individual suit if the defendant has violated an independent duty to the shareholder ....") (citations omitted). The Complaint alleges that the Stewardship Defendants owed to Plaintiffs obligations to disclose material information

---

[12]In contrast, the Fund arguably benefitted from the Stewardship Defendants' omissions. Like the "feeder funds" which funneled capital to the Madoff Ponzi scheme, the Fund here was "merely [a] vessel[] for ferrying the investments" to Petters. *See Anwar*, 728 F.Supp.2d at 401. Thus, it is likely that the Fund would not have existed (and certainly would not have flourished) without the fraudulent conduct alleged herein. *See id.* (court was "not inclined to limit liability to the corporate entity that allegedly functioned essentially as a vehicle for harming Plaintiffs") (citations omitted).

on a timely basis, as well as duties to correct or update representations regarding, *inter alia*, loan performance and collateral monitoring.  Complaint, ¶139.

These duties primarily arise from Plaintiffs' subordinate status as limited Members of the Fund, of which Advisors was its Managing Member (and Quan was the sole member of Advisors, as well as the sole or Managing Member of Acorn), and extends to the Individual Defendants – Seidenwar and Bucci, as officers of Acorn, and to Escher, in his role as "independent manager" of the Fund.  Complaint, ¶¶18-24; *see, e.g., Furchtgott-Roth v. Wilson*, No. 09 Civ. 9877 PKC, 2010 WL 3466770, at *5 (S.D.N.Y. Aug. 31, 2010) (under Delaware law and absent explicit disclaimers, "a general partner owes the traditional fiduciary duties of loyalty and care to the limited partnership and its partners") (citation omitted); *Auburn Chevrolet-Oldsmobile-Cadillac, Inc. v. Branch*, NO. 5:06-CV-0362 GTS/GJD, 2009 WL 667430, at *5 (N.D.N.Y. March 10, 2009) ("Under Delaware law, both officers and directors of a corporation owe fiduciary duties to the company and its shareholders") (citation and internal quotations omitted).  The duties to disclose and update are based upon, *inter alia*, the Stewardship Defendants' affirmative statements regarding the existence and quality of collateral underlying the Fund's investments.  Complaint, ¶¶75-76; *see, e.g., Nemec v. Shrader*, No. 09 Civ. 7466 (LAK), 2010 WL 3958655, at *2, n.4 (S.D.N.Y. Sept. 27, 2010) ("A fiduciary relationship or other relationship of trust and confidence can give rise to a duty to disclose material information, as can unique access to information") (citations omitted); *In re NovaGold Resources Inc. Sec. Litig.*, 629 F.Supp.2d 272, 301 (S.D.N.Y. 2009) ("The duty to correct applies to statements that are false at the time they are made, and it arises when the defendant learned that its prior statement was untrue [while ...] the more limited duty to update applies to a statement made misleading by intervening events, even if the statement was true when made") (citations, internal

quotations and alterations omitted).

Defendants cite Judge Hall's ruling in *Ernst & Young Ltd. v. Quinn*, No. 09-cv-1164
(JCH), 2009 WL 3571573 (D. Conn. Oct. 26, 2009), and the decision in *Quinn v. Stewardship
Credit Arbitrage Fund, LLC*, No. X03 CV 09-4046467-S, slip op. (J.D. of Hartford (CLD) Aug.
6, 2010), but neither of these decisions negate the foregoing principles.  First, the claims
addressed in these decisions did not arise under the federal securities laws, but were common
law-based claims such as breach of fiduciary duty, fraud and negligent misrepresentation.  *See
Ernst & Young*, 2009 WL 3571573, at *1, *5 (complaint alleged that "E&Y breached its duty of
care *to the Fund ...*") (emphasis in original).  In addition, the recovery sought was for
"diminution in the value of the fund."  *Quinn*, slip op. at 3; *see Ernst & Young*, 2009 WL
3571573, at *6 ("Under Connecticut law, a claim arising from the diminution of value of a
corporation's assets is derivative, not direct") (citations omitted).  Here, Plaintiffs and other
members of the proposed class are seeking individual, compensatory damages arising from
investing in the Fund based on material omissions.  Complaint, ¶¶4, 147 ("action seeks recovery
on behalf of Plaintiffs and other investors in the Stewardship Fund;" "Plaintiffs and other
members of the proposed Class have suffered damages" as a result of Defendants' wrongful
conduct).[13]

---

[13]Compensatory, tort-based damages are indicative of direct claims such as those brought
here.  *See*, *e.g.*, *Panos v. Island Gem Enterprises, Ltd., N.V.*, 880 F.Supp. 169, 176 (S.D.N.Y.
1995) (noting that "the out-of-pocket measure of damages constitutes the difference between the
price paid for the security and its true value absent the fraud on the date of the transaction," is
"[b]ased primarily on tort theory [...] seeks to compensate a plaintiff for his loss by returning him
to the position he occupied before the fraud," and, "in most cases brought under the 1934 Act
defrauded buyers are restricted to recovering solely their out-of-pocket losses") (citations
omitted).  Moreover, this is ill-suited for a motion to dismiss, as the issue is generally a subject of
expert testimony.  *See*, *e.g.*, *In re Warner Comm. Sec. Litig.*, 618 F.Supp. 735, 744 (S.D.N.Y.
1985) ("Undoubtedly, expert testimony would be needed to fix not only the amount, but the
existence, of actual damages") (citation omitted).

The Initial Motion makes reference to certain allegations in the original pleading, since superceded by the Complaint, that losses to the Fund resulted from its reckless investments in, *inter alia*, PAC Funding's promissory notes and the loans secured by grossly over-valued jewelry.  Initial Motion at 9.  However, such isolated allegations (since amended) do not establish that the claims asserted are derivative.  Indeed, such an argument fails to appreciate that "direct and derivative actions based on the same underlying conduct are not mutually exclusive."  *In re Smith Barney*, 2011 WL 350289, at *5 (citations omitted); *see Excimer Assocs., Inc. v. Vision, Inc.*, 292 F.3d 134, 140 (2d Cir. 2002) ("[W]here the plaintiff's injury is direct, the fact that [the corporation] may also have been injured and could assert its own claims does not preclude the plaintiff from asserting its claim directly"); *Grimes v. Donald*, 673 A.2d 1207, 1212-1213 (Del. 1996) ("[T]he same set of facts may result in direct and derivative claims").

Taken to its logical end, the Stewardship Defendants' argument would lead to absurd results, and eviscerate the federal securities laws.  However, Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder are intended to empower investors, not to benefit corporations.  *See In re American Intern. Group, Inc. 2008 Sec. Litig.*, 741 F.Supp.2d 511, 2010 WL 3768146, at *14 (S.D.N.Y. 2010) ("The purpose of the federal securities laws is to ensure that investors have sufficient information to assess and avoid undue risks by refraining from purchasing securities that carry greater risks than the investor is willing to bear") (citation and internal quotations omitted).  Accordingly, the Court should reject the Stewardship Defendants' argument and find that the claims asserted here properly belong to Plaintiffs.

### C.   **Plaintiffs' Securities Fraud Allegations Are Sufficient.**

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection

with the purchase or sale of any security ... any manipulative or deceptive device or contrivance

in contravention of such rules and regulations as the [Securities and Exchange] Commission may

proscribe as necessary or appropriate in the public interest or for the protection of investors."  15

U.S.C. § 78j(b).  To implement Section 10(b), the SEC promulgated Rule 10b-5, which prohibits

"mak[ing] any untrue statement of a material fact or omit[ting] to state a material fact necessary

in order to make the statements made, in the light of the circumstances under which they were

made, not misleading."  17 C.F.R. § 240.10b-5(b).  In order to state a claim for securities fraud

based on these provisions, a plaintiff must allege facts showing that, "in connection with the

purchase or sale of securities, the defendants, acting with scienter, made a misstatement or

omission of a material fact upon which plaintiffs relied causing the plaintiffs to sustain injury."

*In re Sturm, Ruger & Co., Inc. Sec. Litig.*, No. 3:09-CV-1293 (CFD), 2011 WL 494753, at *2 (D.

Conn. Feb. 7, 2011) (citing *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 161 (2d Cir. 2000)).

Although the Motions challenge a majority of these elements, none of these challenges have

merit.

### 1.   **Loss Causation Is Adequately Pled.**

Loss causation may be defined as "the causal link between the alleged misconduct and the

economic harm ultimately suffered by the plaintiff."  Advisors/Quan Motion at 10 (quoting

*Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007)).  "A misstatement [or

omission] is the proximate cause of an investment loss if the risk that caused the loss was within

the zone of risk concealed by the misrepresentations [or omissions] alleged by a disappointed

investor."  *Lattanzio*, 476 F.3d at 157 (citations, internal quotations and alterations omitted).

Allegations of loss causation are governed by Rule 8.  *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346 (2005) ("neither the [Federal] Rules [of Civil Procedure] nor the securities statutes impose any special further requirement in respect to the pleading of proximate causation or economic loss").

