# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

POPTECH, L.P., individually and on behalf of   :
a class of others similarly situated,   :
  :
  :
                    Plaintiff,   :
  :
v.   :      No. 3:10cv967 (MRK)
  :
STEWARDSHIP CREDIT ARBITRAGE   :
FUND, LLC; STEWARDSHIP INVESTMENT   :
ADVISORS, LLC; ACORN CAPITAL GROUP,   :
LLC; MARLON QUAN; GUSTAV E. ESCHER,   :
III; PAUL SEIDENWAR; ROBERT BUCCI,   :
  :
               Defendants.   :

## MEMORANDUM OF DECISION

This is a securities fraud case. Plaintiff Poptech, L.P. ("Poptech") was an investor in Defendant Stewardship Credit Arbitrage Fund, LLC ("Stewardship Fund"), a private, Connecticut-based fund. Poptech's 98-page-long Second Amended Complaint [doc. # 101] asserts claims against several Defendants under Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated under that statute by the United States Securities and Exchange Commission ("SEC Rule 10b-5"). *See* 17 C.F.R. § 240.10b-5(b). The Second Amended Complaint also asserts claims under Section 20(a) of the Exchange Act against Defendants who are alleged to have exerted control over the primary violators. *See* 15 U.S.C. § 78t(a).[1] Defendant Paul Seidenwar falls into the latter category only.

---

[1] The Second Amended Complaint also asserts state law claims against Defendants. Those claims are not directly at issue at this time and the Court will therefore ignore them for now.

Pending before the Court is Mr. Seidenwar's Motion to Dismiss [doc. # 102] the Section 20(a) claim asserted against him in the Second Amended Complaint, pursuant to Rule 12(b)(6) of the *Federal Rules of Civil Procedure*. For the reasons set forth below, Mr. Seidenwar's motion is DENIED. Assuming, without deciding, that Poptech's Second Amended Complaint contains sufficient factual allegations to state a primary violation claim against Stewardship Fund; Stewardship Investment Advisors, LLC ("Stewardship Advisors"); and/or Acorn Capital Group, LLC ("Acorn Capital") – the Court need not decide for the time being whether or not it does – the additional factual allegations in the Second Amended Complaint regarding Mr. Seidenwar are more than sufficient to state a Section 20(a) claim against Mr. Seidenwar. Specifically, the Court concludes that Poptech has sufficiently alleged that Mr. Seidenwar possessed control over the alleged primary violators, and that Poptech has sufficiently alleged that Mr. Seidenwar was also a culpable participant in the alleged primary violations. That said, Mr. Seidenwar may renew his motion to dismiss if the Court determines later on in this case that the Second Amended Complaint fails to state primary violation claims against Stewardship Fund, Stewardship Advisors, and Acorn Capital.

## I.

Before turning to the factual allegations regarding Mr. Seidenwar in the Second Amended Complaint, the Court must set forth the applicable law. There is a good deal of disagreement among district courts within the Second Circuit – as well as among federal courts generally – regarding both the elements of the prima facie case under Section 20(a), *see* 4 Thomas Lee Hazen, *The Law of Securities Regulation* § 12.24(1), at 481-83 (6th ed. 2009),[2]

---

[2] The Second Circuit has frequently relied on Professor Hazen's treatise in its securities fraud cases, *see, e.g.*, *In re Lehman Brothers Mortgage-Backed Securities Litigation*, --- F.3d ---, 2011 WL 1778726, at *10 (2011), and this Court will therefore rely on it as well.

and the pleading standard applicable to each of the elements of the prima facie case. *See id.* at 483-84. District courts would be greatly aided if the Second Circuit or the Supreme Court would step in and resolve the disagreement. Until one of those two courts does so, this Court will likely adhere to the legal conclusions set forth in this Memorandum of Decision.

**A.**

Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). The Second Circuit has repeatedly stated that "[t]o establish a prima facie case of control person liability [under Section 20(a)], a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Communications, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007); *see Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 170 (2d Cir. 2000); *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998); *SEC v. First Jersey Securities, Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996).

Poptech argues that despite the Second Circuit's clear and repeated statements that a plaintiff asserting a Section 20(a) claim must show the defendant's culpable participation as part of the prima facie case, a plaintiff need not allege culpable participation in the complaint. *See* Mem. in Opp'n [doc. # 105] at 11 n.8. There is support for Poptech's argument in many district court decisions from within the Second Circuit, a number of which predate the Second Circuit's

clear and repeated statements that a plaintiff asserting a Section 20(a) claim must show the defendant's culpable participation as part of the prima facie case. *See, e.g.*, *Savino v. E. F. Hutton & Co., Inc.*, 507 F. Supp. 1225, 1242-43 (S.D.N.Y. 1981) (concluding that a plaintiff need not allege culpable participation as part of the prima facie case). Even after the Second Circuit's clear and repeated statements that the plaintiff must show culpable participation as part of the prima facie case, a number of well-respected district court judges within the Second Circuit have continued to adhere to the view that "[t]he Second Circuit has not addressed the question whether a plaintiff must *allege* culpable participation" in the complaint. *In re Parmalat Securities Litigation*, 375 F. Supp. 2d 278, 307 (S.D.N.Y. 2005) (emphasis added); *see ST Microelectronics v. Credit Suisse Group*, --- F. Supp. 2d ----, 2011 WL 1238817, at *7 (E.D.N.Y. Mar. 31, 2011); *In re WorldCom, Inc. Securities Litigation*, 294 F. Supp. 2d 392, 415 (S.D.N.Y. 2003); 4 Hazen, *The Law of Securities Regulation* § 12.24(1), at 483 (observing that "it has been held that the plaintiff need not affirmatively *plead* culpable participation" (emphasis added)).

