# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

POPTECH, L.P., individually and on behalf of      :
a class of others similarly situated,      :
     :
         Plaintiff,      :
     :
v.      :       No. 3:10cv967 (MRK)
     :
STEWARDSHIP INVESTMENT ADVISORS,      :
LLC; ACORN CAPITAL GROUP, LLC;      :
MARLON QUAN; GUSTAV E. ESCHER, III;      :
STEWARDSHIP CREDIT ARBITRAGE      :
FUND, LLC; PAUL SEIDENWAR; and      :
ROBERT BUCCI,      :
     :
         Defendants.      :

## MEMORANDUM OF DECISION

In this securities fraud case, Plaintiff Poptech, L.P. ("Poptech") and Movants Terence Isakov, M.D. and William A. Meyer (collectively "Plaintiffs") have filed a 98-page-long Second Amended Complaint [doc. # 101], bringing suit against numerous defendants: Acorn Capital Group ("Acorn"); Stewardship Investment Advisors, LLC ("Advisors"); the Stewardship Credit Arbitrage Fund, LLC ("the Fund"); Marlon Quan; Gustav E. Escher, III; Paul Seidenwar; and Robert Bucci (collectively "Defendants"). Plaintiffs' suit is brought pursuant to § 10(b) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated under that statute by the United States Securities and Exchange Commission ("SEC Rule 10b-5"), 17 C.F.R. § 240.10b-5(b). The Second Amended Complaint also alleges claims under § 20(a) of the Exchange Act against those defendants who are alleged to have exerted control over the primary violators, *see* 15 U.S.C. § 78t(a), and state law claims under the Connecticut Uniform Securities Act ("CUSA"), Conn. Gen. Stat. § 36b-29, against those

1

defendants who offered to sell interests by means of untrue statements of material facts and those who aided and abetted in such violations.

Numerous motions to dismiss are pending before this Court. The first three make substantially similar arguments; namely, that (1) Plaintiffs lack standing to bring any of their claims, as the claims are derivative on behalf of the Fund; (2) with regard to their first count alleging a violation of § 10-b, Plaintiffs fail to meet the enhanced pleading standards of Rule 9(b) of the *Federal Rules of Civil Procedure* and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, because Plaintiffs fail to plead loss causation, fraud, or scienter with the requisite specificity; (3) as Plaintiffs have failed to state a claim upon which relief can be granted under § 10(b), Plaintiffs have also failed to state a claim upon which relief can be granted under § 20(a); and (4) because Plaintiffs have failed to establish the federal claims, the Court should not exercise supplemental jurisdiction over the remaining two state law claims. *See* Quan & Advisors Mot. to Dismiss Second Am. Class Action Compl. [doc. # 111]; the Fund Mot. to Dismiss Counts I and III of Pls.' Second Am. Class Action Compl. [doc. # 114]; Acorn Mot. to Dismiss Second Am. Class Action Compl. [doc. # 115].

The remaining two individual defendants—Mr. Bucci and Mr. Escher[1]—filed separate motions adopting the above arguments and advancing additional ones. Mr. Bucci argues that Plaintiffs fail to plead with adequate specificity a cause of action for control person liability under § 20(a), and both Mr. Bucci and Mr. Escher argue that Plaintiffs fail to plead with adequate specificity a cause of action for aiding and abetting under CUSA. *See* Bucci Mot. to

---

[1] After finding that the Second Amended Complaint sufficiently alleged his control of primary violators and his culpable participation in a controlled person's fraud, this Court earlier denied Mr. Seidenwar's Motion to Dismiss [doc. # 102]. *See Poptech, L.P. v. Stewardship Credit Arbitrage Fund, LLC*, 792 F. Supp. 2d 328 (D. Conn. 2011).

Dismiss Second Am. Class Action Compl. [doc. # 121]; Escher Mot. to Dismiss Second Am. Compl. [doc. # 110].

After reviewing the extensive briefing on all motions and conducting oral argument—at which lawyers for all parties argued impressively on these close questions—the Court concludes that Plaintiffs pled their § 10-b claim with adequate specificity. Accordingly, their § 20(a) and state law claims stand and Mr. Quan and Advisors's Motion to Dimiss [doc. # 111]; the Fund's Motion to Dismiss [doc. # 114]; and Acorn's Motion to Dismiss [doc. # 115] are denied. However, because Dr. Isakov fails to allege a connection between an omission for which Defendants are liable and his purchase of a security, he does not state a § 10(b) claim and is dismissed as a proposed Class Representative.

The Court further finds that Plaintiffs have adequately alleged that Mr. Bucci is subject to control person liability and materially assisted in the violation of securities laws and therefore denies his Motion to Dismiss [doc. # 121]. However, as Plaintiffs fail to adequately allege that Mr. Escher materially assisted in the violation of securities, his Motion to Dimiss [doc. # 110] is granted.

## I.

The Court has had prior opportunity to review the facts of this case, *see Poptech, L.P. v. Stewardship Credit Arbitrage Fund, LLC*, 792 F. Supp. 2d 328 (D. Conn. 2011), but they bear reiteration and supplementation here. These factual allegations are taken from the Second Amended Complaint [doc. # 101], which the Court must accept as true for the purposes of this motion. Additional facts are provided where appropriate in the analysis.

A.

Poptech is a Delaware limited partnership, and its sole general partner, Poptech, LLC, is a Delaware limited liability company, with its principal place of business in Florida. In January 2005, Poptech acquired Class "P" interests in the Fund, thereby becoming a Fund member. During the Class Period, which extends from February 6, 2006 to September 25, 2008, Poptech converted these shares to Class "A" interests.

Movant and proposed Class Representative, Terence Isakov, M.D., resides in Ohio. Dr. Isakov's spouse originally invested in the Fund. Thereafter, as the manager of the Isakov Family LLC, his family's investment vehicle, Dr. Isakov invested in the Fund in January 2005. Dr. Isakov claims to be a Fund member since 2005 as the manager of the Isakov Family LLC. On September 1, 2006, Dr. Isakov, as an individual, purchased an additional $450,000 in Class A shares through his IRA.

Movant and proposed Class Representative William A. Meyer resides in Florida. On or around June 1, 2007, Mr. Meyer acquired Class "A" interests in the Fund and thereby became a Fund member.

At all times relevant to this action, Acorn was a finance company that specialized in asset-based lending, which entails investing in privately originated loans secured by a specific asset or pool of assets. Acorn sold its loans as investments to the Fund. Advisors was the Fund's managing member and controlled it.[2] The Fund, Advisors, and Acorn all operated out of a single office in Greenwich, Connecticut, where employees of one company frequently worked for the other companies. For example, Dominick Miele "initially perform[ed] Fund-related

---

[2] Advisors and Acorn also provided identical services to Stewardship Credit Arbitrage Fund, Ltd. ("the Offshore Fund"), not named in this complaint, which ran an offshore fund similar to the domestic one run by the Fund.

responsibilities . . . and then transitioned into a loan monitoring role for Acorn." Second Am. Compl. ("SAC") [doc. # 101] ¶ 37. In essence, Plaintiffs allege, all of the companies operated as a single entity: they were each grossly undercapitalized, failed to observe corporate formalities insofar as officers and employees were treated as interchangeable, and the roles of officers and employees for the three companies were not separate or distinct.

Marlon Quan was the creator of the Fund, Advisors, and Acorn and the sole member of Advisors and Acorn. Mr. Quan was also the President of the two Fund subsidiaries and one of two representatives and contact persons for the subsidiaries; Acorn's President, owner, and managing member; and Advisors's managing member.[3]

Paul Seidenwar was Acorn's President during the Class Period; he had previously served as its Chief Credit Officer and Managing Director. Mr. Seidenwar was also identified as a representative of and contract person for the Fund's subsidiaries. He is currently the President of ABRG, Acorn's successor-in-interest.

Robert Bucci was Acorn's Chief Financial Officer, Advisors's Chief Financial Officer, and an Assistant Portfolio Manager for the Fund.

Finally, Gustav E. Escher, III, along with his other positions in non-parties, was identified as the "Independent Manager" of the Fund, responsible for independently evaluating transactions between Acorn and the Fund. He was simultaneously one of four directors of the Offshore Fund and a director of one of the Fund's subsidiaries, the latter of which was created in November 2007.

---

[3] John Ruggiero, not a defendant in this case, is listed as Advisors's Vice President and Chief Compliance Officer.

B.

The Fund's Private Placement Memoranda ("PPMs"), the first of which was issued in September 2004, disclosed that the Fund's primary investment strategy was asset-based lending, a strategy which involved purchasing short-term loans. The Fund represented in its PPMs that it would acquire all or substantially all of its short-term notes from Acorn, which might transact with numerous types of businesses, including "merchandise distributors . . . who are engaged in the business of buying excess high-quality, consumer merchandise inventory arising, for example, from manufacturing overruns, wholesale inventory overages and retail bankruptcies, at distressed prices and selling the merchandise to retailers at a profit." Escher Mot. to Dismiss [doc. # 35-2] Ex. A at 10 (2006 PPM).

The Fund's PPMs represented that it would engage in a safe, low-risk investment strategy. They indicated that the loans the Fund would purchase from Acorn would be short-term loans, meaning for terms of 180 days or less; would be secured by cash, cash equivalent, inventory, and accounts receivable; and would be secured by additional cash collateral held by the borrower in a segregated account. The PPMs note that Acorn informed the Fund that Acorn

> [i]ntends generally to undertake the following procedures with respect to each
>
> Distribution Company and related transactions:
>
> - enter into a Credit Agreement, Security Agreement(s) and Lock-Box Agreement (and certain ancillary agreements);
> - receive a Secured Registered Promissory Note;
> - be designated as a co-beneficiary on policies of insurance with respect to various defaults or other risks of loss on the Short-Term notes;
> - confirm that the underlying assets fall into an acceptable category;
> - confirm that the accounts receivable counterparty has an "A" or higher credit rating prior to acquisition, inclusive of any credit insurance coverage;
> - obtain a security interest in the underlying assets and accounts receivable proceeds;
> - require payment of the accounts receivable into a lock-box account; and
> - perform ongoing quantitative and qualitative analysis or similar protracted

6

procedure to determine the fair market value of underlying assets of the short-term commercial credit market and the financial conditions of the borrower and its customers.