In this regard, the Complaint alleges that the "losses of Plaintiffs and other members of the proposed Class were proximately caused by the active and primary participation of the [Stewardship Defendants] in the scheme to defraud and omissions alleged herein," and that, absent the alleged wrongdoing (*i.e.*, failure to disclose that loan performance was not being monitored and inadequate due diligence was being performed with respect to a majority of the Fund's investments), "Plaintiffs and other members of proposed Class would not have invested, continued to invest, or converted one class of interests to another class of interests in the Stewardship Fund, or would have redeemed those interests long before the Petters' Ponzi scheme was revealed."  Complaint, ¶145.  At a minimum, these allegations clearly satisfy the loss causation requirement.  *See*, *e.g.*, *In re Beacon Associates Litig.*, No. 09 Civ. 777 LBS, 2010 WL 3895582, at *20 (S.D.N.Y. Oct. 5, 2010) ("losses from Madoff's misappropriation were within the zone of risk concealed by the non-disclosure of the fact that the activities of the investment manager controlling over 70% of the Beacon Fund's assets were not subject to any due diligence"); *In re J.P. Jeanneret*, 2011 WL 335594, at *19 ("It is unquestionably the case that Bernard Madoff's monumental fraud was the ultimate cause of Plaintiffs' loss [but], just as success has many fathers, an injury can have more than one proximate cause").

Nevertheless, in an argument that goes more to Lead Plaintiff's standing, the Stewardship Defendants complain that there is no allegation that Poptech "paid any consideration for the Class A interest other than to exchange the Class P interest" and that this exchange is insufficient

-23-

for purposes of loss causation because the failure to conduct due diligence pre-dated even the

initial purchase by Lead Plaintiff.[14]   Motion at 12.   However, the Class P and Class A interests in

the Fund are unquestionably securities, and Poptech's conversion or exchange of Class P

interests for Class A interests is both a "purchase" and "sale" for purposes of the federal

securities statutes.  *See* 15 U.S.C. § 78c(a)(13) ("purchase" includes "buy, purchase or acquire").

It is generally recognized that where securities are exchanged for other securities, a purchase and

sale takes place.  *Realmonte v. Reeves*, 169 F.3d 1280, 1285 (10th Cir. 1999) (the Exchange Act's

definition of "sale" (*i.e.*, "every contract of sale or disposition of a security or interest in a

security, for value") "has been interpreted to include exchanges of one security for another")

(citations omitted); *see 7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211, 223

(5th Cir.1994) (Securities Act's definition of "sale" was "generally interpreted to include

exchanges of one security for another") (citing, *inter alia*, II L. Loss & J. Seligman, *Securities

Regulation* 1085 (1989) ("It is clear on the face of the [definitions contained in the Securities

Act] that an exchange of one security for another is a sale")).

    Poptech's investments in the Fund consisted of two discrete events – the initial 2005

investment and the conversion in 2006.  Complaint, ¶15.   Thus, as the Complaint alleges, but for

the omission of the material fact that there effectively was no, *inter alia*, monitoring of loan

performance or verification of collateral, Poptech, L.P. would not have converted its then-

---

[14]For purposes of this particular argument, the Motion ignores the two other Plaintiffs, Dr.
Isakov and Mr. Meyer, and their allegations of loss causation.  Complaint, ¶¶16, 17, 74.  Thus,
the Court may presume that the Defendants have no argument against the sufficiency of the other
Plaintiffs' loss causation allegations.  *See, e.g., Packer v. SN Servicing Corp.*, 250 F.R.D. 108,
112 (D. Conn. 2008) ("It is well settled that a failure to brief an issue is grounds to deem the
claim abandoned") (citation and internal quotations omitted); *see also Tischmann v. ITT/
Sheraton Corp.*, 145 F.3d 561, 568 n. 4 (2d Cir. 1998) (failure to raise argument until reply brief
constitutes waiver).

valuable Class P interests into Class A interests and thereby sustained its injury.  Complaint, ¶¶ 15, 73.  Contrary to the Stewardship Defendants' argument, the Complaint clearly shows that, at the time of the Class P conversion offer, the Petters' "house of cards" was still intact.  While discovery will likely bear this out, at this point it is reasonable to infer that, following the conversion, not only was fresh capital coming into the Fund, but capital could also exit.  Indeed, it was not until June, 2008, more than two years later, that all withdrawals from the Fund were "suspended."  Complaint, ¶ 84.  Therefore, it is inherently plausible (and, in fact, correct) that Poptech could have "cashed out" its Class P interests, rather than re-investing, if it had known about the true state of monitoring and due diligence.  This is more than sufficient for purposes of standing and loss causation.

### 2.    The Alleged Omissions Are Sufficiently Specific.

The Stewardship Defendants next argue that the Complaint unclearly identifies which statements are rendered misleading by the alleged omissions.  Along the way, although not entirely clear in the jumble of arguments presented, the Advisors/Quan Motion also seems to question whether the Stewardship Defendants had a duty to disclose.  According to the Defendants, these supposed shortcomings of the Complaint violate both the PSLRA's requirement that "each statement alleged to have been misleading" must be specified and Rule 9(b)'s requirement that "the circumstances constituting fraud" must be stated "with particularity."  Advisors/Quan Motion at 12-16.

The existence of the Stewardship Defendants' duty to disclose is unassailable.  The Complaint alleges that the duty arose in two ways – as a result of the Stewardship Defendants'

superior, fiduciary positions as Managing Member (or its sole member)[15] of the Fund (or its

officer or "independent manager"), Complaint, ¶¶5, 139, and because once they affirmatively

opined on the Fund's performance and the condition of the collateral underlying its investments,

the Stewardship Defendants had a duty to disclose all material information, including, *inter alia*,

the failure of PAC Funding and other Petters entities to adhere to, or Acorn to enforce, certain

contractual commitments intended to afford more protection.  Complaint, ¶139.  The Motion

ignores the first basis of the duty to disclose and misapprehends the second.[16]

The Stewardship Defendants, either directly or indirectly, owed the duty of disclosure to

Plaintiffs.  *See, e.g.*, *DirecTV Latin America, LLC v. Park 610, LLC*, 691 F.Supp.2d 405, 439

(S.D.N.Y. 2010) (under the laws of Delaware and New York, "the manager of an LLC owes the

traditional fiduciary duties of loyalty and care to the members of the LLC [which ...] include a

duty of disclosure and candor") (citations and internal quotations omitted).  Although "there can

be no fraud absent a duty to speak," *Chiarella v. United States*, 445 U.S. 222, 235 (1980), a duty

to speak can arise from "a fiduciary or other similar relationship of trust and confidence between

the parties to the transaction."  *United States v. Chestman*, 947 F.2d 551, 565 (2d Cir. 1991)

---

[15]Advisors was Managing Member of the Fund, as well as its investment advisor.  The
Fund purchased all of its investments, including the PAC Funding promissory notes, from Acorn.
Quan was the sole member of both Advisors and Acorn (although also identifying himself as the
Fund's "Investment Manager" and "Managing Member").  Complaint, ¶¶19, 21, 83-84.  The
PPM acknowledged that "Quan effectively controls both Acorn and the [Fund] through his
ownership interests in [Advisors] and Acorn."  Complaint, ¶21.  As a result of these overlapping
roles, the Complaint also alleges that the Fund, Advisors and Acorn were alter egos of each
other, and each was the alter ego of Quan.  Complaint, ¶25.

[16]As indicated, *supra*, a general partner of a limited partnership owes fiduciary duties,
including a duty to disclose or update, to junior partners, as would officers of a limited liability
company owe duties to shareholders or members.  *Cf.*, *Furchtgott-Roth*, 2010 WL 3466770, at
*5; *Auburn Chevrolet-Oldsmobile-Cadillac*, 2009 WL 667430, at *5.  Affirmative statements,
positions of superiority or which afford unique access to information can also support a duty to
disclose.  *See Nemec*, 2010 WL 3958655, at *2, n.4; *In re NovaGold*, 629 F.Supp.2d at 301.

(citations, internal quotations and alterations omitted); *see Chiarella*, 445 U.S. at 228 ("[W]hen dealing with a claim of fraud based on material omissions, it is settled that a duty to disclose arises only when one party has information that the other [party] is entitled to know because of a fiduciary or other similar relation of trust and confidence between them") (citations omitted); *S.E.C. v. DiBella*, 587 F.3d 553, 563 (2d Cir. 2009) ("A fiduciary relationship or other relationship of trust and confidence can give rise to a duty to disclose material information, as can unique access to information") (citation and internal quotations omitted); *see also Rizzo v. MacManus Group, Inc.*, 158 F.Supp.2d 297, 302 (S.D.N.Y. 2001) (duty to disclose exists "where one party possesses superior knowledge not available to the other and knows that the other is acting on the basis of mistaken knowledge") (citations omitted).

In addition, as the Stewardship Defendants recognize, a duty to disclose also may be based on, *inter alia*, "an inaccurate, incomplete or misleading prior disclosure." *Vento & Co. of New York v. Metromedia Fiber Network, Inc.*, No. 97 Civ. 7751 (JGK), 1999 WL 147732, at *9 (S.D.N.Y. March 18, 1999) (citation and internal quotations omitted); *see Glazer v. Formica Corp.*, 964 F.2d 149, 157 (2d Cir. 1992) (duty to disclose arises when disclosure is necessary "to make prior statements not misleading"); *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 n.4 (2d 1993) (duty to update arises where "factual assertion[s] ceased to be true").  Based on the foregoing authorities, the Stewardship Defendants clearly owed Plaintiffs a duty to disclose.