The arguments those courts have advanced in favor of their view are not trivial. They have pointed out that Congress's use of the word "unless" at the beginning of the final phrase in Section 20(a) indicates that the *defendant* – not the plaintiff – bears the burden of establishing "good faith and lack of inducement." *In re Parmalat*, 375 F. Supp. 2d at 308. Those courts have also pointed out that their reading of Section 20(a) is most consistent with "the purpose of Section 20(a)[,] which . . . was enacted 'to expand, rather than to restrict, the scope of liability.'" *Id.* (quoting *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 812 (2d Cir. 1975)). Finally, those courts have relied on isolated language from a recent Second Circuit decision which seemingly supports their view. *See Suez Equity Investors, LP v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001) ("The complaint alleges that DeRoziere was an officer of the Bank

and that he had primary responsibility for the dealings of that Bank and the other corporate defendants with SAM Group. While somewhat broad, this allegation is sufficient to plead controlling-person liability for the Bank derived from DeRoziere, the purported primary violator." (citation omitted)).

However, in this Court's view, there are a number of significant weaknesses in those courts' arguments. First, the language of Section 20(a) is not as clear as some of them seem to believe. Section 20(a) provides that a controlling person is liable *unless* the defendant acted in good faith and did not induce the primary violation. *See* 15 U.S.C. § 78t(a). But Section 20(a) does not specify whether under the "unless" clause *the plaintiff* must show lack of good faith and inducement, or whether *the defendant* must show his or her own good faith and lack of inducement. Either is fully consistent with the text, and there is a circuit split regarding that particular issue. *Compare ATSI Communication*, 493 F.3d at 108, *with Frank v. Plumbers & Pipefitters National Pension Fund*, No. 09-4233, slip op. at 13 (6th Cir. May 25, 2011). Second, there is some contradictory language in the very Second Circuit decision on which those courts have often based their arguments. In *Suez Equity Investors, LP v. Toronto-Dominion Bank*, 250 F.3d at 87, the Second Circuit stated that "[c]ontrolling-person liability is a form of secondary liability, under which *a plaintiff may allege* a primary § 10(b) violation by a person controlled by the defendant *and culpable participation* by the defendant in the perpetration of the fraud." *Id.* at 101. Thus, the fact that the Second Circuit went on later in the decision to state that the factual allegations in the complaint sufficed to plead the defendant's control, *see id.*, is inconclusive as to the issue of whether the plaintiff must also plead culpable participation. *See Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 248 n.9 (S.D.N.Y. 2006).

Even if the Court were persuaded by those courts' arguments, their position seems to go not to the question of whether culpable participation must be alleged in the complaint, but rather to the question of whether culpable participation is part of the plaintiff's prima facie case or an affirmative defense. The Second Circuit has, of course, conclusively resolved that particular issue. *See, e.g.*, *ATSI Communication*, 493 F.3d at 108 (stating that the plaintiff must show culpable participation); *see also* 4 Hazen, *The Law of Securities Regulation* § 12.24(1), at 483 (observing that "[t]he better view is that culpable participation is part of the plaintiff's cause of action"). Persuasive as the opposing position might be, *see, e.g.*, *In re Stone & Webster, Inc., Securities Litigation*, 424 F.3d 24, 26 (1st Cir. 2005) (Leval, J., sitting by designation), it is the law of the Second Circuit that the "unless" clause sets forth an element of the prima facie case. This Court has no choice but to follow that law.

It is true that the Second Circuit has never explicitly stated that the plaintiff must "plead" or "allege" culpable participation at the outset. *See ATSI Communications*, 493 F.3d at 108 (stating that a "plaintiff must *show* . . . that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud" (emphasis added)). But even under the fairly lax pleading standard set forth in Rule 8(a), it is ordinarily the plaintiff's duty to allege all of the facts that would plausibly make out a prima facie case of liability. *See Ashcroft v. Iqbal*, --- U.S. ----, 129 S. Ct. 1937, 1949 (2009). This Court knows of no other circumstances under which a plaintiff is not required to plead facts relating to an element which is undisputedly part of the plaintiff's prima facie case. In short, the Court believes that those courts that have concluded that there is no need to plead culpable participation have put too fine a point on the procedural posture of the Second Circuit's Section 20(a) cases, *see, e.g.*, *Mishkin v. Ageloff*, No. 97cv2690 (LAP), 1998 WL 651065, at *23 (S.D.N.Y. Sept. 23, 1998) (describing the fact that

the Second Circuit had not decided any Section 20(a) cases at the motion to dismiss stage as a "critical" distinction), and its use of the term "show" rather than "plead" or "allege" in describing the elements of a Section 20(a) claim in *ATSI Communications*, 493 F.3d at 108, and other cases. *See, e.g.*, *First Jersey*, 101 F.3d at 1472.