*Id.* at 11. Prospective members were told that "[a]ll decisions with respect to the investment activities of the [Fund] are made exclusively by [Advisors]" and that "[n]o person should purchase Interests unless he is willing to entrust all aspects of the [Fund's] investment activities to [Advisors]." SAC [doc. # 101] ¶ 34. The required initial minimum contribution for an investor to become a member throughout the Class Period was $1 million, although subsequent contributions could be in lesser amounts.

There are no specific allegations regarding which individual or individuals prepared the PPMs, but they were produced by the Fund.[4]

## C.

In November 2004—shortly after the Fund circulated its September 2004 PPM—Acorn entered into an agreement to make up to $200 million in short-term loans to PAC Funding, LLC ("PAC"), a company owned and controlled by Thomas J. Petters.[5] PAC was supposedly in the business of purchasing excess foreign high-end consumer electronics and reselling them to "big box" retailers, such as BJ's Wholesale Club, and it supposedly needed short-term loans to cover

---

[4] Plaintiffs allege, based on Mr. Bucci's testimony before the SEC, that Mr. Quan was the "principal drafter" of certain presentation materials and that Mr. Bucci "and others at Acorn were also involved in their creation and/or review." SAC [doc. # 101] ¶ 36. However, as Plaintiffs do not allege that they relied upon these materials in the purchase or sale of securities, the Court need not address them.

[5] In 2001, Acorn conducted approximately 33 successful note transactions with Redtag, another Petters corporation. In 2002, Acorn began entering into transactions with PCI, also a Petters company, which ultimately totaled approximately 149 note transactions worth over $585 million. In November 2004, Acorn began entering into note transactions with PAC, which ultimately totaled 491 note transactions worth over $1.9 billion. These, as well as other agreements with Petters companies, resulted in Acorn entering into over 670 separate loan transactions with an aggregate value of over $2.6 billion.

the acquisition of the goods and the time that elapsed before it was able to resell them.

The Initial Credit Agreement between Acorn and PAC indicated that Acorn would make individual loans of up to $6 million each to PAC, secured by the purchase orders from the retailers and PAC's accounts receivable. Acorn and PAC also entered into a separate Security Agreement which (1) granted Acorn a security interest in PAC's assets, provided that PAC would deposit 10% into a block account prior to requesting a loan; (2) provided that payments from accounts receivable would be deposited into a lockbox account; and (3) required PAC's principal, Mr. Petters, sign a personal guarantee for up to $50 million.

Plaintiffs allege that Mr. Quan, Mr. Seidenwar, and Mr. Bucci held frequent, private, closed-door meetings around the time when Acorn began its relationship with PAC, and that PAC-related matters were never discussed in more public, office-wide meetings. This was not Acorn's usual practice regarding prospective deals.

In addition, Acorn performed essentially no due diligence before agreeing to enter the relationship with PAC. Although it was Acorn's practice to make verification calls, Mr. Quan told an employee not to do so with regard to Petters's retailers.[6] Mr. Quan testified in deposition that because there was an established track record with Petters companies, there was no need to conduct specific due diligence with regard to this transaction. According to an October 2004 memo, approved by Mr. Quan, Mr. Seidenwar, and Mr. Bucci, Acorn was comfortable with the arrangement because Acorn had a prior history of lending to Petters entities; because the loan agreement provided for retailers to make payments into lockbox accounts; and additionally because Mr. Petters had provided a $50 million personal guarantee. However, Acorn did nothing

---

[6] However, Mr. Quan testified that, in 2004, he made a telephone call to Larry Reynolds, a Petters accomplice who Acorn believed was facilitating PAC's merchandise purchases. Mr. Reynolds confirmed that such merchandise was being sold and stated that he could not provide more information because of a non-disclosure agreement and confidentiality concerns.

to verify that Mr. Petters could actually satisfy a $50 million personal guarantee and did not investigate Mr. Petters's criminal history, despite the promises in the PPMs and the fact that Acorn conducted such investigations on other individuals.

Acorn also allegedly did not monitor the PAC loans as required in the Security Agreement. Mr. Quan testified before the SEC that Acorn never confirmed that retailers actually picked up merchandise or obtained audits of PAC or its intermediaries. Furthermore, in 2006, Mr. Miele, the employee responsible for monitoring compliance with the lockbox procedures outlined both in Acorn's loan agreements and the materials provided to the Fund investors, noticed that PAC had made a payment into the lockbox account. Believing that the payments should have been made by retailers, Mr. Miele brought the PAC payment to the attention of Mr. Bucci, who then consulted with Mr. Quan and Mr. Seidenwar. Mr. Bucci then told Mr. Miele that "everything was okay with regards to [PAC] sending the money" because "PAC Funding had the ability to prepay a note." *Id.* ¶ 100. Mr. Miele had never previously investigated the source of the lockbox funds, and he did not attempt to verify them after this incident. Mr. Miele was also responsible for reviewing another Petters company's purchase documents. He had to do it at the company and was instructed by Defendants to surreptitiously photograph the orders while he was there.

Acorn and PAC amended their November 2004 Initial Credit Agreement multiple times to increase the total amount of loans authorized, eventually to as much as $300 million. As of April 30, 2008, over 70% of the value of the Fund's assets (about $85 million) were represented in loans Acorn made to PAC, and as of May 2008, Acorn had made more than $1.9 billion in total loans to PAC. During the period at issue in this case, Acorn made an additional $700 million in loans to PAC-related entities. While PAC and the related entities did have a history of

9

repaying loans from Acorn, PAC borrowed at or near the $300 million limit at any given time.

PAC began falling behind in its payments in late 2007.[7] By February 2008, it was in default on more than $100 million in loans. Between February and May 2008, PAC and Acorn restructured these defaulted loans multiple times. First, in February 2008, PAC and Acorn entered into a Forbearance Agreement, in which Acorn agreed to postpone foreclosing on PAC's loans in return for a security interest in Polaroid Corp. ("Polaroid")—another Petters company— and proof that PAC was the legal owner of at least $112 million in accounts receivable from various retailers—apparently, Acorn had never received such proof before. In April 2008, PAC and Acorn restructured the credit facility of the Initial Credit Agreement from a revolving credit facility to a term facility.

By May 2008, PAC owed Acorn $289 million on loans, which represented somewhere between 60% and 70% of Acorn's portfolio at the time. On May 14, 2008, PAC and Acorn further amended the Initial Credit Agreement to impose large burdens on Polaroid and interest in Polaroid's intellectual capital—in effect, replacing the previous guarantees with Polaroid inventory, account receivables, and trademarks. PAC and Acorn also engaged in a number of "round-trip loans" in early 2008, whereby PAC would send Acorn money, which Acorn would then promptly re-loan to PAC. The roundtrip transactions were made from an account meant to be a segregated cash security for investors, eliminating investors' only source of cash security.

In June 2008, Advisors sent its members a letter informing them that it had stopped

---

[7] Although Acorn's relationship with PAC is the primary issue in this case, it is worth noting that the Offshore Fund, the related investment fund which also purchased loans as investments from Acorn, began to experience problems at a similar time. In 2006, some of its investors began to complain about the Offshore Fund's low returns and high management fees. When those investors attempted to redeem their shares, Mr. Quan informed them that their investments could not be redeemed for cash at that time. In May 2008, those investors sued the Offshore Fund in the United States and in Bermuda. Eventually, in 2009, a court in Bermuda declared the Offshore Fund to be insolvent and froze the Offshore Fund's assets.

calculating the value of the Fund and that it was suspending subscription requests from new members and withdrawal requests from existing members. The letter explained that those two steps were necessary because of general volatility and illiquidity in the markets; because a large amount of redemption requests from the Offshore Fund members had led a lender to declare the Fund and the Offshore Fund in default; and because some of Acorn's loans were in default. The June 2008 letter contained no mention of PAC or Mr. Petters.

In September 2008, the federal government raided Mr. Petters's offices. It was soon publically disclosed that he was a convicted felon who was orchestrating a massive Ponzi scheme, involving billions of dollars. Instead of assisting retailers with short-term financing, Mr. Petters's companies "were actually financing the purchase of non-existent merchandise secured by fabricated purchase orders." SAC [doc. # 101] ¶ 42. Investors received "profit" payments with funds obtained from later investors. In October 2008, Advisors informed Fund members for the first time that a majority of Acorn's loans were made to entities controlled by Mr. Petters.

The Petters-related loans were not the only dubious loans that Acorn made and passed on to the Fund's members. In December 2006, Acorn agreed to loan $40 million to R. Esmerian, Inc. ("R. Esmerian"), a jewelry company. In December 2007, Acorn agreed to loan another $13.5 million to Vassal Jewels, Inc. ("Vassal Jewels") in order to purchase stock in R. Esmerian. R. Esmerian and Vassal Jewels both pledged jewelry collections as collateral for the loans, and Acorn agreed to employ Benjamin Zucker as an appraiser. It later was discovered that Mr. Zucker was a close friend of Ralph Esmerian, the principal of R. Esmerian, and that the jewelry collections pledged as collateral were worth only between $200,000 and $300,000.