By selectively quoting from the Complaint, Defendants contend that the allegations do not specify the statements rendered misleading by the omitted information.  However, the Complaint (contrary to the Motion's derisive descriptions) not only includes a Table of Contents, but one of its delineated sections is "The Class Period Statements of Advisors and Quan." Therein, the Complaint reproduces virtually the totality of statements issued by the Stewardship

Defendants during the Class Period, consisting of monthly newsletters and periodic letters prompted by then-current economic conditions.  Complaint, ¶¶75-82.  Also included are Quan's letters, on Advisors' letterhead, regarding the *Gottex* actions and the suspension of the calculation of the net asset value and withdrawals from the Fund.  Complaint, ¶¶83-84.  In addition, the belated, post-Class Period disclosure that the majority of the Fund's investments were with Petters' entities and the Fund's auditor's announcement that its opinions "can no longer be relied upon" are alleged.  Complaint, ¶87.  In none of these Class Period statements was there any mention of Petters or that most of the Fund's investments were with entities that he controlled.  Complaint, ¶88.

More importantly, none of these Class Period statements contain any indication that the extensive due diligence – as the PPMs and the presentation materials promised would be conducted regarding the Fund's investments – had abated or changed in intensity, or that the entities holding the majority of the Fund's investments eschewed compliance with their loan contracts (and that compliance was not being enforced by Acorn, which the Fund was paying to service the loans).  *E.g.*, Complaint, ¶¶96 (no audited financial statements of PAC Funding), 97-98 (no compliance with Lockbox Agreement); 101 (traveling to Petters' Minnesota offices to view and surreptitiously photograph (falsified) purchase orders); 103 (lack of shipping documentation); 106 (Sovereign Bank's collateral examination report reflecting, at best, abysmal due diligence).  Not only were the Stewardship Defendants obliged, as fiduciaries, to relay this material information, they knew – as creators or promoters of the PPMs and presentation materials – that the information contained therein was no longer accurate (if, indeed, it ever was) and that, in fact, it was entirely false.

Thus, the criticism of the Complaint's contents in the Advisors/Quan Motion must be

purposefully obtuse.[17]  Clearly, the representations in the presentation materials effectively "set

the stage" – identifying the reasonable expectations of Plaintiffs regarding the due diligence to be

performed regarding the Fund's investments based on the Stewardship Defendants' own words.

Complaint, ¶¶30-31.  The PPMs, although not as forceful as the presentation materials, equally

emphasized the Fund's ability to manage risk through safeguards and precautions such as the

creation of lockbox accounts, blocked accounts and the performance of "ongoing quantitative

and qualitative analysis or similar protracted procedure to determine the fair market value of

underlying assets ... and the financial conditions of the borrower and its customers."  Complaint,

¶32.  The Complaint alleges that, in truth, there was no due diligence being performed,

Complaint, ¶¶96-111, thus triggering the Stewardship Defendants' duties to disclose and update.

These allegations are sufficiently specific to satisfy both the PSLRA and Rule 9(b).

### 3.    Omissions That Post-Date Plaintiffs' Investments Are Actionable.

The Stewardship Defendants' next argument is based upon another misapprehension.

Defendants argue that alleged misstatements disseminated later in the Class Period, after

Plaintiffs purchased their interests in the Fund, cannot have been "in connection with the

purchase and sale" of those interests and are not actionable.  Advisors/Quan Motion at 17.  This

---

[17]Most of the allegations attacked by Defendants appear within the section of the
Complaint captioned "Background."  Moreover, the criticisms are inaccurate.  For example, the
Advisors/Quan Motion describes the presentation materials as unspecified and insufficient
pursuant to Rule 9(b).  *Id.* at 14, 16.  In fact, the presentation materials are alleged to have been
used in or around September, 2004 in order to solicit new Members to the Fund.  Complaint, ¶28.
Given this specific purpose, among many reasonable inferences, one is that they were created by,
or at the direction of, the Stewardship Defendants, and communicated to potential investors.  The
other unsubstantiated criticisms amount to quibbles over isolated words in what are clearly
summary or introductory paragraphs.  *See* Advisors/Quan Motion at 16.

is pure sophistry, bereft of any support.[18]

Particularly as alleged here, the alleged omission of material information, contrary to the representations regarding due diligence made in, *inter alia*, the PPMs, occurred not only "in connection with" investing in the Fund, but both pre-dated and post-dated Plaintiffs' investments.  Complaint, ¶¶91-92 (approval of 2004 credit agreement based primarily on past lending experiences, and no due diligence conducted regarding $50 million guarantor); 96-107 (failure to conduct due diligence, albeit undisclosed, continuing through July, 2008).  In other words, the omissions, although capable of being rectified in statements issued by the Stewardship Defendants at any point prior to the end of the Class Period, were continuous.  Therefore, the omissions necessarily were "in connection with the purchase" of interests in the Fund because they contradicted misstatements made to Plaintiffs upon which they relied when first making their investments.

To the extent that the Stewardship Defendants are contesting Plaintiffs' allegations of reliance, such an argument is underdeveloped and, in any event, unavailing.  In an action alleging material omissions, a rebuttable presumption of reliance can also be invoked "if there is an omission of a material fact by one with a duty to disclose," so that "the investor to whom the duty was owed need not provide specific proof of reliance."  *Stoneridge Inv. Partners, LLC v.*

---

[18]The Advisors/Quan Motion solely relies on this Court's decision in *Chien v. Skystar Bio Pharm. Co.*, 566 F.Supp.2d 108, 118 n.9 (D. Conn. 2008), for the unremarkable holding that an allegedly defrauded purchaser cannot have relied on misstatements that postdate her purchases. *See Gurary v. Winehouse*, 235 F.3d 792, 799 (2d Cir. 2000) (any claim for market manipulation that allegedly occurred *after* plaintiff's purchases was barred by Rule 10b-5's "in connection with the purchase or sale of a security" requirement).  The situation here, however, is readily distinguishable from *Chien* and *Gurary*.  Primarily, the deception that occurred "in connection with" Plaintiffs' investment in the Fund was the omission of material information relating to, *inter alia*, the absence of due diligence.  Obviously, by its nature, this alleged deception was ongoing and continued throughout the Class Period until the revelation about the Fund's significant investments with Petters' entities.

*Scientific-Atlanta, Inc.*, 552 U.S. 148, 159 (2008) (citing *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-54 (1972)).  Based on the duties to disclose owed by the Stewardship Defendants to Plaintiffs, this presumption of reliance is applicable here.  In addition, the Complaint specifically alleges that Plaintiffs had to acknowledge their reliance on the false and misleading statements in order to invest in the Fund.  Complaint, ¶143.  Accordingly, reliance is more than sufficiently pled.

### 4.  Any Challenge To The Sufficiency Of The Stewardship Defendants' Due Diligence, If Any, Is Inappropriate At This Stage.

The Stewardship Defendants' argument yet again misapprehends the parties' respective burdens at this stage – Plaintiffs are obligated to present sufficient factual content to support a plausible inference that what they allege occurred provides recovery under the legal claims advanced.  Because Plaintiffs have not had the opportunity to test their allegations through discovery, they are given the benefit of the doubt, reasonable inferences are drawn in their favor and the factual allegations are assumed to be true.  In a motion to dismiss, defendants are allowed to test whether those facts are sufficient for the legal claims, but not to dispute the factual underpinnings.

However, the argument advanced in the Advisors/Quan Motion impermissibly seeks to have the Court render inferences in Defendants' favor and make findings of fact, based on an incomplete record, to determine, as a matter of law, that the allegations demonstrate that sufficient due diligence was conducted.  Advisors/Quan Motion at 18-20.  This is plainly improper for several reasons, including having the Court weigh evidence at the pleading stage.  *See*, *e.g.*, *Yajure v. DiMarzo*, 130 F.Supp.2d 568, 571-572 (S.D.N.Y. 2001) ("The role of a district court in considering a motion to dismiss is not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient")

(citing *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)); *DiBlasio v. Novello*, 344 F.3d 292, 304 (2d Cir. 2003) ("[A] disputed issue of fact ... is inappropriate to consider in the context of a Rule 12(b)(6) motion").  At least in the context of the point at which statutes of limitation are triggered, courts within this Circuit have found that "whether a plaintiff exercised due diligence in making the required inquiry is usually a question of fact for the jury to decide." *Norman v. Salomon Smith Barney, Inc.*, 350 F.Supp.2d 382, 390 (S.D.N.Y. 2004) (citation and internal quotations omitted); *see In re Issuer Plaintiff Initial Public Offering Antitrust Litig.*, No. 00 Civ. 7804 (LMM), 2004 WL 487222, at *5 (S.D.N.Y. March 12, 2004) ("issues of fraudulent concealment and due diligence are questions of fact that should not be decided on a motion to dismiss") (citations and internal quotations omitted).  Moreover, courts have rejected attempts to evaluate factual disputes at the motion to dismiss stage.  For example, in *Lonegan v. Hasty*, 436 F.Supp.2d 419 (E.D.N.Y. 2006), where the defendant argued, on motion to dismiss claims under the Wiretap Act, that portions of the Justice Department's Inspector General Report contradicted plaintiff's allegations that he acted with intent, the court found that "the veracity of contentions by [the subjects of the Report contesting the Inspector General's findings] is an issue for the trier of fact to determine at the appropriate stage of the litigation [as the] task of the court in ruling on a Rule 12(b)(6) motion is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof."  *Id.*, 436 F.Supp.2d at 429-430 (citation and internal quotations omitted); *see In re New Century*, 588 F.Supp.2d 1206, 1234 (C.D. Cal. 2008) (court was not "persuaded that the [Bankruptcy] Examiner's finding that there was no evidence of intentional misrepresentation to be dispositive at the pleading stage").  Ultimately, the Stewardship Defendants can put their own "spin" on a complete record and argue that due diligence was sufficient.  That exercise, however, is improper at this stage.