The Court respectfully disagrees with the district courts in the Second Circuit that have concluded that culpable participation is not an element that must be pleaded in the complaint as a part of the prima facie case. The Court instead joins with the other district courts in the Second Circuit that have concluded that "to withstand a motion to dismiss a Section 20(a) controlling person liability claim, a plaintiff must allege 'some level of culpable participation at least approximating recklessness in the Section 10(b) context.'" *Edison Fund v. Cogent Investment Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 231 (S.D.N.Y. 2008); *see also Lapin*, 506 F. Supp. 2d at 248 (same); *In re Alstom SA Securities Litigation*, 406 F. Supp. 2d 433, 489 (S.D.N.Y. 2005) (same).

## B.

Ordinarily, when considering a motion to dismiss pursuant to Rule 12(b)(6), this Court must "accept[] all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *Matson v. Bd. of Educ. of the City Sch. Dist. of New York*, 631 F.3d 57, 63 (2d Cir. 2011) (citation omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In assessing the plausibility of a plaintiff's allegations, the Court must assume that the allegations are true and view them as a whole. *See Matrixx Initiatives, Inc. v. Siracusano*, 131 S. Ct. 1309, 1322-23 (2011). The question is not whether the plaintiff will ultimately prevail, but whether the

"complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, --- S. Ct. ----, No. 09-9000, 2011 WL 767703, at *6 (Mar. 7, 2011). Put slightly differently, the "plausible grounds" requirement "does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence" supporting the plaintiff's claim for relief. *Twombly*, 550 U.S. at 556.

However, primary securities fraud violation claims brought under Section 10(b) and SEC Rule 10b-5 are subject to heightened pleading standards. Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed. R. Civ. P. 9(b). In addition, under the Private Securities Litigation Reform Act of 1995 ("PSLRA"), a complaint alleging securities fraud must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Finally, again under the PSLRA, a complaint alleging securities fraud must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

There is no dispute in this case that in order to state a Section 20(a) claim against Mr. Seidenwar, Poptech must allege a primary violation by one of the other defendants in accordance with Rule 9(b) and the relevant provisions of the PSLRA. There is, however a dispute about whether the pleading standards set forth in Rule 9(b) and the PSLRA apply to the remaining two elements that must be alleged in Poptech's Second Amended Complaint in order to state a Section 20(a) claim against Mr. Seidenwar: control and culpable participation. Poptech argues that it need only allege control consistent with Rule 8(a), *see* Mem. in Opp'n [doc. # 105] at 12,

and further that to the extent that it is required to plead culpable participation at all, its allegations need not satisfy either Rule 9(b) or any provision of the PSLRA. *See* Mem. in Opp'n [doc. # 105] at 10-11 n.10. For his part, Mr. Seidenwar seems to argue generally that Poptech's allegations with regard to *all* of the elements of the prima facie case must be pleaded in accordance with Rule 9(b) and the PSLRA. *See* Mem. in Supp. [doc. # 102-1] at 2.

Mr. Seidenwar's argument, if the Court has understood it correctly, is inconsistent with established law. It is well-recognized that Rule 9(b) and the provisions of the PSLRA apply to specific elements of securities fraud claims, rather than to entire claims. *See, e.g.*, 4 Hazen, *The Law of Securities Regulation* § 12.13(2)(A), at 216 ("The Reform Act focuses on state of mind, and accordingly is has been held that the PSLRA does not impose heightened pleading with respect to the other elements of the claim such as causation."). Rather than imposing an across-the-board pleading standard to all of the elements of Poptech's Section 20(a) claim against Mr. Seidenwar, the Court will proceed element-by-element.

With regard to the control element, the Court agrees with Poptech that the allegations in the Second Amended Complaint need only satisfy the requirements of Rule 8(a). *See In re Fannie Mae 2008 Securities Litigation*, 742 F. Supp. 2d 382, 415 (S.D.N.Y. 2008). The Court reaches that conclusion because an allegation of control is not an "averment[] of fraud or mistake," Fed. R. Civ. P. 9(b); it is unrelated to whether any misleading statement was made by the controlled person, *see* U.S.C. § 78u-4(b)(1); and has nothing to do with state of mind. *See* 15 U.S.C. § 78u-4(b)(2). The position this Court adopts in this Memorandum of Decision appears to be the prevailing view, at least among district courts in the Second Circuit. *See, e.g.*, *In re American International Grup, Inc. 2008 Securities Litigation*, 741 F. Supp. 2d 511, 535 (S.D.N.Y. 2010). *But see* 4 Hazen, *The Law of Securities Regulation* § 12.24(1), at 483 ("The

facts underlying a claim of control person liability must be pleaded with specificity."). Because a plaintiff's allegations regarding the control element need only comply with the requirements of Rule 8(a), the factual issue of a Section 20(a) defendant's control over a primary violator is ordinarily not resolved summarily at the pleading stage, and is more appropriately resolved after the parties have had an opportunity to engage in discovery. *See Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 776 (1st Cir. 2011) (Boudin, J.); 4 Hazen, *The Law of Securities Regulation* § 12.24(1), at 484.