Plaintiffs also allege that the Defendants' experience with the *Wedbush* action should have put them on a heightened alert for fraud. *See Acorn Capital Grp. LLC v. Wedbush Morgan*

*Sec.*, No. C 06-01674-JSW (N.D. Cal.). In its March 3, 2006 complaint, Acorn alleged that as of March 2004 it had been defrauded out of over $3 million in loans after relying on phony account statements, telephone verification, and positive past lending experience.

D.

This section summarizes Plaintiffs' allegations of Defendants' misrepresentations or failures to correct misleading information. All of the following statements fall under the heading "The Class Period Statements and Material Omissions of Advisors and Quan." SAC [doc. # 101] at 50.

On February 7, 2006—the first day of the Class Period—Mr. Quan invited Poptech and other Class P Fund members to convert their Class P interests into Class A interests. Mr. Quan wrote that the conversion opportunity was prompted by "'[e]conomic events over the past year.'" *Id.* ¶ 75. In reliance on claims of due diligence from the September 1, 2004 PPM, Poptech and other investors traded in their Class P interests for the same value of Class A interests. "Subsequent communications from Defendants omitted any mention of the failure to conduct [due diligence] regarding the loans purchased by the Fund, and contained no information regarding the performance of those loans or otherwise corrected previous claims." *Id.* ¶ 76.

Thereafter, Plaintiffs allege, investors continued to make contributions and initial investments in the Fund in reliance on the existing PPMs: Dr. Isakov purchased stock on September 1, 2006 pursuant to a July 1, 2005 PPM and Mr. Meyer purchased stock on June 1, 2007 pursuant to a May 1, 2006 PPM. Plaintiffs allege that the Defendants' claims of due diligence and monitoring practices were perpetuated inaccurately in all versions of the PPMs.

Advisors sent monthly newsletters to investors from 2006 through 2008, which Plaintiffs allege "were extremely general; they failed to specifically mention any particular investment

12

(including the incredible concentration of investments with Petters) and omitted any material information regarding the manner in which the Fund's assets were being invested and whether those assets were being safeguarded." *Id.* ¶ 77.

A letter sent around February 20, 2008, which Mr. Quan composed, noted that Plaintiffs and other Fund members were not at risk from the ongoing sub-prime credit situation because the Fund had been "'proactive in the removal of deteriorating assets and the inclusion of new assets as the opportunities arise.'" *Id.* ¶ 84.

As late as March 2008, Advisors send a letter to its members specifically indicating that "'few defaults ha[d] occurred'" in Acorn's loan portfolio, *id.*, despite the fact that by February 2008 PAC was more than $100 million in debt.

In May 2008, after the Offshore Fund has been sued by its investors in the United States and Bermuda, Mr. Quan sent Fund investors a letter assuring them that the claims in the cases against the Offshore Fund were "'entirely without merit and w[ould] ultimately be dismissed,'" and that those cases did not involve the Fund and would have no effect whatsoever on the Fund. *Id.* ¶ 85. Less than a month later, in a June 20, 2008 letter, Fund members learned for the first time that the Fund was in trouble. Reasons given for the suspension of calculation of net asset value and subscription and withdrawal requests were that (1) markets had become volatile and illiquid; (2) the Offshore Fund had received a large amount of redemptions and that resolution of the resulting issues involved the Fund; and (3) "'certain underlying loans are not current in payment.'" *Id.* ¶ 86.

The first notice Fund members received of the extent of the relationship between the Fund and Mr. Petters was in an October 17, 2008 memorandum from Mr. Quan, well after Acorn had commenced an action against Mr. Petters individually in August 2008.

## II.

The Court must apply a familiar standard when ruling on any motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the *Federal Rules of Civil Procedure.* The Court must "accept as true all allegations in the complaint and draw all reasonable inferences in favor of the non-moving party." *Matson v. Bd. of Educ. of the City Sch. Dist. of New York,* 631 F.3d 57, 63 (2d Cir. 2011) (quotation marks omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).

The parties do not dispute, for the purpose of these motions, that Plaintiffs' interests in the Fund purchased or acquired during the Class Period constitute investment contracts and are "securities" pursuant to § 3(a)(10) of the Exchange Act, 15 U.S.C. § 78c(a)(10). Nor do the parties now dispute that the interests are not "covered securities" as defined by 15 U.S.C. § 77r(b). The parties also do not presently contest class certification issues or whether the Fund, Advisors, Acorn, and Mr. Quan (and potentially others) are alter egos of each other.

## III.

Defendants maintain that whether a claim may be asserted directly by shareholders or must be asserted derivatively on behalf of the corporation is determined by the law of the state under which the entity is incorporated. *See May v. Coffey*, 291 Conn. 106, 113 n.6 (2009) (citing authorities); *see also* Conn. Gen. Stat. § 34-222. Therefore, according to Defendants, as the Fund is a Delaware limited liability company, the Court should decide this question based on Delaware state law. Plaintiffs counter that courts generally look to federal law to evaluate standing questions under § 10(b) of the Exchange Act. *See In re Smith Barney Transfer Agent*

14

*Litig.*, 765 F. Supp. 2d 391, 397 (S.D.N.Y. 2011) (citing cases).

The Court need not address this question at present, however, because while federal law on the question of standing for § 10(b) claims is not well developed, the central inquiry regarding direct versus derivative claims under both federal and Delaware state law is substantially similar. Whereas federal law asks "whether a plaintiff suffered an individual injury distinct from the injury to the corporation," *see id.* at 398 (quotation marks omitted), Delaware law states that the distinction between direct and derivative claims "must turn *solely* on the following questions: (1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004) (emphasis in original). Under both inquiries, then, standing depends at least in part on whether a plaintiff suffered individualized harm distinct from any injury to the corporation.

Under Delaware law—and presumably under federal law as well—"a claim is not 'direct' simply because it is pleaded that way . . . . Instead, the court must look to all the facts of the complaint and determine for itself whether a direct claim exists." *Dieterich v. Harrer*, 857 A.2d 1017, 1027 (Del. Ch. 2004); *see also In re Syncor Int'l Corp. Shareholders Litig.*, 857 A.2d 994, 997 (Del. Ch. 2004) ("[T]he duty of the court is to look at the nature of the wrong alleged, not merely at the form of words used in the complaint.").

If the Complaint merely alleged, as earlier versions did, that the Defendants' mismanagement caused the Fund to lose money and thereby damaged Plaintiffs, Plaintiffs would have asserted only a derivative claim. *See Ernst & Young Ltd. v. Quinn*, No. 09-cv-1164 (JCH), 2009 WL 3571573 (D. Conn. Oct. 26, 2009) (finding that shareholder claims based on injuries

sustained by the Fund were derivative claims).[8] However, in its most recent incarnation, the Complaint alleges that the Fund and other Defendants' non-disclosures resulted in material misrepresentations and omissions that induced Plaintiffs to purchase stocks, a separate and individual injury.

There is no clear precedent, either in federal or Delaware law, on whether fraudulent (or negligent) inducement constitutes a direct or derivative claim. Some courts have found that whenever a plaintiff's harm is due to losses that are suffered by all shareholders, the plaintiff's claim is necessarily derivative. *See, e.g.*, *Lewin v. Lipper Convertibles*, 756 F. Supp. 2d 432, 441-42 (S.D.N.Y. 2010) (finding, at summary judgment, that plaintiffs claiming fraudulent inducement lacked standing on the basis that they had failed to demonstrate that they suffered damages differently from other limited partners). In support of this approach, Defendants make much of the Delaware Supreme Court's statement that a "stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail without showing an injury to the corporation," *Tooley*, 845 A.2d at 1039, which Defendants read as permitting direct claims *only* when the corporation has suffered no injury. Thus, when a plaintiff alleges harm related in any way to the diminution of the value of their shares, they would be precluded from bringing a direct suit. Other courts have applied Defendants' reading. *See, e.g.*, *Smith v. Waste*

---

[8] The *Quinn* court also found that allegations of fraudulent inducement were not sufficient to convert a derivative claim into a direct one. *See Quinn*, 2009 WL 3571573, at *6. Another related case, *Quinn v. Stewardship Credit Arbitrage Fund, LLC.*, No. X03-CV09-4046467S (Conn. Super. Ct. Aug. 6, 2010), found that plaintiffs—who were also Fund investors—stated only a derivative claim on the basis that "[t]here are no claims involving individualized harm to [plaintiffs] which would distinguish them from any other investors in the fund." *Id.* at 4. Although fraud and negligent inducement were two of the many claims alleged in the plaintiffs' complaint, the Connecticut Superior Court did not provide reasons for its conclusion with regard to these claims in its analysis. Acknowledging that these decisions were based on one line of precedent in a confusing area of law, the Court respectfully disagrees with the portions of these analyses that find allegations of fraudulent inducement to be derivative claims.

*Mgmt., Inc.*, 407 F.3d 381, 384-85 (5th Cir. 2005) (applying *Tooley* and finding that "[t]he misrepresentations that allegedly caused [plaintiff's] losses injured not just [the plaintiff] but the corporation as a whole"); *Shirvanian v. DeFrates*, 161 S.W.3d 102, 110 (Tex. Ct. App. 2004) ("The misrepresentations the [plaintiffs] allege caused their injury were based on mismanagement of the corporation's assets. The [plaintiffs] cannot prove their injury without proving an injury to the corporation. We hold, therefore, that the [plaintiffs'] suit is derivative under Delaware law.").