The Stewardship Defendants then use their own interpretation of the fact-based allegations to argue that they actually amount to no more than corporate mismanagement, and not securities fraud.  Motion at 21-22.  Defendants' spin amounts to a gross distortion of the Complaint's allegations.  As alleged, the Complaint charges that the Stewardship Defendants, after assuring Plaintiffs that various procedures and safeguards would be used to minimize the risk associated with the planned style of investing, in fact did not, *inter alia*, verify the existence of the collateral that supposedly secured the investment notes, ensure that the loan agreements were adhered to, or engage in what is collectively referred to as "due diligence."  *E.g.*, Complaint, ¶7 ("Defendants omitted from periodic communications issued during the Class Period ... any mention of: (I) the failure to conduct due diligence regarding the Fund's investments with Petters' entities, as well as other loans purchased from Acorn; (ii) the failure to monitor the performance of those loans and/or the condition of collateral that was intended to secure these loans; and (iii) the failure to insist that terms of the loan agreements (including 'Lockbox' arrangements and the provision of audited financial statements and tax returns), ostensibly included to afford more protection to the Fund, were actually followed").  This amounts to outright and intentional deception – not mere mismanagement.

Courts in this Circuit have found that securities fraud is adequately alleged where "minimal due diligence and reckless loan origination practices [] were not merely 'bad business decisions' but alleged to establish the falsity of Defendants' assurances to the market." *Freudenberg v. E*Trade Financial Corp.*, 712 F.Supp.2d 171, 193 (S.D.N.Y. 2010) (citation omitted).  "The mere fact that the conduct arguably constitutes mismanagement will not preclude a claim if the defendant made a statement of material fact wholly inconsistent with known existing mismanagement or failed to disclose a specific material fact resulting from that

mismanagement." *Id.*, 712 F.Supp.2d at 192 (quoting *In re Donna Karan Int'l Sec. Litig.*, No. 97-CV-2011, 1998 WL 637547, at *10 (E.D.N.Y. Aug. 14, 1998)) (internal quotations and alterations omitted).  What the Stewardship Defendants ignore is the Complaint's allegations of non-disclosure and omissions – not just ineffective and incompetent performance.  To be sure, the latter is fully supported by the factual allegations, but it is the knowing or reckless omission of this ineffective performance, notwithstanding a duty to disclose, which creates liability under the federal securities laws.

### 5.   The Allegations Support A Strong Inference Of Scienter.

The Supreme Court has directed how allegations of scienter for purposes of Section 10(b) should be evaluated.  In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), the Court explained that the inquiry is "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  *Id.*, 551 U.S. at 323 (emphasis in original); *id.* at 326 (reiterating "that the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically") (citation omitted).  Because "[t]he strength of an inference cannot be decided in a vacuum," but rather is "inherently comparative," courts should "take into account plausible opposing inferences."  *Id.*  While "[t]he inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, ... it must be cogent and compelling [and ...] at least as compelling as any opposing inference one could draw from the facts alleged."  *Id.* at 324.  Thus, the district court must determine whether, "[w]hen the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?"  *Id.* at 326.

The *Tellabs* decision emphasizes that the scienter "inquiry is to be made in the context of

a traditional motion to dismiss [*i.e.*,] assuming the well-pleaded facts of the complaint to be true- and that all the facts alleged, taken collectively, must be considered ...." *City of Brockton Ret. Sys. v. Shaw Group Inc.*, 540 F.Supp.2d 464, 472 (S.D.N.Y. 2008). Moreover, as decisions after *Tellabs* have recognized, "even if the plaintiff demonstrates only that an inference of scienter is at least as compelling as any nonculpable explanation for the defendant's conduct, the 'tie ... goes to the plaintiff.'" *City of Brockton*, 540 F.Supp.2d at 472 (citation omitted); *Akerman v. Arotech Corp.*, 608 F.Supp.2d 372, 382 (E.D.N.Y. 2009) (same).

In this Circuit, there are two recognized avenues to pleading the "requisite state of mind" for securities fraud. Plaintiffs must allege facts that either (i) "show that defendants had both motive and opportunity to commit fraud," or (ii) "constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 168-169 (2d Cir. 2000) (citations omitted); *see Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir.), *cert. denied*, 531 U.S. 1012 (2000) (same); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001) (same).[19] "Recklessness" in this context is defined as conduct that is "highly unreasonable" and

---

[19]Although Plaintiffs are not invoking the "motive and opportunity" prong, that does not mean that the Defendants' motive is irrelevant. First, if a complaint is to be reviewed "holistically" for a strong inference of scienter, *see Tellabs*, 551 U.S. at 326, that means any well-pled fact should be considered in the analysis. Thus, the Complaint's allegations that "Defendants also turned a blind eye ... so that they could continue to perpetrate their investment scheme and earn fees/ income" and that "Quan operated Acorn, Advisors and the Fund for his own personal benefit to earn lucrative fees and income from each such entity," Complaint, ¶¶1, 21, must be considered along with allegations regarding the fees charged that even the PPMs described as "substantial." Complaint, ¶¶124-128 (describing "management fee," "Performance Allocation" and "mark up" imposed by Advisors and Acorn). The Southern District of New York has recognized that similar fees, "though typical for hedge funds, allowed the [defendants] to collect hundreds of millions of dollars for ... shoveling money into Madoff's scheme." *Anwar*, 728 F.Supp.2d at 407. While finding that a "profit-making motive alone" was insufficient for scienter, the *Anwar* court still considered such allegations "as important background information in analyzing scienter." *Id.* Significantly, unlike the impact of an increase in share price on stock owned by an officer, "a hedge fund manager's earnings from investments are directly proportional to the amount of money he brings into a fund or allows to appreciate once in the

"an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Novak*, 216 F.3d at 308 (quoting *Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 47 (2d Cir.), *cert. denied*, 439 U.S. 1039 (1978)); *see, e.g.*, *In re Scholastic*, 252 F.3d at 76 (same).  In addition, "an egregious refusal to see the obvious, or to investigate the doubtful," can also support an inference of scienter.  *See Novak*, 216 F.3d at 308 (citations and internal quotations omitted).  At a minimum, recklessness encompasses "willful blindness."  *In re Kidder Peabody Secs. Litig.*, 10 F.Supp.2d 398, 415 (S.D.N.Y.1998) (citing *In re Fischbach Corp. Sec. Litig.*, No. 89 Civ. 5826 (KMW), 1992 WL 8715, at *6 (S.D.N.Y. Jan. 15, 1992) ("[R]eckless disregard of the truth satisfies the scienter requirements of § 10(b) when the defendant deliberately failed to acquire the information that would have indicated to her that her statements were false or misleading").

   With respect to the second avenue for pleading scienter, conscious misbehavior or recklessness is established where defendants allegedly "engaged in deliberately illegal behavior;" "knew facts or had access to information suggesting that their public statements were not accurate;" or "failed to check information they had a duty to monitor."  *Novak*, 216 F.3d at 311

_____

fund [and his or her] benefit also recurs annually in an easily predictable amount, while a shareholder-executive may realize only a one-time rise in share price." *Id.* at 407-408.  This situation presents "an almost archetypal example of moral risk."  *Id.* at 407.

The Complaint strongly suggests the same "moral risk" was present here.  The Off-Shore Fund's fees were onerous enough to cause a sophisticated investor to request to withdrawn its investment.  Complaint, ¶62.  As to the Stewardship Fund, the PPMs characterized its fees and charges as "substantial," *id.*, ¶128, and delineated Advisors' management fees that likely exceeded $10 million annually.  *Id.*, ¶124.  Advisors would also receive a quarterly "Performance Allocation," and Acorn charged a "mark-up" on every promissory note (which may have been worth as much as $22 million in a single month).  *Id.*, ¶¶125-126.  It can be reasonably inferred that the continuing profitability of the PAC Funding relationship provided the Stewardship Defendants with additional motivation for their reckless or intentional acts.

(citations omitted); *see, e.g., Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008) (same); *In re Openwave Systems Sec. Litig.*, 528 F.Supp.2d 236, 249 (S.D.N.Y. 2007) (same); *Schnall v. Annuity and Life Re (Holdings), Ltd.*, No. 3:02-CV-2133(GLG), 2004 WL 515150, at *6 (D. Conn. March 9, 2004) (same); *In re Xerox Corp. Sec. Litig.*, 165 F.Supp.2d 208, 215-216 (D. Conn. 2001) (same).

The Complaint's allegations support the strong inference that the Stewardship Defendants knew their public statements were inaccurate or failed to check information they had a duty to monitor and which would have demonstrated the falsity of their statements.  Complaint, ¶140. Among the information concealed or red flags not investigated was, *inter alia*, due diligence not conducted, loan performance not monitored and collateral not verified.  *Id.*  These allegations include the following:

- The PPMs represented that, in connection with each Acorn promissory note to be purchased by the Fund and among other things, there would be confirmation that "the underlying assets fall into an acceptable category," a "security interest in the underlying assets" would be obtained and an "ongoing quantitative and qualitative analysis or similar protracted procedure to determine the fair market failure of underlying assets" would be performed.  Complaint, ¶32.