With regard to the culpable participation requirement, Rule 9(b) does not appear to apply, since an allegation of culpable participation in someone else's fraud is not really the same thing as an allegation of a direct fraud or of mistake. *See* Fed. R. Civ. P. 9(b). However, the Court agrees with Mr. Seidenwar that the allegations in the Second Amended Complaint must comply with the PSLRA's requirement that facts giving rise to a strong inference that the defendant acted with the required state of mind must be stated with particularity. *See* 15 U.S.C. § 78u-4(b)(2). As the Court has already discussed above, the Court joins with those district courts that have concluded that a plaintiff asserting a Section 20(a) claim must allege that the defendant acted with a level of culpable participation approximating recklessness. *See Edison Fund*, 551 F. Supp. at 231; *Lapin*, 506 F. Supp. 2d at 248; *In re Alstom*, 406 F. Supp. 2d at 489.

While some district courts have concluded that the culpable participation requirement is not a state of mind requirement, and thus need not comply with the PSLRA, *see In re WorldCom*, 294 F. Supp. 2d at 415 (stating that "it does not appear that there is any requirement that the plaintiff plead or prove a culpable state of mind to allege or establish culpable participation"), this Court respectfully disagrees. A showing of *culpable* participation would indeed appear to require a showing of a particular state of mind. The legal terms "culpable" and "culpability" both

plainly refer to blameworthy states of mind. *See Black's Law Dictionary* 435 (9th ed. 2009) (defining "culpable" as "[g]uilty; blameworthy" and defining "culpability" as encompassing purposeful, knowing, reckless, and negligent action). The Court therefore joins with those district courts thats have required that culpable participation must be alleged in conformance with the PSLRA. *See, e.g.*, *Edison Fund*, 551 F. Supp. 2d at 231 (applying "a pleading burden . . . akin to pleading Section 10(b) scienter").

To comply with the PSLRA, then, Poptech must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "[T]o qualify as 'strong,' an 'inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference . . . .'" *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 194 (2d Cir. 2008) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)). That said, the Court emphasizes that because the claim against Mr. Seidenwar is not a primary violation claim, Poptech need only allege a state of mind approximating recklessness, *see Lapin*, 506 F. Supp. 2d at 248; *In re*, 406 F. Supp. 2d at 489, not the sort of purposeful or knowing misconduct that would be required to state a primary violation claim under Section 10(b). *See Aaron v. SEC*, 446 U.S. 680, 690 (1980).

## II.

Having set forth the three required elements of a Section 20(a) claim that must be alleged in Poptech's Second Amended Complaint, as well as the pleading standards that apply to each of those three elements, the Court now turns to the factual allegations in the Second Amended Complaint regarding Mr. Seidenwar. The Court will first discuss the factual allegations regarding Mr. Seidenwar's control over the primary violators, and then turn to discuss the factual

allegations regarding Mr. Seidenwar's culpable participation in the alleged primary violations. With regard to both elements, the Court believes that the detailed factual allegations in the Second Amended Complaint are adequate to survive Mr. Seidenwar's Motion to Dismiss.

The Court notes at the outset of its discussion regarding the factual allegations that it recognizes that to survive a motion to dismiss, the Second Amended Complaint must show more than that Mr. Seidenwar instituted insufficiently stringent due diligence procedures in his capacity as an officer of Acorn Capital. Poptech's allegations of control and culpable participation must be related to the actual transactions at issue in the primary violation claims, namely the communication of misleading information to Stewardship Fund's investors. *See In re Alstom*, 406 F. Supp. 2d at 494. Mr. Seidenwar concedes that the allegations are sufficient to show that the due diligence procedures he was responsible for putting into place may not have been sufficient and that he knew they may not have been sufficient, *see* Second Am. Compl. [doc. # 101] ¶ 74; *see* Ex. B to Mem. in Supp [doc. # 102-3] at 4, but contends that there are no allegations to show he either had control over, or ever participated in, investor communications. The Court disagrees with Mr. Seidenwar's contention.

### A.

As to the control element, the Court is confident that Poptech has alleged sufficient facts regarding control to raise a reasonable expectation that discovery will reveal evidence supporting the plaintiff's claim. *See Twombly*, 550 U.S. at 556. The term "control" is not defined in Section 20(a), but the SEC has defined "control" generally to mean "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b-2. The Second Circuit has adopted the SEC's definition for purposes of determining control under

Section 20(a). *See First Jersey*, 101 F.3d at 1472-73. "Corporate officers are usually presumed to possess the requisite power to control the actions of their employees and are often held accountable as controlling persons." 4 Hazen, *The Law of Securities Regulation* § 12.24(2), at 486-87; *see In re Alstom*, 452 F. Supp. 2d at 210-11.

Mr. Seidenwar's primary argument in support of the pending motion is that, although he held titles that suggest he was an officer of Acorn Capital, he was actually just an "employee" of Acorn Capital, and that Defendant Marlon Quan exercised exclusive control over the operations of Stewardship Fund, Stewardship Advisors, and Acorn Capital. The Court disagrees with that argument at this stage of the case. As described in detail below, Second Amended Complaint plausibly alleges that Mr. Seidenwar was one of the people who had the power to exercise control over the operations of Stewardship Fund, Stewardship Advisors, and Acorn Capital.