Another line of precedent finds that fraudulent inducement is a separate and individual injury, and therefore permits a plaintiff to state a direct claim. *See, e.g.*, *In re Smith Barney Transfer Agent Litig.*, 765 F. Supp. 2d at 399 (finding, after applying federal law, that plaintiffs' claim that misrepresentations induced their investment was direct); *Stephenson v. Citco Grp. Ltd.*, 700 F. Supp. 2d 599, 610-24 (S.D.N.Y. 2010) (finding that fraudulent inducement claims against an auditor are direct claims under Delaware law); *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 401 (S.D.N.Y. 2010) ("[A]llegations by investors of having been tortuously induced to invest or to retain an investment are not derivative claims."); *Albert v. Alex. Brown Mgmt. Serv., Inc.*, Nos. Civ. A. 762-N, Civ. A 763-N, 2005 WL 2130607, at *12 (Del. Ch. Aug. 26, 2005) ("Generally, non-disclosure claims are direct claims.").

The Court finds the second approach more persuasive. Fraudulent inducement claims "are direct because they allege a harm suffered by plaintiff independent of the partnership and a duty to plaintiff that is not merely derivative of [the defendant's] fiduciary duties to the partnership." *Stephenson v. Citco Grp. Ltd.*, 700 F. Supp. 2d at 612; *see also In re Smith Barney Transfer Agent Litig.*, 765 F. Supp. 2d at 399 ("[A] determination that Plaintiffs['] § 10(b) claims are derivative claims—i.e., that the [Fund was] the primary victim of the Defendants' alleged

fraud—overlooks the fact that Defendants' misrepresentations were directed primarily at investors in the [Fund]."); *Albert.*, 2005 WL 2130607, at *12 ("[T]he partnerships were not harmed by the alleged disclosure violations. Any harm was to the unitholders, who either lost their opportunity to request a withdrawal from the Funds from the Managers, or to bring suit to force the Managers to redeem their interests."). The injury is in such a claim is not only the loss of the shares, but the fact that those shares were lost as a result of the inducement. The Court does not believe that this necessarily benefits some shareholders unfairly at the expense of others, because shareholders who were fraudulently induced to invest in a corporation are not similarly situated to shareholders who did not rely on misrepresentations or omissions. *But see Smith*, 407 F.3d at 385 (arguing that finding fraudulent inducement claims to be direct would allow one shareholder to benefit at the expense of others).

The Court therefore reads the *Tooley* statement as requiring that a plaintiff state a direct claim of individual harm upon which he or she can prevail that was not *also* suffered by the corporation. *See In re Smith Barney Transfer Agent Litig.*, 765 at 399 (applying federal law and finding that "direct and derivative actions based on the same underlying conduct are not mutually exclusive."); *Grimes v. Donald*, 673 A.2d 1207, 1212 (Del. 1996) (applying Delaware law and finding that "[c]ourts have long recognized that the same set of facts may result in direct and derivative claims"), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (2000) (holding that appellate review was *de novo* rather than deferential); *see also Excimer Assocs., Inc. v. LCA Vision, Inc.*, 292 F.3d 134, 140 (2d Cir. 2002) (applying New York law and finding that "where the plaintiff's injury is direct, the fact that [the corporation] may also have been injured and could asset its own claims does not preclude the plaintiff from asserting its claim directly"). This Court's reading is not inconsistent the well-established requirement that, "[i]n

order to state a direct claim, the plaintiff must have suffered some individualized harm not suffered by all of the stockholders at large." *Feldman v. Cutaia*, 951 A.2d 727, 733 (Del. 2008).

Fraudulent inducement claims "are direct to the extent (and only to the extent) that they allege (1) violation of a duty owed to potential investors at large and (2) that such violations induced plaintiff to invest in [the corporation]." *Stephenson v. Citco Grp. Ltd.*, 700 F. Supp. 2d at 612. The question of individual harm is ripe for further factual development, either at the class certification or summary judgment stage. At present, however, the Court must accept Plaintiffs' factual allegations as true and therefore finds that, with regard to this issue, the Plaintiffs have standing to bring suit, as they have alleged a direct injury under both federal and Delaware law.

## IV.

Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), forbids the "use or employ, in connection with the purchase or sale of any security . . . [of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." *Id.*; *see also* 17 C.F.R. § 240.10b-5 (SEC Rule implementing § 10(b)).

A claim for securities fraud pursuant to § 10(b) of the Exchange Act and SEC Rule 10b-5 requires allegations of "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179, 2184 (2011) (citations and quotation marks omitted).

A claim for relief under Section 10(b) is subject to the heightened pleading requirements of Fed. R. Civ. P. 9(b) and the PSLRA. *See ATSI Commc'ns v. Shaar Fund Ltd.*, 493 F.3d 87, 99

(2d Cir. 2007). Neither *Iqbal, Twombly*, Rule 9(b), nor the PSLRA require detailed factual allegations. *See Iqbal*, 129 S. Ct. at 1949; *Twombly*, 550 U.S. at 555; *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 72 (2d. Cir. 2001) (observing that neither Rule 9(b) nor the PSLRA "require the pleading of detailed evidentiary matter in securities litigation").

However, under both Rule 9(b) and PSLRA, allegations must be made "with particularity" and must give "rise to a strong inference that the defendant acted with the required state of mind," namely, "to deceive, manipulate or defraud." *Telllabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314, 319 (2007). In other words, plaintiffs must "'allege facts that give rise to a strong inference of fraudulent intent.'" *Stephenson v. PricewaterhouseCoopers, LLP*, 768 F. Supp. 2d 562, 571 (S.D.N.Y. 2011) (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)).

The Defendants maintain that Plaintiffs fail to meet the enhanced pleading standards of Rule 9(b) and the PSLRA because Plaintiffs fail to plead fraud, scienter, or loss causation with the requisite specificity. In conducting its analysis, the Court also considers whether Plaintiffs sufficiently allege a relationship between the misrepresentations or omission and the purchase or sale of securities, but assumes that the parties agree for the purposes of this motion that Plaintiffs have adequately pled reliance and economic loss.

## A.

The first element of a claim for securities fraud pursuant to § 10(b) of the Exchange Act requires allegations of "a material misrepresentation or omission by the defendant." *Erica P. John Fund, Inc.*, 131 S. Ct. at 2184. An "omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17

(1988)). As relevant here, a duty to disclose may exist when disclosure is necessary to render affirmative statements not misleading. *See Stepak v. Aetna Life and Cas. Co.*, No. H:90CV00886, 1994 WL 858045, at *11 (D. Conn. 1994), *aff'd* 52 F.3d 311 (2d Cir. 1995).

To satisfy the PSLRA pleading standard for fraudulent misrepresentations, plaintiffs "must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). The PSLRA requires that plaintiffs "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Where a complaint fails to specify which omissions and failures to disclose were misleading, the PSLRA requires that the complaint be dismissed. *See, e.g.*, *Thesling v. Bioenvision*, 374 F. App'x 141, 143 (2d Cir. 2010) (summary order) (dismissing case because plaintiff did not identify materially misleading mistatements); *Malhotra v. Equitable Life Assurance Soc'y of the U.S.*, 364 F. Supp. 2d 299, 308 (E.D.N.Y. 2005) (same).

Meanwhile, Rule 9(b) requires that the complaint "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). This means that the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006); *Chien v. Skystar Bio Pharm. Co.*, 566 F. Supp. 2d 108, 114 (D. Conn 2008) (same).

1.

First, Plaintiffs allege that Defendants knew that they had not conducted the usual due diligence, as promised in the PPMs, when approving the PAC loan. Second, Platintiffs allege that, even if Defendants were not already aware of this fact, Defendants were on notice as of November 2005 that Acorn's monitoring practices with respect to PAC were deficient (insofar as the procedures spelled out in the agreement were not being followed) and therefore were not in accordance with promises made in the PPMs.

At that time, the Fund was attempting to obtain credit from a German bank, AG Deutsche Zentral-Genossenschaftsbank Franfurt am Main ("Deutsche Zentral"). On November 28, 2005, Mr. Seidenwar sent Mr. Quan, and copied Mr. Bucci, an email that Deutsche Zentral had noted deficiencies in the Fund's monitoring of the PAC loans. *See* Seidenwar Mem. [doc. # 102-2] Ex. A. The email noted that Acorn might need to (1) start using a lockbox account and requiring that receivables be paid into that account by the retailers doing business with PAC; (2) obtain "log in numbers" from PAC to confirm the amount of receivables due from retailers, (3) obtain copies of wire transfers between PAC and the retailers; (4) conduct quarterly standardized field exams; and (5) collect financial statements prepared by outside auditors. *Id.* Plaintiffs allege that Acorn, Advisor, the Fund, Mr. Quan, Mr. Seidenwar, and likely Mr. Bucci were aware of the fact that no improvements were ever made to the monitoring process. Defendants contend that this letter merely demonstrates that Acorn could have conducted additional due diligence, not that its due diligence practices were necessarily deficient.

Meanwhile, in 2006, Mr. Miele, the employee responsible for monitoring compliance with the lockbox procedures outlined both in Acorn's loan agreements and the materials provided to the Fund investors, noticed that PAC had made a payment into the lockbox account, when that

payment should have been made directly by a retailer. Mr. Miele brought the PAC payment to the attention of Mr. Bucci, who consulted with Mr. Quan and Mr. Seidenwar. Mr. Bucci then told Mr. Miele that "'everything was okay with regards to [PAC] sending the money'" themselves because "PAC Funding had the ability to prepay a note." SAC [doc. # 101] ¶ 100. Mr. Miele thereafter stopped monitoring for payments into PAC's lockbox accounts.

Mr. Seidenwar testified before the SEC "that he knew that payments on receivables were supposed to be made directly from Retailers (*i.e.*, payees) into the Lockbox for the benefit of Acorn and that this was not occurring"; that "he knew and understood that Retailers were not sending their payments to the Lockbox in violation of the Initial Credit Agreement"; and that Mr. Quan "spoke to both him and Bucci about this violation of the Lockbox agreement."[9] *Id.* ¶ 139. Mr. Bucci testified before the SEC

> that he understood the PPMs to be the textbook of how investments would be undertaken by the Fund [and that] he also knew and understood that, with respect to its principal investment (i.e., in PAC Funding), Acorn and Advisors were not following the textbook and were departing from their own investment standards with respect to a majority of the Fund's investments.