- In light of these representations, a Fund investor would find it material that, *inter alia*, other than a single, indistinct telephone call with the supposed distributor of the high-end consumer electronics to be purchased by the Petters' entity, Complaint, ¶90, Acorn relied solely on earlier lending transactions in deciding to enter into the November, 2004 Credit Agreement with PAC Funding.  *Id.*, ¶91. Thereafter, even though it was Acorn's (and the lending industry's) standard practice in connection with purchase order transactions to make verification calls to the retailer or buyer, no such calls were ever made.  *Id.*, ¶104.  Moreover, with the exception of falsified purchase orders (which apparently were clandestinely photographed because Quan did not trust that Petters or his employees would not alter them),[20] *id.*, ¶101, neither Acorn nor any of the other Stewardship Defendants ever saw any shipping documentation.  *Id.*, ¶¶103, 107.  As Sovereign

---

[20] As verified by Miele's deposition testimony, which was submitted in connection with the Advisors/Quan Motion.  *See* Exhibit B to the February 14, 2011 Declaration of David S. Smith, at 9 (35:22-36:16).

Bank's examiner found, neither Acorn nor any of the Stewardship Defendants "perform verification on purchase orders or receivables that are in its collateral pool." *Id.*, ¶106.

• The PPMs further represented that, *inter alia*, pursuant to a "Lock-Box Agreement" to be entered into with borrowers such as PAC Funding, "payments of the accounts receivable" would be required to be made "into a lock-box account." Complaint, ¶32. Internally, this feature was intended to add "to the comfort level of the transaction." *Id.*, ¶91. In addition to the lending history with Petters, another factor counted in favor of entering into the Credit Agreement with PAC Funding was Petters' own personal guaranty (which Quan thought dispensed with the need for due diligence). *Id.*, ¶92.

• In light of these representations, a Fund investor would find it material that, *inter alia*, an employee of Acorn (or the Fund, depending on his tasks), Complaint, ¶¶37, 100, whose job included daily review of the lockbox account and who understood that payments to that account represented the proceeds of the sales transactions submitted by retailers, had only once inquired as to the source of payments to the lockbox and even though, on that one occasion, discovered that the source had been a Petters entity – and not a retailer – never again attempted to verify the source of payments to the lockbox account. *Id.*, ¶98. Equally material to a Fund investor would be Acorn's internal perception that Petters' single monthly payment was unusual, given the staggered nature of the underlying transactions that Acorn was financing (and the Fund was purchasing). *Id.*, ¶99. Fund investors would also find it important that, notwithstanding that Petters' $50 million personal guaranty was a significant motivating factor in entering into the Credit Agreement with PAC Funding, *id.*, ¶94, there was no background check of Petters conducted (which not only would have uncovered his criminal background, but was also contrary to Acorn's standard practice), no personal tax returns were ever reviewed (if even requested) and the only personal financial information ever seen were statements prepared by Petters' own staff (an executive who was ultimately convicted of tax fraud). *Id.*, ¶¶93-94.

• The Credit Agreement with PAC Funding required that it provide Acorn with audited financial statements. Complaint, ¶96. Fund investors would have considered material the fact that not only was such information never received from PAC Funding, it was apparently never even requested. *Id.* Equally material to Fund investors would be Acorn's own perception that the unaudited financial statements were inherently less valuable. *Id.*

• Given that Fund investors were assured that "Collateral Risk" would be managed by, *inter alia*, UCC filings covering the collateral, Complaint, ¶¶30, 32, they would be interested to learn that, nothing was done to verify the existence of the collateral that secured the notes owned by the Fund even after Acorn was confronted with a blatant red flag. Rather, when the Petters' entities were caught by the their own elaborate machinations and "double-pledged" collateral, the

Stewardship Defendants accepted, without investigation, a revised (but equally bogus) UCC statement. *Id.*, ¶102.

• At a time when the credit line to PAC Funding had been extended to approximately $250 million, of which more than $100 million was overdue and outstanding, Complaint, ¶¶50, 56, and the borrower was on the verge of entering into a forbearance agreement with Acorn and Quan (which would hold in abeyance Acorn's right to file an action or foreclose on the collateral underlying the promissory notes), *id.*, ¶57, Fund investors would consider material the fact that Quan, on behalf of Acorn and the Fund, agreed to "round-trip" payments. *Id.*, ¶¶108-110 (detailing transactions of over $46 million in which PAC Funding made payments to Acorn conditioned on Acorn's agreement to immediately send the funds back to PAC Funding).[21]

These specific instances, which represent the Stewardship Defendants' knowledge of facts, access to information that was contrary to their public statements in the PPMs, and/or their failure to check information they had a duty to monitor regarding, *inter alia*, due diligence that would conducted, loan performance that would be monitored and collateral that would be verified, all support a strong inference of scienter.

However, the magnitude of the Stewardship Defendants' recklessness also is amplified by the scheme alleged in the *Wedbush* action, which details how Acorn was defrauded out of at least $1.3 million through, *inter alia*, past lending history and phony documents. Complaint, ¶¶114-120.[22] Even without the fiduciary duties owed to Plaintiffs and other members of the proposed class, parties such as the Stewardship Defendants, entrusted to safeguard others' investments,

---

[21]Furthermore, to accomplish the "round-trip" transactions, PAC Funding had to withdraw funds from the "blocked account" (presumably being monitored by Acorn), Complaint, ¶109, which, together with the lockbox agreement, was supposedly intended to "add[] to the comfort level" of the Credit Agreement. *Id.*, ¶91.

[22]What is equally notable about the *Wedbush* action is the amount of due diligence Acorn conducted over such a relatively small loan amount, Complaint, ¶115 (describing Acorn's telephone verifications, supporting correspondence and requirement that the borrower provide Acorn with "control" over his brokerage account), juxtaposed against the paucity of due diligence conducted regarding the $200 million Credit Agreement with PAC Funding less than two years later (and only nine months after discovering the *Wedbush* fraud). *Id.*, ¶121.

who were duped as alleged in the *Wedbush* complaint, would be expected to learn from their mistakes, to exercise increased vigilance and generally adhere to a "once burnt, twice shy" approach.

Here, the Stewardship Defendants would have the Court believe that the *Wedbush* experience created no obligation on their part to beware of fictitious financial statements and non-existent assets underlying a transaction.  Such an approach simply fails to recognize the reality for any skilled investor and is implausible under the circumstances.  Morever, when combined with their fiduciary duties, the Stewardship Defendants' failure to be more cautious following the *Wedbush* experience constitutes intentional conduct akin to wilful blindness or, as discussed above, perhaps something more nefarious.  *See In re Fischbach*, 1992 WL 8715, at *6 ("Facts suggesting reckless disregard of the truth in a 10b-5 case often suggest wilful blindness. While it is possible that defendants were merely extraordinarily careless, this is usually not the most plausible inference to draw [b]ecause civil defendants in 10b-5 cases are usually not neophytes in the marketplace, and because failure to gather obvious information can be so costly, it is difficult to explain why they would have been extraordinarily careless").[23]

---

[23]The recent decision in *South Cherry Street, LLC v. Hennessee Group LLC*, 573 F.3d 98 (2d Cir. 2009), although based on somewhat similar facts, is nonetheless distinguishable.  There, the advior-defendants recommended that the plaintiffs invest in what was a Ponzi scheme.  The advisors claimed that their recommendation of Bayou Accredited, a hedge fund, was the result of performing, *inter alia*, "five levels of scrutiny." *Id.*, 573 F.3d at 100.  Plaintiffs argued the recommendation was made with reckless disregard for the truth because if the advisors had conducted their supposed diligence, they would have discovered a number of problematic signs, including misrepresentations of the fund's founder regarding his previous work experience and that the fund's auditor was owned by another of the fund's principals.  *Id.* at 102.  The *South Cherry* court determined that the scienter allegations were insufficient primarily because there was no allegation that the advisors were aware of the "red flags," but rather they all were based on a conditional "if:" "'[i]f' [the advisors] had asked various questions earlier, it would have further questioned the [hedge fund's] financial records or recognized the need to ask further questions." *Id.* at 112.  By comparison, the Complaint here details recklessness or willful avoidance that had been going on for years, through successive increases in the amount loaned to

### D.      Section 20(a) Liability Is Adequately Pled

Advisors, Quan and Acorn only contest liability as control persons under Section 20(a) of the Exchange Act on the basis that claims for primary liability have not been stated under Section 10(b) of the Exchange Act and, therefore, based on their "logic," the dependent claims against them under Section 20(a) must fail.  Since the claims under Section 10(b) are well pled and are well founded, Advisors, Quan and Acorn effectively concede, as they must, their liability as "control persons" under Section 20(a).  *See*, *e.g.*, *Packer*, 250 F.R.D. at 112 (the "failure to brief an issue is grounds to deem the claim abandoned").  As a result, for the reasons explained above, the Advisor/Quan Motion and Acorn's Motion to Dismiss must be denied.[24]

Seidenwar and Bucci each desperately seek to avoid liability for their misconduct by independently contesting liability under Section 20(a).  As the Court recently explained in *In re Fannie Mae 2008 Sec. Litig.*, 742 F.Supp.2d 382 (S.D.N.Y. 2010), however, the standard for

---

PAC Funding (with an inverse decreased demand for due diligence, monitoring of loan performance or collateral verification), and not simply a one-time recommendation such as *South Cherry*.  Furthermore, similar to the conclusion reached by the *Anwar* court, "[t]he key difference between this case and *South Cherry* is that the defendant in *South Cherry* failed to learn what it would have if, with affirmative steps and more diligence, it had done more to inform itself [whereas h]ere, plaintiffs allege that the [] Defendants ignored not only what was handed to them but that what they were given was readily suspicious to any reasonable person exercising ordinary prudence [and w]hen presented with notorious signs of fraud, they discounted them ..." *Id.*, 728 F.Supp.2d at 411.  Likewise, the Stewardship Defendants' awareness of "red flags," such as PAC Funding's failure to provide audited financial statements and Acorn's failure to demand such documentation, was not conditional; the Stewardship Defendants knew that the loan agreements required such information, but they also knew that they never received or insisted on its production.