The Second Amended Complaint alleges that Stewardship Fund, Stewardship Advisors, and Acorn Capital all operated out of a single, relatively small office in Greenwich, Connecticut. *See* Second Am. Compl. [doc. # 101] ¶ 37. Mr. Quan created all three companies in 2001. *See id* ¶¶ 5, 18, 20. The three companies operated together as follows. First, Acorn Capital, a finance company specializing in asset-based lending, would make short-term loans to companies with limited capital or financing options at relatively high interest rates, secured by those companies' assets and inventories. *See id.* ¶ 20. Second, Stewardship Fund would purchase Acorn Capital's interests in repayment of the loans as investments for its members. *See id.* ¶ 18. Stewardship Advisors was the managing member of Stewardship Fund. *See id.* ¶ 19. Stewardship Fund's members knew that Stewardship Fund's investments would come exclusively – or almost exclusively – in the form of loans purchased from Acorn Capital. *See id.*

Although, as the founder of all three companies, Mr. Quan obviously occupied the highest-level position in the companies, Mr. Seidenwar and Defendant Robert Bucci also held positions as officers of the companies. Mr. Quan installed Mr. Seidenwar first as Chief Credit Officer and Managing Director, and later as President of Acorn Capital. *See id.* ¶ 23. Mr. Quan installed Mr. Bucci as Chief Financial Officer of Acorn Capital, as well as Chief Financial Officer of Stewardship Advisors. *See id.* ¶ 24. Like Mr. Bucci, Mr. Seidenwar was also involved in the operations of more than one of the three companies. Along with Mr. Quan, Mr. Seidenwar was at one time listed on loan documents as one of the contact persons for two wholly-owned subsidiaries of Stewardship Fund. *See id.* ¶ 22.

The fraud allegations in the Second Amended Complaint relate to Mr. Quan's and Stewardship Advisors' communications with the members of Stewardship Fund beginning on February 7, 2006 regarding the status of the Fund's investments. *See id.* ¶ 76. Before February 7, 2006, various Private Placement Memoranda ("PPMs") and other materials presented to investors indicated that Acorn Capital's portfolio of loans would be broad, and that Acorn Capital would provide financing only on a transaction-by-transaction basis. *See id.* ¶ 27. The PPMs and other investor materials emphasized that all of Acorn Capital's loans would be properly securitized, and that Acorn Capital, Stewardship Fund, and a major outside accounting firm would properly audit entities receiving financial from Acorn Capital. *See id.* ¶ 30-31. Finally, they stated both that Acorn Capital would confirm the acceptability of the underlying assets serving as collateral for the loans, and that Acorn Capital would require all payments on borrowers' accounts receivable to be paid into lock-box accounts. *See id.* ¶ 32. Acorn Capital played a part in the creation and the approval of the initial materials provided to investors in Stewardship Fund around September 2004. *See id.* ¶¶ 28, 36.

In November 2004 – just months after Stewardship Fund indicated in materials approved by Acorn Capital that the latter company would lend broadly and on a transaction-by-transaction basis, Acorn Capital extended a $200 million line of credit to PAC Funding, LLC. *See id.* ¶ 49. PAC Funding was purportedly a business that purchased discounted electronics and other goods from overseas manufacturers, and then sold them to retailers in the United States for a profit. *See id.* ¶ 40. PAC Funding supposedly needed the loans from Acorn Capital because the overseas manufactures required payment from PAC Funding up front, and the domestic retailers refused to pay PAC Funding until delivery. *See id.* As it turned out, PAC Funding was actually part of a Ponzi scheme operated by Thomas J. Petters. *See id.* ¶ 38.

Acorn Capital and PAC Funding amended their credit agreement multiple times to increase the total amount loans authorized, eventually to as much as $300 million. *See id.* ¶ 52. As of May 2008, Acorn Capital had made more than $1.9 billion in loans to PAC Funding. *See id.* PAC Funding borrowed near its limit – in May 2008, PAC Funding owed Acorn Capital $289 million on loans. *See id.* At that time, those loans represented between 60% and 70% of Acorn Capital's loan portfolio, and thus of Stewardship Fund's investment portfolio as well. *See id.*

On October 27, 2004, around time when Acorn Capital began lending to PAC Funding, Acorn Capital issued an Approval Memorandum approved by Mr. Seidenwar, among others. The Approval Memorandum indicates that Acorn Capital in large part approved the credit agreement because of its prior history of dealing with other entities controlled by Mr. Petters, which had never previously defaulted or made any late payments. *See id.* ¶ 93. It also states that the fact that payments on PAC Funding's accounts receivable would have to be made into a lockbox account "add[ed] to [Acorn Capital's] comfort level of the transaction." *Id.* The Second Amended Complaint alleges that – perhaps because of the prior relationship, but contrary to the

representations Stewardship Fund made to its investors – no audit of PAC Funding was ever performed, by Acorn Capital or anyone else. *See id.* ¶ 117.