*Id.*

As this is the motion to dismiss stage, the Court resolves these debates in Plaintiffs' favor and finds for the purposes of deciding this motion that the Defendants were on notice as of at least November 2005 that Acorn was not conducting due diligence and monitoring in accordance with the terms of the Security Agreement and as promised in the PPMs.

---

[9] Defendants contend that Plaintiffs' allegations fail in part because, while Acorn promised to set up a lockbox account, it never stated that only retailers would make payments into this account. This argument fails in light of Mr. Seidenwar's admission.

2.

A duty to disclose may exist when disclosure is necessary to render affirmative statements not misleading. *See Stepak*, 1994 WL 858045, at *11. Plaintiffs also argue that Defendants had a duty to disclose as a result of their fiduciary relationship with Plaintiffs. *See* Pls.' Resp. [doc. # 131] at 23-24. Under either standard, if Acorn was not conducting due diligence and monitoring in accordance with representations made in the PPMs and other communications to investors, it had a duty to disclose relevant material information.

The Second Circuit recently stated:

> The materiality of a misleading statement or omission for § 10(b) purposes is a mixed question of law and fact, and a complaint may not be dismissed under Rule 12(b)(6) on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.

*Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2010) (quotation marks omitted).

The alleged omissions include the intentional failure to disclose, in the PPMs or elsewhere, that Acorn was conducting no initial due diligence of Mr. Petters or his companies and that Acorn was not appropriately monitoring the loans (*inter alia*, it was not holding PAC to the terms of the Security Agreement). As a result of such omissions, Plaintiffs allege that affirmative statements became misleading. These alleged omissions are hardly "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.* Therefore, for the purposes of this motion, the Court finds such omissions material.

3.

As described above, Plaintiffs sufficiently allege that Defendants knew that the PPM procedures were not being followed and Defendants had a duty to disclose this material information. However, as reviewed in the facts section, Defendants never clarified in post-2004 PPMs or other communications that Acorn had conducted effectively no due diligence of Mr. Petters or his companies, was not appropriately monitoring the loans, and was not holding PAC to the terms of the Security Agreement. At the very least, then, Plaintiffs have sufficiently alleged "a material . . . omission by the defendant." *Erica P. John Fund, Inc.*, 131 S. Ct. at 2184.

Defendants argue that Plaintiffs fail to identify "why the statements were fraudulent," *see Lerner*, 459 F.3d at 290, and that the Court should therefore dismiss the Plaintiffs' § 10(b) claims, *see Thesling*, 374 F. App'x at 143. While the Court agrees with Defendants that Plaintiffs could have provided more explicit explanations of why certain statements were problematic, it nonetheless finds that the statements, as relevant to this case,[10] meet the four *Lerner* requirements. Under the heading "The Class Period Statements and Material Omissions of Advisors and Quan," Plaintiffs provide a number of statements for which they identify the speakers and state where and when the statements were made. *See* SAC [doc. # 101] ¶ 73-90. Plaintiffs also claim that all of Defendants' affirmative statements included omissions that rendered affirmative statements misleading: namely, that the promised due diligence and loan

---

[10] Many of Defendants' statements contain, in addition to the alleged omissions, implied misrepresentations that do not satisfy the *Lerner* requirements. For example, Plaintiffs never explicitly state that Mr. Quan's February 20, 2008 letter misrepresents the extent of the Fund's diversification and how well it was protected from the sub-prime credit fallout. Similarly, Plaintiffs imply that Mr. Quan's June 20, 2008 misrepresent the relationship between the Fund and the Offshore Fund's suit. These implied misrepresentations are not sufficiently particular to meet the pleading standards. However, as relevant to this analysis, Plaintiffs do adequately allege that both the February 20, 2008 and the June 20, 2008 letters omit material information regarding Acorn's loan monitoring.

monitoring was not being conducted. Specifically, Plaintiffs allege that Mr. Quan's February 7, 2006 letter and all PPMs omitted information regarding the "true condition of the Fund's investments." *Id.* ¶ 75. Plaintiffs then allege that "[s]ubsequent communications"—which Defendants argue is impermissibly vague, but which the Court reads as describing all subsequently-sent communications, including the 2005 and 2006 PPMs—"omitted any mention of the failure to conduct [due diligence and monitoring] regarding the loans purchased by the Fund, and contained no information regarding the performance of those loans or otherwise corrected previous claims." *Id.* ¶ 76. The Court finds that these allegations are sufficiently particular to meet *Lerner*'s fourth requirement.

## B.

Plaintiffs must next demonstrate that Defendants acted with scienter. *See Erica P. John Fund, Inc.*, 131 S. Ct. at 2184. Scienter is a "mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007) (quotations omitted). A strong inference of scienter may be established by alleging either "(1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009).

The parties' disagreement on this point turns on the question of whether Plaintiffs have alleged facts constituting "strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* "Recklessness" in this context is defined as conduct that is "highly unreasonable" and "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000) (alterations and quotation marks

omitted).

Claims of mismanagement and failures to disclose such mismanagement do not state claims for fraud. *See Leykin v. AT&T Corp.*, 423 F. Supp. 2d 229, 241 (S.D.N.Y. 2006) ("[C]ourts repeatedly have found that allegations constituting nothing more than assertions of general mismanagement, or nondisclosures of mismanagement, cannot support claims under § 10(b) of the Exchange Act.") (quotations omitted), *aff'd*, 216 F. App'x 14 (2d Cir. 2007). Similarly, in the absence of obvious indicia of fraud, a mere absence of knowledge cannot support a strong inference of scienter, even when a defendant's ignorance is due to its failure to perform promised due diligence. *See South Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 112 (2d Cir. 2009); *Ellington Mgmt. Grp., LLC v. Ameriquest Mortg. Co.*, No. 09 Civ. 0416 (JSR), 2009 WL 3170102, at *3 (S.D.N.Y. Sept. 29, 2009) (finding that scienter was not sufficiently pleaded by allegations that "deficiencies are so apparent and so pervasive that they would have been discovered had the Mortgage Companies conducted even a minimal review prior to creating the securities." (quotation marks omitted)).

In addition to the usual pleading requirements, to establish a strong inference of scienter under the PSLRA, the inference must be "more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314; *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 194 (2d Cir. 2008); *see also ECA*, 553 F.3d at 198 (noting that the strength of claims based on circumstantial evidence "must be correspondingly greater" than would be otherwise required if plaintiffs alleged defendants had a motive for their actions). "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 323. A court must also evaluate

"whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* (emphasis in original); *see also id.* at 326 ("[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."). Ultimately, "even if a plaintiff demonstrates only that an inference of scienter is at least as compelling as any nonculpable explanation for the defendant's conduct, the tie goes to the plaintiff." *City of Brockton Retirement Sys. v. Shaw Group*, 540 F. Supp. 2d 464, 472 (S.D.N.Y. 2008) (alteration and quotation marks omitted).

In arguing that Plaintiffs have not met their burden, Defendants rely on *South Cherry*, 573 F.3d 98. The *South Cherry* defendant, an investment advisor industry leader, falsely claimed that it had conducted certain types of due diligence before recommending that plaintiff invest in what turned out to be a Ponzi scheme. *See South Cherry*, 573 F.3d at 100-04. The complaint alleged that the defendant had "knowingly or recklessly" made untrue representations. *Id.* at 112. The Second Circuit affirmed the district court's dismissal of the § 10(b) claim because "the factual allegations in the Complaint do not give rise to a strong inference of either fraudulent intent or conscious recklessness, and . . . the inferences advocated by South Cherry are not as compelling as an inference of negligence." *Id.* at 114. Although the Second Circuit accepted as true the allegation that the defendant had not conducted the due diligence it said it would, the panel nonetheless found that "the factual allegations in the Complaint do not give rise to a strong inference that the alleged failure to conduct due diligence was indicative of an intent to defraud." *Id.* at 113. The panel found plaintiff's claims that the defendant had acted recklessly and ignored red flags insufficient to state a claim, as there were no factual allegations that the defendant "did not believe that the various [Ponzi schemer's] representations, including their records and financial statements, were accurate" or allegations showing that the falsity of the hedge funds'

representations was "obvious" or "that should have alerted [defendant] that the [Ponzi schemer's] representations were dubious." *Id.* at 112. Furthermore, the panel held that the defendant's fee was not sufficient to establish an inference of scienter, given the defendant's reputation as an industry leader. *See id.* at 113.

Plaintiffs counter with *Anwar*, a New York district court case that distinguished *South Cherry* on the basis that

> the defendant in *South Cherry* failed to learn what it would have if, with affirmative steps and more diligence, it had done more to inform itself. Here, Plaintiffs allege that the Fraud Defendants ignored not only what was handed to them but that what they were given was readily suspicious to any reasonable person exercising ordinary prudence. When presented with notorious signs of fraud, they discounted them . . . .

*Anwar*, 728 F. Supp. 2d at 411. Whereas the *South Cherry* defendant had ignored red flags in the absence of concrete evidence that the fund's misrepresentations were "obvious," *South Cherry*, 573 F.3d at 112, the *Anwar* defendant ignored obvious evidence of fraud—namely, that the Ponzi schemer claimed to have conducted trades on days when the market was closed or for amounts not supported in the open market**.** The *Anwar* court's conclusion was bolstered by the fact that the *South Cherry* defendant made a "one-off recommendation," whereas the *Anwar* defendant had an established relationship with the Ponzi schemer and the plaintiff alleged "an ongoing fraud spanning many years." *Anwar*, 573 F.3d at 411.