[24]It also bears noting that neither Advisors, Quan, Acorn nor the Fund contest the Complaint's allegations that they operated as alter egos of each other.  *See*, *e.g.*, Complaint, ¶¶132-136, 138.  As a result, the Complaint states claims against Advisors, Quan and Acorn in any event, regardless of Section 20(a) liability.  *See In re Parmalat Sec. Litig.*, 598 F.Supp.2d 569, 581 (S.D.N.Y. 2009) (recognizing alter ego liability as alternative basis of liability independent of Section 20(a) liability).  Likewise, none of the Individual Defendants contest the Complaint's allegations that Advisors, Quan and Acorn all functioned as alter egos of each other.

stating a claim under Section 20(a) of the Exchange Act is not nearly as burdensome as

Seidenwar and Bucci suggest:

> Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter ... shall also be liable jointly and severally with and to the same extent as such controlled person" unless the purported control person can demonstrate that he "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

> "[T]o plead a *prima facie* case of control person liability under section 20(a), a plaintiff must allege '(1) a primary violation by the controlled [entity], (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud.'" *In re Scottish Re Group Sec. Litig.*, 524 F.Supp.2d 370, 386 (S.D.N.Y. 2007). It is not sufficient for a plaintiff to allege that an individual defendant has control person status; instead, the plaintiff must assert that the defendant exercised actual control over the matters at issue. *Id.*

> ***Control person liability need not be pleaded with particularity*** and is generally analyzed under the "short and plain" statement analysis of Rule 8(a). *See Sedona Corp. v. Ladenburg Thalmann & Co., Inc.*, No. 03 Civ. 3120(LTS)(THK), 2005 WL 1902780, at \*16 (S.D.N.Y. Aug. 9, 2005) (holding that a plaintiff's pleading with respect to the elements of control person liability need only meet the requirements of 8(a) since "***[n]either the PSLRA (because scienter is not an essential element), nor Rule 9(b) (because fraud is not an essential element), apply to a Section 20(a) claim***"). Some courts, however, analyze the culpable participation prong under the heightened pleading standard of the PSLRA. *In re Global Crossing, Ltd. Sec. Litig.*, No. 02 Civ. 910(GEL), 2005 WL 1907005, at \*5 (S.D.N.Y. Aug. 8, 2005) ("[S]ince culpable participation is an element [of 20(a) claims], the PSLRA's heightened pleading requirements apply ....").

*      *      *

As discussed previously, Fannie may have violated 10b-5 via misstatements by Mudd and Dallavecchia regarding Fannie's internal risk controls. As a result, Plaintiffs satisfy the "primary violation" requirement. Further, "[a]lthough status as officer or committee member is generally not enough to constitute control, and thus a mere recitation of [the Individual Defendant]'s title[s] ... is not sufficient," *In re Alstom SA Sec. Litig.*, 406 F.Supp.2d 433, 494 (S.D.N.Y. 2005), Plaintiffs allege enough facts to suggest that the Individual Defendants did indeed have control over Fannie: Mudd, as CEO, was not only Fannie's most senior officer, but he signed the 10-Ks and 10-Qs that contained many of Fannie's purported misstatements, as did Swad, Fannie's CFO (¶28); Dallavecchia, as Executive Vice President and Chief Risk Officer, was responsible for Fannie's risk controls and

for reviewing and approving the methodology and amount of Fannie's combined loss reserves, and also contributed to Fannie's misstatements (¶31); and Blakely does not challenge his Control Person status. *See In re Parmalat Sec. Litig.*, 594 F.Supp.2d 444, 455-56 (S.D.N.Y. 2009) ("'[O]nly the ability to direct the actions of the controlled person, and not the active exercise thereof' is required to establish control.") (citation omitted); *see also Hall v. Children's Place Retail Stores, Inc.*, 580 F.Supp.2d 212, 235 (S.D.N.Y. 2008) ("Whether a person is a 'controlling person' is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss.") (*citing In re Oxford Health Plans, Inc.*, 187 F.R.D. 133, 143 (S.D.N.Y.1999)).

While a party cannot be held liable for both a primary violation and as a control person, alternative theories of liability are permissible at the pleading stage. *See In re Parmalat Sec. Litig.*, 375 F.Supp.2d 278, 310 (S.D.N.Y. 2005). "Culpable participation" is, as discussed above, sufficiently pled for Mudd and Dallavecchia so far as Plaintiffs allegations regarding internal risk management are concerned. Insofar as scienter pleadings under Section 10(b) and Rule 10b-5 are more difficult to allege than 20(a) claims (due to PSLRA and Rule 9(b)), it follows that Plaintiffs have satisfied 20(a)'s "culpable participation" prong for these Defendants. *See In re Take-Two*, 551 F.Supp.2d at 308 ("[B]ecause the Court has determined that [Plaintiff] adequately pleads [Defendant's] scienter ... Count II sufficiently alleges [Defendant's] culpable participation in that fraud as well.") (*citing In re AOL Time Warner, Inc. Sec. and "ERISA" Litig.*, 381 F.Supp.2d 192, 235 (S.D.N.Y. 2004) (indicating that adequate scienter allegations necessarily satisfy culpable participation element)).

*Id.*, 742 F.Supp.2d at 415-416 (emphasis added).

Here, despite the "high" rhetoric advanced by Seidenwar and Bucci, it is beyond cavil that the Complaint contains detailed factual allegations that support a finding of Section 20(a) liability on their part.  First, as explained above, the Complaint states a claim for primary liability under Section 10(b) with respect to Advisors, Quan, Acorn and the Stewardship Fund, all of which functioned as alter egos of each other (which is not contested by any of the Defendants). Second, the Complaint clearly pleads the "control person" status of Seidenwar and Bucci and alleges the following detailed facts (as opposed to mere conclusions) suggesting culpable participation in the fraud at issue, including facts regarding the acts and omissions of Acorn (which obviously are attributable to Seidenwar and Bucci in light of their positions as senior

officers of, and with responsibility for, Acorn):

- Seidenwar and Bucci dominated and controlled Acorn with Quan.  Complaint, ¶¶5, 18;

- During the Class Period, Seidenwar was President of Acorn, and previously served as Acorn's Chief Credit Officer.  *Id.*, ¶23;

- Bucci was the Chief Financial Officer of Acorn.  *Id.*, ¶24;

- Prior to entering into the Credit Agreement with PAC Funding, neither Seidenwar nor Bucci performed any due diligence regarding Petters or PAC Funding (a SPE specially created for Acorn), and this fact was omitted from all communications with Members of the Fund throughout the Class Period.  *Id.*, ¶89;

- The absence of due diligence is confirmed by the October 27, 2004 PAC Funding LLC Approval Memorandum, which was approved by Bucci (as Acorn's Chief Financial Officer) and Seidenwar (as Acorn's then-Chief Credit Officer).  *Id.*, ¶91;

- Bucci was specifically informed by Miele, who was responsible for monitoring payments to the lockbox account, that a late payment had come from PCI – not a retailer as required (which was an explicit violation of the Lockbox agreement) – and Bucci, after consulting with Quan and Seidenwar, told Miele that the late payment was not a matter of concern.  *Id.*, ¶91;

- Acorn's own management (by definition Seidenwar and Bucci) knew that the regular monthly payments by Petters, despite the staggered nature of the promissory notes' pay-off dates (and the existence of the lockbox account), was unusual and suspicious.  *Id.*, ¶99;

- In June, 2008, Seidenwar was specifically advised in writing that purchase orders supposedly assigned by PAC Funding to Acorn as security for Acorn's loans had been "double-pledged" to another lender.  *Id.*, ¶102;

- Based on an October, 2008 collateral field examination of Acorn and its affiliates conducted on behalf of Sovereign Bank, which included discussions with Seidenwar, Sovereign Bank concluded that "due diligence conducted over the past year, at least, has been sorely lacking," and the subsequent Field Examination Report stated that "[w]e were informed by President Paul Seidenwar that [Acorn] had grown overly confident in its relationship with PCI and reduced its oversight over the last year due to its increasing familiarity and comfort and the relationship" – which, of course, was utterly false (to the extent it implied past and significant due diligence) since none of the Stewardship Defendants conducted any meaningful due diligence with respect to the PAC Funding investments at any time during or before the Class Period,.  *Id.*, ¶102;