The Second Amended Complaint alleges a number of facts from which it can be reasonably inferred that Mr. Seidenwar had control over the due diligence Acorn Capital performed regarding PAC Funding. First, the Second Amended Complaint alleges that all meetings held at the Stewardship Fund/Stewardship Advisors/Acorn Capital regarding PAC Funding were closed-door meetings attended only by Mr. Quan, Mr. Seidenwar, and Mr. Bucci. *See* ¶ 132. Second, it alleges that in November 2005, when Stewardship Fund was attempting to obtain credit from a German bank, AG Deutsche Zentral-Genossenschaftsbank Franfurt am Main ("Deutsche Zentral"), Mr. Seidenwar sent emails to Mr. Quan stating that Deutsche Zentral believed that Acorn Capital should be more diligent in its oversight of PAC Funding loans. *See id.* ¶ 74. Specifically, Deutsche Zentral believed that Acorn Capital should require that payments on PAC Funding's receivables be made into a lock-box account, *see id.*, the very procedure that Stewardship Fund told its investors Acorn Capital was using, and the very procedure that was required under the terms of the credit agreement between Stewardship Fund and PAC Funding.

Mr. Seidenwar's counsel insisted at oral argument that while the factual allegations in the Second Amended Complaint might be sufficient to show that Mr. Seidenwar had the ability to control due diligence at Acorn Capital, he did not have any control over the content of the investor communications which are the focus of the primary violation allegations. Those communications, which were sent by Mr. Quan and by Stewardship Advisors between 2006 and 2008, failed to disclose that Acorn Capital was in fact making 60%-70% of its loans to a single entity, PAC Funding, to which it largely agreed to lend based on its own prior relationship with companies controlled by Mr. Petters, and which Acorn Capital never audited. *See id.* ¶ 75. The

communications also left out a number of other significant details, some of which the Court will discuss in more detail in the section below regarding the culpable participation element, including that Acorn Capital did not actually enforce the lock-box requirement in the case of PAC Funding, *see id.* ¶ 100, and that in early 2008, PAC Funding began defaulting on many of its loans. *See id.* ¶ 109.

While "[c]orporate officers are usually presumed to possess the requisite power to control the actions of their employees and are often held accountable as controlling persons," 4 Hazen, *The Law of Securities Regulation* § 12.24(2), at 486-87; *see In re Alstom*, 452 F. Supp. 2d at 210-11, the Court recognizes that "[t]he presumption as to corporate officers should apply only with respect to their ambit of responsibility." 4 Hazen, *The Law of Securities Regulation* § 12.24(2), at 488 (citing *In re Alstom*, 406 F. Supp. 2d at 494). It may well turn out that the facts revealed during discovery support Mr. Seidenwar's argument – essentially, that he was at most only in control of Acorn Capital, that Acorn Capital did not involve itself in Stewardship Fund's investor communications, and that Mr. Quan was solely responsible for any misleading communications sent to investors between 2006 and 2008. But the allegations in the Second Amended Complaint, taking all reasonable inferences in favor of Poptech, are that Mr. Seidenwar was Chief Credit Officer, Managing Director, and later President of Acorn Capital, *see id.* ¶ 23; that Acorn Capital at the very least approved the initial communications to investors detailing the diverse nature of its loan portfolio and its safe, secure lending methods, *see id.* ¶¶ 28, 36; and that almost immediately after Acorn Capital began passing on the risk of its loans to Stewardship Fund's investors, Mr. Quan, Mr. Seidenwar, and Mr. Bucci rather secretively approved a massive credit agreement with a single entity representing more than half of Acorn Capital's lending capacity, and did so without any due diligence and almost exclusively on the basis of a preexisting

relationship. *See id.* ¶ 49. Those allegations more than plausibly show that Mr. Seidenwar was in a position not only to ensure that Acorn Capital was providing sufficient due diligence – Mr. Seidenwar does not dispute that the allegations are sufficient in that regard – but also to exercise some degree of control over the content of the information that investors were getting about Acorn Capital and its role in the Stewardship Fund.

Mr. Seidenwar seems to believe that unless he actually sent the communications himself, or approved the specific communications at issue himself, he cannot be liable under Section 20(a). The Court does not believe there is any support in the case law for his position. To the contrary, other district courts have recognized in the Section 20(a) context that a firm may try to bifurcate the process of reporting information to investors in order to insulate particular people within the firm from future legal liability. *See In re Alstom*, 454 F. Supp. 2d at 210-11; *see also In re Lehman Brothers*, 2011 WL 1778726, at *16 (contemplating that a person with control over the operations of a "shell company" or "dummy corporation" only for the purpose of "avoid[ing] liability for securities law violations" may not be shielded from control person liability). Under such circumstances, it is at least possible that multiple parties or entities could share control over the flow of information to investors. *See In re Alstom*, 454 F. Supp. 2d at 211.

This appears to be just such a case. Here, although Mr. Seidenwar apparently had no official role at Stewardship Advisors, the factual allegations in the Second Amended Complaint plausibly show that all three companies in fact operate as one entity. *See In re Lehman Brothers*, 2011 WL 1778726, at *16. The portion of that entity operated by Mr. Seidenwar, Acorn Capital, did not itself send out investor communications. But at various times, it did play some role in approving the messages that Stewardship Fund sent to potential investors about its own lending practices. *See* Second Am. Compl. [doc. # 101] ¶¶ 28, 36. It is implausible to suggest that Mr.