On the facts, this case is more similar to *Anwar* than to *South Cherry.* As in *Anwar*, Plaintiffs allege that the relationship between Defendants and the Petters companies went on for years, over which time Defendants ignored numerous red flags. Additionally, Plaintiffs also adequately alleged that Defendants knew that there was something unusual and possibly fraudulent about the PAC loans. *Cf. South* Cherry, 57 F.3d at 112 ("[N]owhere in the Complaint is there any allegation that [the defendant] had knowledge that any representation it made as to

the records or circumstances of [the Ponzi schemers] was untrue."). Not only did Acorn fail to conduct its usual due diligence by not making verification calls and not investigating Mr. Petters's personal history, which alone might be chalked up to mere negligence, Mr. Miele was instructed to surreptitiously photograph a Petters company's purchase documents while reviewing them onsite. In addition, Defendants had in their possession documents which were facially invalid: the Sam's Club purchase orders. During the relevant period, Sam's Club was not using manual purchase orders; instead, it required all vendors to use electronic purchase orders. It is possible that these purchase orders were so obviously false as to put Defendants on notice of Mr. Petters's fraud and thereby establish scienter. Finally, as the Second Circuit noted, it was implausible that the *South Cherry* defendant, a large industry leader, would "*deliberately* jeopardize its standing and reliability, and the viability of its business, by recommending to a large segment of its clientele a fund as to which it had made . . . little or no inquiry at all." *South Cherry*, 573 F.3d at 113 (emphasis added). The Fund is not alleged to be an industry leader with anything close to the reputation attributed to defendants in *South Cherry*. *Cf. Anwar*, 728 F. Supp. 2d at 411. Given that the Fund has been defrauded at least three times—by Petters, Webush, and R. Esmerian—there is a strong, plausible inference that it may have been intentionally run badly.

While this is an incredibly close question, and Defendants' suggested inferences of negligence are plausible, the Court ultimately concludes that the alleged facts constitute "strong circumstantial evidence of conscious misbehavior or recklessness," *ECA*, 553 F.3d at 198, and therefore "the inference of scienter [is] at least as strong as any opposing inference," *Telllabs*, 551 U.S. at 326.

C.

To establish the third element of a *prima facie* § 10(b) claim, Plaintiffs must demonstrate "a connection between the misrepresentation or omission and the purchase or sale of a security," *Erica P. John Fund, Inc.*, 131 S. Ct. at 2184. There are two halves to this element—the connection aspect and the purchase or sale aspect—which this Court will address in turn.

1.

With regard to the requirement that Plaintiffs establish a "connection," Defendants argue that any material omission that occurred after Mr. Meyer's June 1, 2007 stock purchase is irrelevant to establishing Plaintiffs' § 10(b) claim. *See Chien*, 566 F. Supp. 2d at 118 n.9 ("Given the fact that [the plaintiff] ceased buying [] stock as of November 4, 2005, any alleged misstatements in the company's November 14 and December 1, 2005 filings are not actionable. . . . Those misstatements obviously could not have induced [the plaintiff] to purchase any securities; nor could he have relied upon them in connection with his earlier purchases." (citing *Gurary v. Winehouse*, 235 F.3d 792, 799 (2d Cir. 2000))).

While Plaintiffs concede that *Chien* stands "for the unremarkable holding that an allegedly defrauded purchaser cannot have relied on misstatements that postdate her purchase," Pls.' Resp. [doc. # 131] at 27 n.18, they think the Court should find *Chien* and similar cases inapposite on the basis that, because the duty to disclose was ongoing, later misrepresentations and omissions are actionable. In other words, because the Defendants' omissions were continuous, they necessarily were "in connection with the purchase" of interests in the fund, because Defendants failed to contradict misstatements made to Plaintiffs upon which they relied when first making their investments.

While material misrepresentation or omissions that occurred after Mr. Meyer's June 1,

2007 stock purchase may be relevant to future class members, they are immaterial here for the purpose of establishing a connection between a statement by a defendant and a plaintiff's purchase of a security. As § 10(b) does not protect holder claims, *see, e.g.*, *Amorosa v. Ernst & Young LLP*, 672 F. Supp. 2d 493, 510 (S.D.N.Y. 2009), it would be counterintuitive to be able to hold Defendants liable for omissions that occurred long after a share was purchased.

The connection requirement renders irrelevant, at least with regard to these Plaintiffs, Mr. Quan's February 20, 2008 letter, Advisors's March 2008 letter, and Mr. Quan's May 2008 letter. Similarly, in the absence of allegations that Plaintiffs relied on Advisors's monthly newsletters in deciding to purchase or sell stock—especially given that the newsletters were sent to Fund members, not prospective investors—the Class Period newsletters also are irrelevant for the connection analysis with regard to these Plaintiffs.[11]

Determining the relevance of statements made before the Class Period, which extends from February 6, 2006 to September 25, 2008, is slightly more complicated. While it is uncontested that pre-Class Period statements may be relevant for demonstrating that defendants knew that later statements included material omissions and had a duty to make certain disclosures, *see In re Scholastic Corp. Secs. Litig.*, 252 F.3d at 72; *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 643 (S.D.N.Y. Apr. 30, 2007), the parties disagree as to whether such statements may be relevant for the purpose of establishing a connection between an omission and the purchase or sale of a security. The Court may not sidestep this issue, as it determines whether

---

[11] In subsequent briefing, Plaintiffs ask the Court to infer that Dr. Isakov relied on the newsletters in deciding to purchase stock in September 2006. However, this is never alleged in the Second Amended Complaint. *See* SAC [doc. # 101] ¶ 16 (stating that Dr. Isakov purchased shares in reliance on the 2005 PPM); *id.* ¶ 76 (noting that Dr. Isakov relied on claims of due diligence in the PPMs in deciding to purchase stock). Although Plaintiffs list the newsletters among those documents which contain material omissions, *see id.* ¶¶ 77-83, Plaintiffs never allege that they relied on the newsletters in making the decision to purchase or sell a security.

Dr. Isakov, who allegedly relied on a 2005 PPM in buying stock during the Class Period, may remain a proposed Class Representative in this action.

In *In re IBM Corp. Secs. Litig.*, 163 F.3d 102 (2d Cir. 1998), the Second Circuit stated broadly that "[a] defendant . . . is liable only for those statements made during the class period." *Id.* at 107. Plaintiffs argue that this case is inapplicable, as it does not consider that Defendants had an ongoing obligation to disclose misrepresentations and omissions. However, whether Defendants had such a duty is separate from the question of whether there is a connection between a material omission and Dr. Isakov's subsequent actions.

Although the Court acknowledges that Plaintiffs' arguments on this point are compelling, especially as "[a] class period is delimited in order to identify the individuals who claim membership in the class, not to identify the conduct that injured them," the "Second Circuit has spoken clearly on this question, and this Court is bound by its conclusion." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d at 643 n.27 (relying on *In re IBM Corp. Secs. Litig.* in finding that pre-class period statements cannot give rise to liability). As the Second Amended Complaint states clearly that Dr. Isakov relied on a document, which allegedly contained an omission, from outside of the class period, Defendants cannot be held liable for Dr. Isakov's actions. Accordingly, Dr. Isakov must be dismissed as a proposed Class Representative.

Plaintiffs claim that all post-2004 PPMs and communications "omitted any mention of the failure to conduct [due diligence] regarding the loans purchased by the Fund . . . or otherwise corrected previous claims," SAC [doc. # 101] ¶ 76, and that Defendants knew of this failure as of at least November 2005 and yet did not notify investors of these discrepancies. As Mr. Meyer purchased stock in June 2006 pursuant to a May 2006 PPM, he has sufficiently alleged a connection between Defendants' omissions and their purchase of a security.

For reasons described below, Poptech's allegation that it converted stock in reliance on the 2006 letter is somewhat more tenuous, but assuming *agruendo* that the conversion of Poptech's stock interests constituted a purchase or sale for § 10(b) purposes, it has also described a connection between a purchase or sale and Defendants' omissions.

2.

Section 10(b) limits private causes of action to individuals who purchase or sell a security within the relevant class period. "[A] 'holder' plaintiff continues to have no private right of action under Section 10(b) of the 1934 Act." *Amorosa v. Ernst & Young LLP*, 672 F. Supp. 2d 493, 510 (S.D.N.Y. 2009); *see also Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 737-38 (1975); *Druck Corp. v. Macro Fund Ltd.*, 290 F. App'x 441, 445 (2d Cir. 2008); *Perlman v. Salomon Inc.*, No. 92 Civ. 5208 (RPP), 1995 WL 110076, at *2 (S.D.N.Y. Mar. 14, 1995) (finding that a would-be plaintiff's decision to hold shares based on alleged misrepresentations or omissions during the relevant class period properly barred her from joining the § 10(b) class action suit under federal and state law) (citing cases).

Unlike Dr. Isakov and Mr. Meyer, Poptech's only activity within the Class Period was its conversion of its Class P shares to Class A interests, which it made in reliance on Mr. Quan's February 2006 letter and the 2004 PPM. Poptech alleges that it "and other Class P investors passed up the chance to 'cash out' and, to their detriment, instead traded in their Class P interests for the same value of Class A interests." SAC [doc. # 101] ¶ 75. Poptech maintains that its conversion is equivalent to a purchase, citing other circuit case law for the proposition that the Exchange Act's definition of "sale" "has been interpreted to include exchanges of one security for another." *Realmonte v. Reeves*, 169 F.3d 1280, 1285 (10th Cir. 1999); *see also 7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211, 225-29 (5th Cir. 1994). However, both of

34

Poptech's cited cases are potentially distinguishable, as neither one involves the voluntary exchange of one form of securities within an entity for another form.