- Acorn, for which Seidenwar served as Chief Credit Officer and then President, and for which Bucci served as Chief Financial Officer, engaged in a number of serious deviations from its own supposed policies and practices, including (I) taking no steps to confirm Petters' representations regarding supposed delays in retailers' shipments, (ii) never verified with any of the retailers that they were actually doing business with Petters or any of his companies even though it was standard practice in the industry and part of Acorn's standard operating procedures to do so, (iii) although it was standard in the industry, Acorn had no shipping information or warehouse information regarding the merchandise that supposedly secured its loans, (iv) although the applicable credit agreement required PAC Funding to provide audited financials on an annual basis, Acorn never requested or received audited financials from PAC Funding, but instead received monthly unaudited financial information, which Acorn knew was inherently unreliable and less valuable compared to audited financial statements, (v) Acorn did not enforce the Lockbox Agreement and, in fact, Petters could not have set up an actual lockbox account to receive payments directly from retailers because there were neither retailers, actual sales to retailers nor payments from retailers, and (vi) in February, 2008, Deanna Coleman, Petters' principal accomplice, began asking Acorn to "roundtrip" payments – *i.e.*, PAC Funding would make repayments on its outstanding loans on the condition that Acorn re-invest the money with PAC Funding within a matter of days – and Acorn willingly participated in these transactions (thereby receiving millions of dollars of payments between February 2008 and May 2008 that it then permitted to literally get away by re-investing the money with PAC Funding just days later). *Id.*, ¶112;

- The *Wedbush* action placed Seidenwar and Bucci on notice regarding the risks that could arise as a result of investing in fraudulent and non-existent assets. *Id.*, ¶¶113-120;

- Within Acorn, the Petters' loan program was shrouded in secrecy, other employees were excluded from any substantive knowledge regarding the Petters loans and Seidenwar and Bucci participated in frequent closed door meetings with Quan regarding the Petters loans and their status. *Id.*, ¶122;

- Although Seidenwar subjected other Acorn investments to stringent criteria and requirements, similar standards were not applied to loans to Petters and PAC Funding. *Id.*, ¶123;

- Although Bucci was Acorn's Chief Financial Officer, Ernst & Young sent its 2002 engagement letter for the audit of the Fund to him on behalf of Advisors and, in a January 15, 2008 assignment between the Fund and Northlight Fund, LP, Bucci executed the assignment on behalf of the Fund and identified himself as an Assistant Portfolio Manager. *Id.*, ¶135; and

- Seidenwar and Bucci controlled, participated in and/or were aware of the

operations of Acorn, Advisors and the Fund, and/or had intimate knowledge of the statements issued regarding the Stewardship Fund, and had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Acorn, Advisors and the Fund, including the content and dissemination of such statements and the information omitted therefrom which rendered the statements false and misleading.  *Id.*, ¶150.

These factual allegations, rather than constituting conclusional assertions as Seidenwar and Bucci blithely claim, more than sufficiently plead control person liability and culpable participation in the fraud at issue – especially, at this juncture in the proceedings, at the pleading stage.  *See Hall v. Children's Place Retail Stores, Inc.*, 580 F.Supp.2d at 235 ("Whether a person is a controlling person is a fact-intensive inquiry, and generally should not be resolved on a motion to dismiss") (citation and internal quotations omitted).[25]  In sum, the Complaint pleads both facts establishing that Seidenwar and Bucci were in positions of control, and facts that establish that they culpably participated in the very acts giving rise to Plaintiffs' claims for violations of the federal securities laws.  Accordingly, Plaintiffs should be provided with an opportunity to adduce evidence through discovery and prove their well-pled claims under Section 20 of the Exchange Act.[26]

## E.    Liability Under The CUSA Is Adequately Pled

The Stewardship Defendants effectively concede the adequacy of the Complaint's alleged primary violations of the CUSA, Conn. Gen. Stat. § 36b-29, by failing to even contest them.  *See*

---

[25]Any argument by Seidenwar or Bucci that they were only acting on behalf of Acorn and owed no duty to Advisors or the Fund is belied by the averments that all of these entities acted as alter egos of each other and shared personnel, Complaint, ¶¶25, 37, 132-136, which allegations Seidenwar and Bucci do not contest, and which render futile any attempt by either of them to escape liability based upon the alleged corporate form of any business entity.

[26]To the extent that Seidenwar or Bucci argue that it is necessary to plead scienter, *i.e.*, that they were reckless or that they had the motive to commit fraud, that argument is plainly wrong.  *See, e.g., Sedona*, 2005 WL 1902780, at *16; *In re Initial Public Offering Sec. Litig.*, 358 F.Supp.2d 189, 208 (S.D.N.Y. 2004).

Advisors/Quan Motion at 35.  CUSA is based in substantial part on the 1956 Uniform Securities

Act and imposes liability for "both intentional and negligent misrepresentations or omissions."

*Lehn v. Dailey*, 77 Conn.App. 621, 631-632 (2003).  Thus, a notable feature of a CUSA claim is

that no showing of scienter is required.  *Id.*, 77 Conn.App. at 633.  In general, in order to

establish primary liability, a plaintiff-buyer must prove "(1) that the primary violator offered or

sold a security by means of either an untrue statement of a material fact, or an omission to state a

material fact necessary to make any statements made, in the circumstances of their making, not

misleading; and (2) that the buyer did not know of the untruth or omission."  *Connecticut*

*National Bank v. Giacomi*, 242 Conn. 17, 46 (1997).

The Advisors/Quan Motion argues only that, once the federal securities violations are

dismissed, this Court need not exercise supplemental jurisdiction over the CUSA claims for

primary violations.  However, even where a court "has dismissed all claims over which it has

original jurisdiction," 28 U.S.C. § 1367(c)(3), the supplemental jurisdiction statute provides that

it may retain jurisdiction.  *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir. 2003) ("In

providing that a district court 'may' decline to exercise such jurisdiction, this subsection is

permissive rather than mandatory").[27]

---

[27]Here, Plaintiffs have little doubt and every confidence that the Court will deny the
Motions in their entirety and allow this action to proceed on all counts.  However, because the
issues presented by the CUSA claim are largely settled (or at least do not require the Court to
divine how a state court would decide issues of liability), Plaintiffs respectfully suggest that, even
if any or all federal claims were dismissed, it still would be proper to retain jurisdiction over the
CUSA claims asserted.  *See* 28 U.S.C. § 1332(d)(2) ("The district courts shall have original
jurisdiction of any civil action in which the matter in controversy exceeds the sum or value of
$5,000,000, exclusive of interest and costs, and is a class action in which (A) any member of a
class of plaintiffs is a citizen of a State different from any defendant"); *McLoughlin v. People's
United Bank, Inc.*, 586 F.Supp.2d 70, 72 (D. Conn. 2008).  In any event, Plaintiffs request the
opportunity to more fully brief the issue in the unlikely event that the Court grants the
Stewardship Defendants' Motions with respect to the federal claims asserted.

The only Defendants who otherwise contest liability under CUSA are Escher, Seidenwar and Bucci, who challenge whether sufficient facts have been pled against them to state a claim for aiding and abetting liability under CUSA.  As discussed above in analyzing the culpable participation of Seidenwar and Bucci in the Section 10(b) violations that give rise to Section 20(a) liability, more than sufficient facts have been pled in the Complaint to state a claim and establish a plausible inference that each Seidenwar and Bucci provided material assistance to the other Stewardship Defendants in committing the underlying CUSA violations.  Seidenwar and Bucci were senior officers of Acorn who were directly involved in making the determinations as to the due diligence (and utter lack thereof) conducted with respect to the most significant investment of the Stewardship Fund (*i.e.,* in the notes from PAC Funding), and each was intimately involved in the Petters loan program.  Moreover, given the close relationship between Acorn and the Fund, Complaint, ¶28 ("Acorn's symbiotic role with the Fund"), the acts and omissions of Seidenwar and Bucci provided obvious and meaningful material assistance to the perpetration of the fraud at issue by the other Stewardship Defendants.  *See JHW Greentree Capital, L.P. v. Whittier Trust Co.*, No. 05 Civ. 2985(HB), 2006 WL 1080395, at *7 (S.D.N.Y. April 24, 2006) ("Plaintiffs have also adequately alleged that the defendants aided and abetted securities violations within the definitions of CUSA section 36b-29(a)(2) [since, *inter alia*] plaintiffs have adequately plead control person liability as to Johnson, Whittier and Loftis under section 20(a) of the Exchange Act [and] [t]his is as much or more than that which is required to plead ... liability under CUSA") (citations and internal quotations omitted).  As the Connecticut Supreme Court explained in *Connecticut Nat. Bank v. Giacomi*, 242 Conn. at 47:

> In order for conduct to violate this section as "material assistance," to which we refer as aiding and abetting, it must also be proven that the aider or abettor materially assisted the primary violator: (1) in the offer or sale; and (2) in the violation by which the primary violator accomplished the offer or sale. In addition

to the foregoing elements of proof, the buyer must also meet a burden of production concerning the issue of whether the aider and abettor knew or should have known of the untruth or omission.  If the buyer meets this burden of production, the burden of proof on this issue shifts, so that the aider and abettor then bears the burden of persuading the fact finder that it did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.