Seidenwar, at one point the President of Acorn Capital, did not know what Stewardship Advisors and Mr. Quan were telling investors thereafter about Acorn Capital. It is also implausible to believe that Mr. Seidenwar, the President of Acorn Capital, had no ability to correct the information being communicated about Acorn Capital, or at the very least to bring Acorn Capital's due diligence procedures into compliance with what the investors were being told. Mr. Seidenwar's counsel appeared to concede to the latter at oral argument.

Further, in their briefing, both parties largely overlooked the allegation in the Second Amended Complaint that from the outset, Stewardship Fund represented to its investors that the investors would receive periodic communications from Acorn Capital. *See id.* ¶ 31. Investors were told in the earliest investor communications that Acorn Capital would provide the investors with audits in its capacity as the servicer of the loans held by Stewardship Fund. *See id.* As President of Acorn Capital, then, Mr. Seidenwar presumably would have had the ability to both perform a full audit regarding PAC Funding, and to send communications to Stewardship Fund about the results. Such an audit might have disclosed the underlying fraud and prevented investors from falling victim to Mr. Petters' Ponzi scheme.

In sum, while the Court recognizes that the mere ability to give advice, to persuade, and to give counsel may not always constitute control, *see* 4 Hazen, *The Law of Securities Regulation* § 12.24(2), at 489, the Second Amended Complaint alleges much more than that with regard to Mr. Seidenwar. It alleges that Mr. Seidenwar was at least nominally the President of Acorn Capital. It alleges that Acorn Capital, Stewardship Fund, and Stewardship Advisors were in fact operated as a single entity. It alleges that at least initially, Acorn Capital played a role in approving investor communications sent by Mr. Quan and the other entities, and it alleges that Stewardship Fund told its investors that Acorn Capital was going to send audits to investors from

time to time. Assuming they are true, those allegations are enough to establish that Mr. Seidenwar had the ability to exert control over the communications at issue here, which related specifically to Acorn Capital's lending procedures and the status of the loan portfolio. *See In re Alstom*, 406 F. Supp. 2d at 487 (reasoning that a Section 20(a) defendant must have control over the specific transaction in question, not just general control over the primary violator).

**B.**

For similar reasons, the Court also believes that the Second Amended Complaint alleges with the specificity required by the PSLRA that Mr. Seidenwar culpably participated in an underlying primary violation of the securities laws. A defendant may be liable under Section 20(a) only if he or she participated in a fraud in some meaningful way, with a state of mind approximating recklessness. *See Edison Fund*, 551 F. Supp. 2d at 231. "In order to be a participant, the defendant must have some actual knowledge of the fraudulent activity taking place or knowledge must be imputed to him or her; knowledge is a first step in proving active participation." 4 Hazen, *The Law of Securities Regulation* § 12.24(3), at 490-91. As the Court has already explained, to satisfy the requirements of the PSLRA, the facts from which a Section 20(a) defendant's actual or imputed knowledge can be reasonably inferred must be set forth in the complaint with particularity, *see Edison Fund*, 551 F. Supp. 2d at 231, and the inference that the defendant acted with the requisite knowledge must be "cogent and at least as compelling as any opposing inference." *Teamsters Local 445*, 531 F.3d at 194 (citation omitted).

It is true that the Second Amended Complaint does not specifically state in any paragraph that Mr. Seidenwar had actual or imputed knowledge of the misleading communications and was therefore engaged in at least reckless misconduct. *See In re Alstom*, 406 F. Supp. 3d at 491 (explaining that recklessness is typically established when a plaintiff specifically alleges that a

defendant was aware of facts or had access to information contradicting public statement, or failed to review or check information that he or she had a duty to monitor). But assuming the truth of the factual allegations regarding Mr. Seidenwar, and taking those allegations as a whole as the Court must, *see Matrixx*, 131 S. Ct. 1309, 1322-23; *Tellabs* 551 U.S. at 322-23, it would be difficult to draw a conclusion other than that Mr. Seidenwar was at least reckless, if not worse, in failing to take steps to correct the information Mr. Quan was providing to Stewardship Fund's investors. *See In re Alstom*, 406 F. Supp. 2d at 491 (stating that conduct is reckless when it represents an extreme departure from the standards of ordinary care, to the extent that a danger was either known to the defendant or so obvious that the defendant must have been aware of the danger).

In the securities fraud context, knowledge of corporate wrongdoing is often imputed to officers "since 'it is reasonable to presume that . . . prospectuses, registration statements, and other group publications are the collective actions of the corporate officers.'" 4 Hazen, *The Law of Securities Regulation* § 12.24(3), at 491; *cf. Teamsters Local 445*, 531 F.3d at 195 (noting that the district court found sufficient allegations of scienter as to corporate officers, and that it is proper to allege an individual's motive and opportunity to commit or participate in fraud as a way of raising an inference of fraud). As the Court has already discussed above, the Second Amended Complaint alleges that Mr. Seidenwar was a high-ranking officer at Acorn Capital, *see id.* ¶ 23; that Acorn Capital at least at an early point approved communications to investors detailing the diverse nature of its loan portfolio and its safe, secure lending methods, *see id.* ¶¶ 28, 36; and that almost immediately after Acorn Capital began passing on the risk of its loans to Stewardship Fund's investors, Mr. Quan, Mr. Seidenwar, and Mr. Bucci together secretively approved a huge credit agreement without performing any due diligence and almost exclusively on the basis of a