The *Realmonte* district court observed that the relevant stock was acquired via a stock-for-stock transfer, was not traded on the open market, and was not subject to certain restrictions in determining that the exchange was not a purchase or sale for § 10(b) purposes. This analysis could be equally applied to the Poptech exchange. The Tenth Circuit's reversal was based not on these factors, but on an additional one: that the stock-for-stock transfer was part of a merger. *See Realmonte*, 169 F.3d at 1285 ("When an exchange of shares facilitates the merger of two separate and distinct corporate entities, that exchange constitutes a 'purchase or sale' for purposes of bringing a Rule 10b-5 action."). In other words, the *Realmonte* holding that a stock-for-stock transfer doesn't preclude a § 10(b) claim does not necessarily mean that a stock-for-stock transfer will always constitute a purchase or sale under § 10(b). Rather, the circumstances of the case will guide a court.[12]

*7547 Corp*. also dealt with a merger, wherein plaintiffs' stocks in one company were exchanged for those in another company. Following Second Circuit precedent on a forced sale in conjunction with a merger that distinguished *Blue Chip Stamps*, the Fifth Circuit found that plaintiffs had standing because their investment had fundamentally changed. *7547 Corp*, 38 F.3d at 229 (citing *Mayer v. Oil Field Sys. Corp.*, 721 F.2d 59, 65-66 (2d Cir. 1983)).

While *Realmonte*, *7547 Corp*., and similar cases may be distinguishable on the basis that

---

[12] The *Realmonte* court's decision was bolstered by the fact that the defendant's deceptions influenced the plaintiff's decision to go through with the merger in a way that was similar to the way those same deceptions influenced those who bought new stock in the open market. *See Realmonte*, 169 F.3d at 1286. The parties do not address this issue in their briefs, and so the Court need not decide the issue now, but it is unclear whether Poptech's reliance on the February 2006 letter renders its claims atypical of a class member who acquired stock based solely on the PPMs.

the transfers were forced, the primary question to be addressed in evaluating Poptech's claim is whether Poptech's investment was fundamentally altered by the exchange of one form of Fund interests for another, which would allow Poptech to distinguish its situation from those of the holder claims alleged in *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir. 1952), or in *Blue Chip Stamps*, 421 U.S. 723. *See Mayer*, 721 F.2d at 65 ("The plaintiffs in *Birnbaum* ended up after the alleged fraud exactly where they had begun—holders of Newport stock. The plaintiffs in *Blue Chip* likewise ended up after the alleged fraud exactly where they had begun— non-holders of Blue Chip Stock. Mayer began as owner of limited partnership interests in partnerships owning oil and gas properties and ended up after the alleged fraud as a stockholder of Integrated, with the partnerships owning no physical assets.").

It is too early in the litigation to answer this question. All that the Court knows at present is that Poptech was allegedly induced to exchange one form of stocks for another; it does not know what Poptech acquired or lost, in money or in benefits, as a result of the conversion. As the Court is required to evaluate facts under motions to dismiss in the light most favorable to the non-moving party, for the purposes of this motion only the Court finds that Poptech has satisfied the purchase or sale of a security requirement and may remain a plaintiff in this action.

### D.

A plaintiff must adequately plead loss causation to state a § 10(b) claim. *See Erica P. John Fund*, 131 S. Ct. at 2184; *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005), (defining loss causation as "a causal connection between the material misrepresentation and the loss"). "Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lattanzio v. Deloitte & Touche LLP*, 476 F.3d 147, 157 (2d Cir. 2007) (quotation marks omitted). "A misstatement [or omission] is the proximate cause of

an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations [or omissions] alleged by a disappointed investor." *Id.* at 157 (citations, quotation marks, and alterations omitted). Section 10(b) is intended only "to protect [investors] against those economic losses that misrepresentations actually cause." *Dura Pharm., Inc.*, 544 U.S. at 345. Unlike the scienter element of § 10(b) claims, loss causation allegations are governed by Rule 8 of the *Federal Rules of Civil Procedure*. *See id.* at 346.

Defendants argue that the Plaintiffs fail to allege loss causation in connection with the May 1, 2006 conversion of its Class P interest in the Fund to a Class A interest. Poptech has alleged that Defendants' nondisclosures at the very least permitted the perpetuation of the Petters fraud, which resulted in Plaintiffs' eventual economic injury. Losses from Mr. Petters's fraud were therefore within "the zone of risk concealed by the misrepresentations" and omissions Poptech alleges. *Lattanzio*, 476 F.3d at 157. Under the permissive Rule 8 standard, Plaintiffs have sufficiently alleged that Defendants' misstatements or omissions were a proximate cause of their investment losses. *See id.*

In discussing loss causation, both sides touch on arguments regarding whether Poptech's stock conversion constitutes a purchase or sale of a security under § 10(b). However, as discussed above, this question is more relevant to the issue of whether Plaintiffs allege "a connection between the misrepresentation or omission and the purchase or sale of a security" than to the issue of whether Plaintiffs allege "loss causation." *Erica P. John Fund, Inc.*, 131 S. Ct. at 2184.

## V.

Count II alleges that Advisors, Acorn, Mr. Quan, Mr. Seidenwar, and Mr. Bucci, as controlling persons, violated § 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Only Mr. Bucci

presently addresses this claim on its merits. The other defendants rely on the argument that, because Plaintiffs fail to state a § 10(b) claim, the Court need not reach this issue. *See ATSI Commc'ns, Inc.*, 493 F.3d at 108; *In re Sec. Capital Assurance, Ltd. Sec. Litig.*, 729 F. Supp. 2d 569, 602 (S.D.N.Y. 2010). As the Court finds that Plaintiffs sufficiently state a § 10(b) claim, it now turns to addressing Mr. Bucci's arguments on the merits of Plaintiffs' § 20(a) claim.

Section 20(a) of the Exchange Act provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

If a primary violation by a controlled person has been adequately alleged, a prima facie case of control person liability requires allegations of control (governed by Rule 8(a) of the *Federal Rules of Civil Procedure*) and culpable participation (measured by the PSLRA's scienter requirements). *See Poptech*, 792 F. Supp. 2d at 334, 335. In its opinion denying Mr. Seidenwar's motion to dismiss, this Court "join[ed] with the other district courts in the Second Circuit that have concluded that to withstand a motion to dismiss a Section 20(a) controlling person liability claim, a plaintiff must allege some level of culpable participation at least approximating recklessness in the Section 10(b) context." *Id.* at 333 (quotation marks omitted). While "[t]here is a good deal of disagreement among district courts within the Second Circuit—as well as among federal courts generally—regarding both the elements of the prima facie case under Section 20(a) and the pleading standard applicable to each of the elements of the prima facie case," *Poptech*, 792 F. Supp. 2d at 330-31 (citations omitted), in the absence of Second Circuit guidance, the Court adheres to its earlier legal conclusions on this issue. *See id.*

38

To survive a motion to dismiss, Plaintiffs must demonstrate more than that Mr. Bucci instituted insufficiently stringent due diligence procedures in his capacity as an officer of Acorn Capital. Plaintiffs' allegations of control and culpable participation must be related to the actual transactions at issue in the primary violation claim.

As noted above, Plaintiffs adequately allege that Advisors, Acorn, and the Fund violated § 10(b), thereby sufficiently stating a primary violation of a controlled person for § 20(a) purposes. The Court need now only address whether Plaintiffs have adequately pled control and culpable participation. Unsurprisingly, given this Court's determination that the Second Amended Complaint adequately alleged a *prima facie* case against Mr. Seidenwar, Mr. Bucci focuses on distinguishing his actions. Plaintiffs unquestionably allege more facts regarding Mr. Seidenwar than they do regarding Mr. Bucci. Nonetheless, the crucial allegations are similar enough that Mr. Bucci's motion to dismiss is denied with regard to Count II.

A.

In finding that Plaintiffs had adequately alleged that Mr. Seidenwar exerted control over Acorn's due diligence, the Court found numerous facts persuasive, including (1) Mr. Seidenwar's prominent role in Acorn and the two Fund subsidiaries, (2) the closed-door PAC meetings; (3) the November 2005 due diligence e-mail; and (4) the link between Mr. Seidenwar's role in Acorn and the Fund's communications with its members. *See Poptech*, 792 F. Supp. 2d at 337, 340.

Plaintiffs' Second Amended Complaint contains similar allegations against Mr. Bucci. First, as the Chief Financial Officer of Acorn and Advisors, Mr. Bucci held an influential role in both organizations. Second, the closed-door meetings regarding PAC were attended only by Mr. Quan, Mr. Seidenwar, and Mr. Bucci. Third, Mr. Bucci was copied on the November 2005 due

39

diligence e-mail. Fourth, the same reasoning that links Mr. Seidenwar's conduct to the alleged violations similarly links Mr. Bucci: Both men held high positions in Acorn; at the very least, Acorn approved initial communications to members; and immediately after Acorn began passing the risk of its loans on to the Fund's investors, Mr. Quan, Mr. Seidenwar, and Mr. Bucci met secretly and allegedly approved a massive credit agreement with a single entity, PAC, representing more than half of Acorn's lending capacity with no due diligence and almost exclusively on the basis of a preexisting relationship. The argument for Mr. Bucci's control is further strengthened by the allegation that Mr. Bucci had control over the Lockbox. Accordingly, the Court finds that Plaintiffs have adequately alleged that Mr. Bucci exerted control over Acorn's due diligence.

B.

"In order to be a participant, the defendant must have some actual knowledge of the fraudulent activity taking place or knowledge must be imputed to him or her; knowledge is a first step in proving active participation." 4 Hazen, *The Law of Securities Regulation* § 12.24(3), at 490-91. To satisfy the requirements of the PSLRA, the facts from which a § 20(a) defendant's actual or imputed knowledge can be reasonably inferred must be set forth in the complaint with particularity, *see Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 231 (S.D.N.Y. 2008) (citing cases), and the inference that the defendant acted with the requisite knowledge must be "'cogent and at least as compelling as any opposing inference.'" *Teamsters Local 445*, 531 F.3d at 194 (quoting *Tellabs*, 551 U.S. at 314).