Here, the facts pled in the Complaint establish that Seidenwar and Bucci (individuals who had specific responsibility for due diligence by Acorn and for ensuring that the loans that the Fund invested in were not fraudulent, which they indisputably failed to perform) provided material assistance with respect to the violations by which the primary violators accomplished the sales at issue (here by, among other things, assisting the primary violators with respect to the investments in the fraudulent Petters investments, failing to engage in any modicum of due diligence, approving loans that failed to meet Acorn's own loan requirements and then sitting by while the primary violators failed to disclose the lack of due diligence being conducted and continuing to solicit and obtain investments in the Stewardship Fund that were then used to fuel the investment activities of the Fund's alter egos, including Acorn and Advisors) in the material non-disclosures that give rise to Plaintiffs' primary claims (and that they clearly knew or should have known about the fraudulent omissions).  *See Connecticut Nat. Bank*, 242 Conn. at 54 (finding aiding and abetting liability under CUSA where a party's "actions had a natural tendency to influence the decision of ... and therefore, materially aided the primary violator [and] helped to procure reliance on [a] previous misrepresentation" and generally holding that personal endorsements can form the basis for aiding and abetting liability).  Clearly, the facts pled establish that the actions of Seidenwar and Bucci had the natural tendency to influence the decision of the Fund/Acorn/Advisors to pursue the PAC Funding investments and depart from their own requirements regarding due diligence with respect to these loans (as well as accepted loan origination practices), and that it was these severe departures from standards of conduct that

-49-

led to the actionable omissions at issue giving rise to the primary violations of CUSA.

Likewise, it is absurd to suggest that Escher did not materially assist the fraudulent conduct alleged in the Complaint.  With Quan literally on each side of the Fund's transactions – from Acorn's promissory note/loan origination, to Advisor's advice and recommendation and the Fund's purchase (and then Acorn's servicing of the promissory notes purchased by the Fund), Escher was presented as the only supposedly impartial and non-affiliated overseer of the Fund's activities.  In other words, Escher provided the Fund with an imprimatur of legitimacy based upon his alleged independence that would not have existed for the Fund absent his presence.  The following specific facts pled in the Complaint establish aiding and abetting liability under CUSA on the part of Escher:

- Escher was a former colleague of Quan's at Artemis Capital/Dain Rauscher and was identified in the PPMs as an "independent manager" of the Fund, meaning that he was "neither affiliated with, nor has a direct or indirect material interest in any transaction of the [Fund], Acorn, Mr. Quan or any affiliate or service provider of the foregoing ... and that [he was] qualified to evaluate any transaction between Acorn and the [Fund]." Complaint, ¶22;

- Notwithstanding these supposed conditions, during the Class Period, Escher served as one of four directors of the Off-Shore Fund (which purchased promissory notes from Acorn and whose investment manager was Advisors), as well as a director of Livingston Acres, LLC, one of the Fund's subsidiaries created in November, 2007.  *Id.*;

- None of the former employees of Acorn, Advisors or the Fund understood Escher's role – his name was not familiar to CW 3 or CW 4, while CW 6 thought perhaps he was Quan's partner, and CW 1 believed he may have been an investor or a consultant.  *Id.*, ¶135;

- "None of these former employees understood that Escher played any kind of independent role with respect to any of Acorn's transactions."  *Id.*;

- Escher was installed as a nominal "Independent Manager" with responsibility to independently evaluate any transaction between Acorn and the Fund, but in fact, Escher (a friend and former colleague of Quan) was conflicted because he was a director of one or more related entities, including the Off-Shore Fund and Livingston Acres, LLC.  *Id.*, ¶5;

- Despite his duties and title as "Independent Manager," in recognition of his conflicted role, Escher never engaged in any independent evaluation or investigation of any transaction between Acorn and the Fund and, indeed, upon information and belief, Escher never challenged or voiced any objection to any transaction foisted upon the Fund by Acorn.  *Id.*;

- Escher materially assisted the Fund, Advisors, Acorn and/or Quan in their violations of Section 36b-29 of the Connecticut General Statutes.  *Id.*, ¶167; and

- Escher, *inter alia*, acted and served, at all times during the Class Period, as Independent Manager of the Stewardship Fund, creating the appearance and deception that the inherent conflict of interest between Advisors, Acorn and Quan with respect to the notes and loans to be purchased by the Fund had been either ameliorated or eliminated, when in actuality, by virtue of his director-positions with the Off-Shore Fund and Livingston Acres, LLC, Escher was not disinterested and did not exercise any independence with regard to the review and/or approval of any proposed sale of a note or loan from Acorn to the Fund.  *Id.*

As in the case of *Connecticut Nat. Bank*, 242 Conn. at 54, Escher's "actions had a natural tendency to influence the decision of ... and therefore, materially aided the primary violator [and] helped to procure reliance on [a] previous misrepresentation."  Clearly, the facts pled establish that the actions of Escher had the natural tendency to influence the decision of the Fund/Acorn/Advisors to pursue the PAC Funding investments and depart from their own internal requirements regarding due diligence with respect to these loans (as well as accepted loan origination practices), and that it was these severe departures from standards of conduct that led to the actionable omissions at issue giving rise to the primary violations of CUSA.  Moreover, given his role as the supposedly "Independent" Manager of the Fund with the delineated responsibility of evaluating transactions between Acorn and the Fund (which constituted all of the Fund's transactions), Escher clearly knew or should have known about the nature of the Petters investments and the complete absence of due diligence on the part of Acorn.  Indeed, to have performed his purported duties in a minimally competent manner, Escher was required to engage in due diligence on the part of the Fund with respect to the loan transactions with Acorn

of the exact kind and degree that Acorn failed to perform with Petters and PAC Funding.  The

Complaint clearly pleads that Escher's failure to do so (as he was required), *see* Complaint, ¶5,

along with his lack of independence (despite the false representation to the contrary), all led

directly to the primary violations at issue.

The collective effort by Seidenwar, Bucci and Escher to "bury their heads in the sand"

and ignore/avoid the averments of control and material assistance in the fraud perpetrated by the

other Stewardship Defendants simply is not persuasive.  The blithe assertions by counsel for

these Individual Defendants that the Complaint fails to plead aiding and abetting liability with

respect to each of them ignores the actual allegations of the Complaint, as well as applicable and

controlling law.  For these reasons, the Complaint contains more than sufficient averments to

establish CUSA violations as to each of the Stewardship Defendants.[28]

## V.     CONCLUSION

For all of the reasons stated above, Plaintiffs respectfully submit that the Stewardship

Defendants' various Motions to Dismiss should be denied in their entirety.  As Plaintiffs'

investigation is continuing and Plaintiffs will continue to independently adduce facts to support

the prosecution of this case once discovery is permitted by the Court, Plaintiffs respectfully

request leave to amend to cure any deficiency identified by the Court in the Amended Complaint

---

[28]Moreover, in addition to the facts identified above establishing control person liability under Section 20(a), which independently give rise to aiding and abetting liability under CUSA, the Complaint plainly and cogently pleads that "[a]t all times, ... Seidenwar, Bucci and Escher knew, or reasonably should have known, of their respective roles in the securities fraud committed by the Fund, Advisors, Acorn and/or Quan" and "Seidenwar, Bucci and Escher aided and abetted the violations of the Connecticut Uniform Securities Act committed by the Fund, Advisors, Acorn and/or Quan...."  Complaint, ¶¶168-69.  By pleading the positions and roles that they played in perpetrating the massive fraud of the Stewardship Fund and all related entities (including all of the Stewardship Defendants), the Complaint plainly and clearly states a claim for aiding and abetting liability under CUSA.

and/or to clarify or expand upon any averments should the Court deem such clarification appropriate and helpful under the circumstances.

DATED: March 22, 2011   Respectfully submitted,

         THE PLAINTIFFS

          /s/ Patrick A. Klingman
         James E. Miller (ct21560)
         Patrick A. Klingman (ct17813)
         Karen Leser-Grenon (ct23587)
         SHEPHERD, FINKELMAN, MILLER & SHAH, LLP
         65 Main Street
         Chester, CT  06412
         Telephone: (860) 526-1100
         Facsimile: (860) 526-1120
         Email:  jmiller@sfmslaw.com
            pklingman@sfmslaw.com
            kleser@sfmslaw.com

         Scott R. Shepherd
         Lawrence D. Berger
         SHEPHERD, FINKELMAN, MILLER & SHAH, LLP
         35 E. State Street
         Media, PA 19063
         Telephone: (610) 891-9880
         Facsimile: (610) 891-9883
         Email:  sshepherd@sfmslaw.com
            lberger@sfmslaw.com

         Lesley E. Weaver
         SHEPHERD, FINKELMAN, MILLER & SHAH, LLP
         199 Fremont Street, 20th Floor
         San Francisco, CA  94105
         Telephone: (415) 992-7282
         Facsimile: (415) 489-7701
         E-mail: lweaver@sfmslaw.com

         Attorneys for Plaintiffs

**CERTIFICATE OF SERVICE**

I hereby certify that on March 22, 2011, a copy of the foregoing Lead Plaintiff's Consolidated Memorandum of Law in Opposition to the Motions to Dismiss was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

/s/ Patrick A. Klingman
Patrick A. Klingman (ct17813)