preexisting relationship. *See id.* ¶ 49. It further alleges that when the employee responsible for checking compliance with lock-box procedures discovered in 2006 that in some instances, PAC Funding was not complying, Mr. Seidenwar directed Mr. Bucci essentially to tell the employee not to worry, and that "everything was okay with regards to" PAC Funding. *Id.* ¶ 100. Mr. Seidenwar's alleged 2005 emails regarding Deutsche Zentral further confirm that he knew that PAC Funding was not complying with the lock-box procedures. *See id.* ¶ 74.

Assuming that those factual allegations regarding Mr. Seidenwar are true, a number of inferences can be drawn regarding Mr. Seidenwar's state of mind, all of them sufficient to find Mr. Seidenwar liable under Section 20(a). In light of the allegation that Acorn Capital signed off on Stewardship Fund's initial investor communications, it would be reasonable to infer that Mr. Seidenwar knew exactly what investors were being told – that Acorn Capital was going to make decisions about loans on a case-by-case basis and pass on a diverse loan portfolio to investors – and knew that representation was not true. Almost immediately after the initial investors were brought into Stewardship Fund, Acorn Capital, in a decision that Mr. Seidenwar was allegedly deeply involved in and that was cloaked in secrecy, agreed to lend hundreds of millions of dollars to a single entity, PAC Funding. Indeed, Acorn Capital's relationship with PAC Funding was its primary lending relationship, and at the very least, Acorn Capital's employees faced an uphill battle in getting approval for any non-PAC Funding loans. *See id.* ¶ 133.

Given those allegations, and in particular given the secrecy with which Mr. Quan, Mr. Seidenwar, and Mr. Bucci allegedly handled the relationship with PAC Funding at the shared offices, *see id.* ¶ 132, and the fact that Acorn Capital had a relationship with PAC Funding-related entities long before Stewardship Fund began soliciting investments, *see id.* ¶ 93, the Court believes the most cogent and compelling inference that can be drawn from the allegations

in Second Amended Complaint at this early stage is that Mr. Seidenwar was not just reckless, but a knowing participant in a scheme to keep Stewardship Fund's investors – not to mention Stewardship Fund's own employees – in the dark about the real lending goals and due diligence practices at Acorn Capital. In light of the allegation that Acorn Capital signed off on Stewardship Fund's description to investors of its business plan and lending practices, the allegations regarding Mr. Seidenwar's continuing failures to perform sufficient due diligence and his utter failure to make any attempt to correct investors' misconceptions is more than sufficient to show *at least* reckless participation in Mr. Quan's and the other entities' continuing policy of misleading Stewardship Fund investors about the nature of Acorn Capital's business.

Mr. Seidenwar's argument appears to be that he had no idea what Stewardship Fund investors were being told about Acorn Capital. But the factual allegations in the Second Amended Complaint paint quite a different picture, particulary since the Second Amended Complaint alleges that Mr. Seidenwar, Mr. Quan, and Mr. Bucci were extremely secretive about the PAC Funding loans even within the confines of the shared offices of Acorn Capital, Stewardship Fund, and Stewardship Advisors. *See* Second Am. Compl. [doc. # 101] ¶ 132. Again, the most cogent inference that can be drawn from the allegations is that Mr. Seidenwar either actually knew about the misrepresentations, or at best, purposefully buried his head in the sand to avoid learning what Mr. Quan and the other entities were telling investors. The latter inference is further supported by the fact that Acorn Capital never bothered to send out audits to investors as promised.

Not only do the factual allegations strongly suggest that Mr. Seidenwar knew or should have known about the misrepresentations, they also strongly suggest that Mr. Seidenwar knew he should have been doing more to protect Stewardship Fund investors. The Second Amended

Complaint specifically alleges, based on testimony that Mr. Seidenwar himself provided to the SEC, that he knew that asset-based lending required a significant amount of due diligence, and that the failure to perform such due diligence was risky. *See id.* ¶ 74; *see* Ex. B to Mem. in Supp [doc. # 102-3] at 4 ("I mean, you know, asset-based lending requires a lot of due diligence."). Poptech has more than adequately pleaded culpable participation with regard to Mr. Seidenwar.

## III.

In sum, the Court concludes that the Second Amended Complaint plausibly alleges that Mr. Seidenwar had the ability to control alleged primary violators Stewardship Fund, Stewardship Advisors, and Acorn Capital, including the ability to exert control over the content of communication to Stewardship Fund's investors about Acorn Capital's investment policies and due diligence processes. In addition, the Court concludes that the Second Amended Complaint alleges with the particularly required by the PSLRA that Mr. Seidenwar was a culpable participant in the alleged underlying primary violations. For those reasons, Mr. Seidenwar's Motion to Dismiss [doc. # 102] can only be DENIED.

IT IS SO ORDERED.

/s/         Mark R. Kravitz     
United States District Judge

**Dated at New Haven, Connecticut: May 26, 2011.**