In the securities fraud context, knowledge of corporate wrongdoing is often imputed to officers "since 'it is reasonable to presume that . . . prospectuses, registration statements, and other group publications are the collective actions of the corporate officers.'" 4 Hazen, *The Law*

*of Securities Regulation* § 12.24(3), at 491; *cf. Teamsters Local 445*, 531 F.3d at 195.

Again, a comparison of the facts alleged against Mr. Seidenwar and Mr. Bucci is useful guidance. In its prior decision, the Court found that Plaintiffs adequately alleged that Mr. Seidenwar was a culpable participant based on the facts discussed above. The Court also found it important that when Mr. Miele, the employee responsible for confirming compliance with the lockbox procedures, discovered in 2006 that PAC and not retailers was making lockbox payments, he so informed Mr. Seidenwar. Mr. Seidenwar consulted with Mr. Bucci, and Mr. Bucci later told Mr. Miele essentially not to worry and that "'everything was okay'" with regard to PAC's actions. SAC [doc. # 101] ¶ 100. Just as the Court previously found that these facts supported a number of inferences sufficient to find Mr. Seidenwar culpable under § 20(a), *see Poptech*, 792 F. Supp. 2d at 340-41, these facts similarly support a number of inferences sufficient to find Mr. Bucci similarly culpable.

The argument that Mr. Bucci was a culpable participant is further buttressed by the allegation that Mr. Bucci had control over the Lockbox, that Mr. Seidenwar's testified to the SEC that Mr. Quan had spoken with him and Mr. Bucci about PAC's violation of the Lockbox agreement, and that Mr. Bucci testified to the SEC that

> he understood the PPMs to be the textbook of how investments would be undertaken by the Fund [and that] he also knew and understood that, with respect to its principal investment (i.e., in PAC Funding), Acorn and Advisors were not following the textbook and were departing from their own investment standards with respect to a majority of the Fund's investments.

SAC [doc. # 101] ¶ 139.

Taking into account all allegations, the most cogent and compelling inference that can be drawn from the Second Amended Complaint is not that Mr. Bucci was merely reckless, but rather that he was a knowing participant in a scheme to keep the Fund's investors quiet and

complacent while perpetuating the real lending goals and ignoring due diligence requirements at Acorn. As Plaintiffs have adequately alleged the elements for a § 20(a) claim, Mr. Bucci's motion to dismiss on this basis is denied.

In his briefings, Mr. Bucci highlights numerous cases where CFOs were found to not have control person liability. However, all of these cases are distinguishable. *See, e.g.*, *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542 (S.D.N.Y. 2010) (dismissing § 20(a) case against CFO on the basis that investor failed to adequately allege a § 10(b) claim). Mr. Bucci was corporate insider with direct involvement in the affairs of the business at the time of the alleged misrepresentations and omissions; the allegedly fraudulent statements were not made after he left his employment. *Cf. In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d at 642-44, 662-63 (finding that the group pleading doctrine did not give rise to liability for later statements by a defendant CFO's former associates, given that the defendant had left the company before the alleged misrepresentations were made). Plaintiffs allege facts which compel the inference that Mr. Bucci knew the due diligence and monitoring procedures were lacking. *Cf. In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 588, 598 (S.D.N.Y. 2010) (finding a CFO not liable under § 20(a) because allegations that he served on a committee was not sufficient to establish that he was personally aware of certain reports or information); *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 304-05, 307-08 (S.D.N.Y. 2008) (finding a CFO not liable because the complaint failed to allege that he knew or was reckless in not knowing of the company's misrepresentations). Based on these allegations, the Court determines that Plaintiffs have sufficiently pled a § 20(a) claim against Mr. Bucci.

## VI.

Because the Court finds that Plaintiffs allege a valid claim for relief under federal law, the Court may exercise supplemental jurisdiction over the two state law claims, as described in Counts III and IV. *See* 28 U.S.C. § 1367.

The parties appear to agree that Count III's survival depends on whether Plaintiffs sufficiently allege a § 10(b) claim, as none of the Defendants contest Count III on the merits. Therefore, any motion asking that Count III be dismissed is denied.

Turning to Count IV, CUSA provides in relevant part:

(a) Any person who . . . (2) offers or sells or materially assists any person who offers or sells a security by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading, who knew or in the exercise of reasonable care should have known of the untruth or omission, the buyer not knowing of the untruth or omission, and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission is liable to the person buying the security . . . ."

Conn. Gen. Stat. § 36b-29. In slightly simpler language: "This section creates liability for anyone who 'materially assists' in a violation of the securities laws." *Retirement Program for Empl. of the Town of Fairfield v. Madoff*, No. X08 CV09 5011561S, 2011 WL 7095186, at *9 (Conn. Super. Dec. 29, 2011) (alterations and quotation marks omitted). The Connecticut Supreme Court has clarified the relevant standard for liability under this statute:

In order for conduct to violate this section as "material assistance," to which we refer as aiding and abetting, it must also be proven that the aider or abettor materially assisted the primary violator: (1) in the offer or sale; and (2) in the violation by which the primary violator accomplished the offer or sale. In addition to the foregoing elements of proof, the buyer must also meet a burden of production concerning the issue of whether the aider and abettor knew or should have known of the untruth or omission. If the buyer meets this burden of production, the burden of proof on this issue shifts, so that the aider and abettor then bears the burden of persuading the fact finder that it did not know, and in the exercise of reasonable care could not have known, of the untruth or omission.

*Conn. Nat'l Bank v. Giacomi*, 242 Conn. 17, 47 (1997).

Although Plaintiffs allege in Count IV that Advisors, Acorn, Mr. Quan, Mr. Seidenwar, Mr. Bucci, and Mr. Escher all aided and abetted the Fund, Advisors, Acorn, and/or Mr. Quan in violation of CUSA, Conn. Gen. Stat. § 36b-29, only Mr. Bucci and Mr. Escher now challenge that claim on the merits.

Plaintiffs sufficiently allege a control person liability cause of action against Mr. Bucci. By extension, they have sufficiently pled that he offered material assistance in a violation of the securities laws. Accordingly, his motion to dismiss is denied with regard to Count IV.

Evaluating the claim with regard to Mr. Escher is slightly more complicated. As the Independent Manager, Mr. Escher's role was essentially limited to evaluating whether transactions between Acorn and the Fund were fair. These evaluations occurred after investors had become Fund members. The PPMs plainly state that the Independent Manager "is expressly not required to perform any due diligence . . . other than to determine whether the Independent Manager believes that the economic and other terms of any transaction are fair to the Members." Escher Mot. to Dismiss [doc. # 35-2] Ex. A at 29 (2006 PPM).

Plaintiffs allege that, as the Independent Manager, Mr. Escher aided and abetted Mr. Quan, the Fund, Advisors, and Acorn by creating the appearance and deception that inherent conflicts of interest between the entities had been ameliorated or eliminated. However, as a simultaneous director of the Offshore Fund and of a Fund subsidiary (the latter of which was created in November 2007), Plaintiffs allege that Mr. Escher was not disinterested; that he never engaged in any independent evaluation or investigation of any transaction between Acorn and the Fund; and, upon information and belief, that he never challenged or voiced any objection to any such transaction. Plaintiffs note that none of their confidential witnesses understood Mr.

44

Escher's role or that he was meant to be an independent entity. Plaintiffs further allege that Mr. Escher knew or should have known of the fraud perpetuated by Mr. Quan, the Fund, Advisors, and Acorn.

Plaintiffs never allege that Mr. Escher participated in any fraudulent activities, either by controlling the Fund's investments or by participating in the creation of inaccurate communications to Plaintiffs and other class members. The only allegation supported by facts is that Mr. Escher was not disinterested—but it is not at all obvious how it then follows that Mr. Escher aided and abetted other Defendants in securities law violations. Plaintiffs attempt to argue that Mr. Escher's actions "had the natural tendency to influence the decision of the Fund/Acorn/Advisors to pursue the PAC Funding investments and depart from their own internal requirements regarding due diligence with respect to these loans." Pls.' Resp. [doc. # 130] at 37-38. However, Plaintiffs fail to allege a single fact to support this inference. Nor did Mr. Escher fail to exercise due diligence, *cf. id.* at 38, given that the PPMs expressly informed investors that he would not conduct any such due diligence.

Taking Plaintiffs' claim that Mr. Escher was not a disinterested Independent Manager as true, Plaintiffs fail to carry their burden to allege that Mr. Escher assisted other Defendants in the securities fraud violation or that, even if he did, Mr. Escher knew or should have known of the alleged misrepresentations and omissions. *See Giacomi*, 242 Conn. at 47. Accordingly, Mr. Escher's motion to dismiss is granted.

## VII.

For the reasons given above, the Court DENIES Mr. Quan and Advisors's Motion to Dimiss [doc. # 111]; the Fund's Motion to Dismiss [doc. # 114]; Acorn's Motion to Dismiss [doc. # 115]; and Mr. Bucci's Motion to Dismiss [doc. # 121]. Dr. Isakov is dismissed as a proposed

Class Representative. As Plaintiffs fail to adequately allege that Mr. Escher materially assisted in the violation of securities, his Motion to Dimiss [doc. # 110] is GRANTED. **Defendants must file their Answer within 14 days of the entry of this Order, and all parties must submit a 26(f) Report within 30 days of the entry of this Order.**

IT IS SO ORDERED.

/s/     Mark R. Kravitz
        United States District Judge

Dated at New Haven, Connecticut: March 19, 2012.